UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LORI ANN MORAN, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 05-10033 NG |
| | ) | |
| ANDREW DIPASQUA, MICHAEL | ) | |
| SANBORN, WILLIAM F. GAY, III, and | ) | |
| the ONSET FIRE DISTRICT, | ) | |
| Defendants | ) | |

**DEFENDANTS' LOCAL RULE 56.1 CONCISE STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

Pursuant to L.R. 56.1 of the Local Rules of the United States District Court for the District

of Massachusetts, the Defendants submit the following concise statement of the material facts of

record as to which Defendants contend there is no genuine issue to be tried:

**The Onset Fire District**

1.     The village of Onset is located in Wareham Massachusetts.  See Pl.'s Depo. p. 11 (attached

hereto as **Exhibit A**).

2.     It has a population of 1,292 persons within a geographic area of about 1 square mile

according to the most recent census figures.  See U.S. Census 2000, Massachusetts Data

(available at  http://www.census.gov/census2000/states/ma.html).

3.     The Onset Fire District is comprised of a Call-Firefighter Fire Department and a Water

Department.

4.     The Water Department operations are overseen by a three-member Board of Water

Commissioners.

5.     There is a Prudential Committee of the Onset Fire District which is responsible for budgeting

for both the Fire Department and the Water Department, but does <u>not</u> have oversight authority over the Board of Water Commissioners, nor does it control the daily operations of the Water Department. <u>See</u> M. McCoy Depo. p.9 (attached hereto as **Exhibit B**).

6.   Superintendent Gay also served on the Onset Fire Department as a call firefighter since approximately 1980, and progressed in rank during his tenure to the rank of Captain in the Fire Department. <u>See</u> W. Gay Depo. p. 9 (attached hereto as **Exhibit C**).

7.   Superintendent Gay began working for the Onset Water Department as a part-time meter reader in 1990, then worked full time and was promoted progressively, obtaining various water treatment licenses, until he was appointed Superintendent in 2002. <u>See</u> W. Gay Depo. pp. 13-15.

8.   Superintendent Gay's duties included the day-to-day operations of the Water Department and the Maintenance and operation budget. <u>See</u> W. Gay Depo. pp. 15-16.

9.   At the time of his appointment as Superintendent, the Water Department had five employees: the Superintendent, the Plaintiff, Kathi Semple (office manager), Chris Poirier (foreman) and Jay Semple (laborer). <u>See</u> W. Gay Depo. p. 20.

**Plaintiff's Employment**

10.   Plaintiff has lived in Onset her whole life. <u>See</u> Pl.'s Depo. p. 5.

11.   Plaintiff worked for the Onset Water Department for approximately 15 months. <u>See</u> Pl.'s Depo. p. 16.

12.   Plaintiff started her employment on April 1, 2003. <u>See</u> Pl.'s Depo. p. 24.

13.   Plaintiff was hired by the Board of Water commissioners on recommendation from Office Manager Kathi Semple. <u>See</u> M. Sanborn Depo. p. 18 (attached hereto as **Exhibit D**).

14.    She was hired as a part-time office clerk, and her immediate supervisor was Kathi Semple. See Pl.'s Depo. p. 39.

15.    At the time of her hiring, Plaintiff's duties included answering phones, helping customers at the counter and reading meter sheets. See Pl.'s Depo. p. 39.

16.    Plaintiff worked less than 20 hours per week. See Pl.'s Depo. p. 40.

17.    Her place of work was the offices of the Onset Water Department at 15 Sand Pond Road in Onset. See Pl.'s Depo. p. 40.

18.    Plaintiff did not rely upon the Employee's Association Agreement to set forth the terms and conditions of her employment. See Pl.'s Depo. p. 171.

19.    There was no employee's handbook or other documents outlining the terms and conditions of employment for Water Department employees. See Pl.'s Depo. pp. 171-172.

20.    Plaintiff became a full-time employee on July 1, 2003, three months after starting employment. See Pl.'s Depo. p. 42. Plaintiff's job duties remained the same after becoming a full-time employee. See Pl.'s Depo. p. 48.

21.    William Gay became the Superintendent of the Water Department approximately seven months after Plaintiff was hired, taking over after the retirement of his predecessor. See Pl.'s Depo. p. 41.


**The Onset Water Department Employee's Association**

22.    Plaintiff did not consider herself to be a union member while employed by the Onset Fire District. See Pl.'s Depo. pp. 12-13.

23.    Plaintiff did not view the Water Department Employee's Association as a union. See Pl.'s

3

Depo. p. 138.

24.   Plaintiff considered it to be only an Association, which did not require dues. See Pl.'s Depo. pp. 138-139.

25.   At the time of her employment, there were five members of the Employee's Association. See Pl.'s Depo. p. 171.

26.   At the time of Plaintiff's employment, the Employee's Association had an Agreement with the Onset Water Department to establish a grievance procedure and rates of pay and other conditions of employment. See Onset Water Department Employee's Association Agreement dtd. 7/22/03 (attached hereto as **Exhibit E**).

**The April 27, 2004 Incident**

27.   Before the April 27, 2004 incident, Plaintiff characterized her working relationship with Superintendent Gay as "excellent." See Pl.'s Depo. pp. 61-62.

28.   On April 27th, Superintendent Gay spoke to Kathi Semple and Plaintiff concerning providing copies of minutes of meetings to a citizen, Ramona O'Hearne. See Pl.'s Depo. p. 79.

29.   Eventually, Plaintiff returned to her desk to work, while Superintendent Gay continued to talk to Kathi Semple about the assignment some eight to ten feet away. See Pl.'s Depo. pp. 79-80.

30.   Plaintiff objected because Superintendent Gay apparently referred to Plaintiff as "she" and "her" when speaking to Kathi Semple. See Pl.'s Depo. pp. 80-81.

31.   Plaintiff told the Superintendent that her name is Lori and she prefers to be called by that name. See Pl.'s Depo. p. 81

32.     The Superintendent responded that they were not talking bad about her. <u>See</u> Pl.'s Depo. p.

        82.

33.     According to the Superintendent, he also apologized if using the word "she" had offended

        Plaintiff. <u>See</u> W. Gay depo. pp. 43-44; <u>see also</u> K. Semple Aff. ¶ 25 (attached hereto as

        **Exhibit F**).

34.     After the Superintendent left the room and returned several minutes later, Plaintiff again

        voiced her objection to being called "she" and "her" to which the Superintendent allegedly

        told her to "get over it." <u>See</u> Pl.'s Depo. pp. 82-83.

35.     The Superintendent asserts Plaintiff followed him out of the room, persisting in objecting to

        the use of the word "she." <u>See</u> W. Gay Depo. p. 46.

36.     Plaintiff acknowledged that before this date she had never told the Superintendent or any

        other employee about her "pet peeve" of being called "she" or "her" in her presence. <u>See</u>

        Pl.'s Depo. p. 87.

37.     Indeed, throughout the depositions conducted by her attorney in this litigation, Plaintiff's

        counsel regularly referred to her own client as "she" and "her" while the Plaintiff was present

        during the deposition. <u>See, e.g.</u> W. Gay Depo. pp. 42-44.

38.     Plaintiff contends that in response to being told to "get over it" she started to tell the

        Superintendent to "shut-up," but insists she stopped herself before the words came out. <u>See</u>

        Pl.'s Depo. p. 83.

39.     The Superintendent testified that Plaintiff did indeed tell him to "shut-up." <u>See</u> W. Gay

        Depo. pp. 47-48.

40.     Although denying she said 'shut up" Plaintiff agreed that it would not be proper to say that

to your boss. <u>See</u> Pl.'s Depo. p. 93.

41.    The Superintendent then left the room, and Plaintiff overheard him speaking in another room, to which she yelled "get it right Bill, I did not tell you to shut up." <u>See</u> Pl.'s Depo. p. 83.

42.    Later, when the Superintendent called on the radio to Kathi Semple seeking a ride home, Plaintiff told Kathi Semple to "tell him I'll give him a ride on the bumper of my van." <u>See</u> Pl.'s Depo. p. 84.

43.    When Kathi Semple refused to do so, Plaintiff asked for the Nextel Radio to speak directly to the Superintendent. <u>See</u> Pl.'s Depo. p. 84.

44.    When she obtained the radio from Kathi Semple, Plaintiff "repeated it to Billy Gay that – I said Hey Bill, it's Lori, I'll give you a ride home on the bumper of my van." <u>See</u> Pl.'s Depo. p. 84; <u>See also</u> W. Gay Depo. p. 51.

45.    Superintendent Gay took this as a threat to run him over with her car. <u>See</u> W. Gay Depo. p. 59.

46.    Plaintiff is 5'8" tall and weighs more than Superintendent Gay, who she estimated at 5'7" tall and 150 pounds. <u>See</u> Pl.'s Depo. p. 152.

47.    Superintendent Gay responded on the radio by asking for Kathi Semple, who confirmed she would give him a ride home. <u>See</u> Pl.'s Depo. p. 84.

48.    Superintendent Gay came back to the office and immediately gave Plaintiff a "verbal warning." <u>See</u> Pl.'s Depo. p. 85.

49.    Plaintiff responded that she was only joking with him. <u>See</u> Pl.'s Depo. p. 85.

50.    When the Superintendent replied that he was not joking, he suggested Plaintiff could leave

if she didn't like it. <u>See</u> Pl.'s Depo. p. 85; <u>see also</u> W. Gay Depo. p. 54.

51. Plaintiff immediately questioned whether she was being fired. <u>See</u> Pl.'s Depo. p. 85.

52. According to Plaintiff, the Superintendent did not respond, but instead told her to wait a minute, and left the room. <u>See</u> Pl.'s Depo. p. 85.

53. In the Superintendent's version of events he never told Plaintiff to wait, and instead instructed her to go home early with pay. <u>See</u> W. Gay depo. pp. 53-54.

54. Plaintiff testified she waited for a response until after closing time of 4:00 pm in the parking lot for the Superintendent, who told her "I'll let you know." <u>See</u> Pl.'s Depo. pp. 85-86; <u>see also</u> W. Gay depo. p. 57.

55. Superintendent Gay's version of the events of April 27, 2004 were recorded in a memorandum he typed that day. <u>See</u> W. Gay Memo. dtd. 4/27/04 (attached hereto as **Exhibit G**); <u>see also</u> W. Gay Depo. pp. 61-62.

56. Kathi Semple was a witness to the incident of April 27, 2004, and she agrees that Plaintiff was yelling at the Superintendent about his using the word "she," continued to complain about being disrespected, and threatened to give the Superintendent a ride home on her bumper. <u>See</u> K. Semple Aff. ¶¶ 21-36.

57. The Superintendent immediately reported the incident to the two sitting Water Commissioners, Michael Sanborn and John Cook, the third Commissioner, Larry Blacker, had retired. <u>See</u> W. Gay depo. pp. 59-61; <u>see also</u> M. Sanborn Depo. p. 23.

58. Of the two Water Commissioners, Mr. Cook could not take any action concerning Plaintiff because he was personally related to her, creating a conflict of interest. <u>See</u> W. Gay Depo. p. 60.

59.     Mr. Sanborn decided to place Plaintiff on administrative leave until further steps could be

        taken.  See W. Gay Depo. p. 60.


**The Pre-Termination Proceedings**

60.     The next morning, Plaintiff was told not to report to work, and to stay home with pay, by a

        telephone call from Ms. Semple on behalf of the Superintendent.  See Pl.'s Depo. pp. 109-

        110.

61.     Ms. Semple then called later that afternoon to advise Plaintiff she was instructed to stay

        home with pay until the following Monday, and that the Water commissioners would be

        meeting on Friday, April 30, 2004 to address the authority of the Superintendent to fire her.

        See Pl.'s Depo. pp. 110-111.

62.     Plaintiff requested a written letter to document she was instructed to stay out of work for

        three days, which she received by hand delivery.  See Pl.'s Depo. pp. 112-113; see also W.

        Gay ltr. to L. Moran dtd. 4/28/04 (attached hereto as **Exhibit H**).

63.     Plaintiff also received a letter the following day, April 29, 2004, advising her she was "on

        administrative leave for the events that occurred on 4/27/04 and are pending disciplinary

        action."  See Pl.'s Depo. p. 114-115; see also W. Gay ltr. to L. Moran dtd. 4/29/04 (attached

        hereto as **Exhibit I**).

64.     Plaintiff contacted one of the Water Commissioners, John Cook, and requested further

        explanation of why she was on administrative leave.  See Pl.'s Depo. pp. 115-116.

65.     In response, Plaintiff received another letter advising she was on administrative leave "for

        disregard of a direct order from the Superintendent, and for continuing to pursue the matter

on April 27, 2004." See W. Gay ltr. to L. Moran dtd. 5/3/04 (attached hereto as **Exhibit J**).

66.   Superintendent Gay testified that the "direct order" which Plaintiff disregarded was her refusal to stop the continued yelling and badgering of the Superintendent, including with bodily threats against him, and the "continued to pursue the matter" concerned Plaintiff's ongoing badgering of the Superintendent after he left the room on several occasions and then waiting after work hours to confront him in the parking lot. See W. Gay Depo. pp. 75-76.

67.   Plaintiff remained on administrative leave for approximately 10 weeks and was paid the entire time. See Pl.'s Depo. p. 119.

68.   Plaintiff first contacted her attorney on Thursday, April 29, 2004. See Pl.'s Depo. p. 112.

69.   Plaintiff attended all of the hearings concerning her employment together with her attorney. See Pl.'s Depo. pp. 121-122.

70.   The Board of Water Commissioners first held a meeting to determine whether the Superintendent had authority to hire or fire employees, but Plaintiff was not specifically discussed at that meeting. See W. Gay Depo. pp. 63-64; 74; see also M. Sanborn Depo. p. 22.

71.   The Board decided that only the Board itself had authority to hire and fire employees, but the Superintendent had authority to place an employee on administrative leave. See W. Gay Depo. pp. 100-101; see also M. Sanborn Depo. pp. 29-30.

72.   Andrew DiPasqua was elected to the Board in May 2004 to replace the retiring Board member, and Mr. DiPasqua had previously served one three-year-term as Board member starting in 1998. See A. DiPasqua Depo. p. 6 (attached hereto as **Exhibit K**). He was not a member of the Board at the time of the April 27, 2004 incident. See A. DiPasqua Depo.

9

p. 27.

73.   Michael Sanborn served on the Board of Commissioners from 1999 to 2005.  See M. Sanborn Depo. pp. 9-10.

74.   By letter dated June 17, 2004, the Water Commissioners notified Plaintiff of a public meeting to consider the discipline of Plaintiff for the events of April 27, 2004.  See M. Sanborn ltr. to L. Moran dtd. 6/17/04 (attached hereto as **Exhibit L**).

75.   Accompanying that letter was a copy of Superintendent Gay's memorandum dated April 27, 2004 describing his version of events of that day.  See M. Sanborn ltr. to L. Moran dtd. 6/17/04 (referencing attached memo); see also W. Gay Memo. dtd. 4/27/04.

76.   Plaintiff admits that she received the memorandum of Superintendent Gay with the June 17 letter, and that she had heard the Superintendent read the memorandum at a previous meeting of the Water Commissioners.  See Pl.'s Depo. pp. 123-124.

77.   Plaintiff knew the reasons why Superintendent Gay was seeking to discipline or terminate her well before the date of her disciplinary hearing on June 30, 2004.  See Pl.'s Depo. p. 124.

78.   Plaintiff attended the disciplinary hearing on June 30, accompanied by her attorney, her husband, and approximately twelve other family members and friends.  See Pl.'s Depo. pp. 125-126.

79.   Plaintiff recalled the three Water Commissioners conducted the hearing were Commissioners DiPasqua, O'Hearn & Sanborn.  See Pl.'s Depo. p. 129.

80.   Plaintiff believes the hearing lasted about one hour.  See Pl.'s Depo. pp. 129.

81.   The hearing began by announcing the names of all persons who were present so they could be recorded on the audiotapes of the meeting.  See Pl.'s Depo. p. 130.

82.   The Water Commissioners asked questions of the Plaintiff, as well as of her fellow employees Kathi Semple, Kerry Semple, Chris Poirier, and also of witness Peter Murphy. <u>See</u> Pl.'s Depo. pp. 130-132.

83.   Plaintiff believed Superintendent Gay read his statement again. <u>See</u> Pl.'s Depo. p. 132.

84.   Plaintiff's Attorney made a 10-15 minute presentation on her behalf at the hearing. <u>See</u> Pl.'s Depo. p. 133.

85.   In addition, some of the spectators in attendance were allowed to speak at the meeting about the proceedings. <u>See</u> Pl.'s Depo. p. 134.

86.   Plaintiff was asked to make a statement and her attorney made a statement on her behalf, Superintendent Gay made a statement, and each of the employees made statements at the hearing, all of which was recorded on audiotape. <u>See</u> M. Sanborn depo. pp. 56-58.

87.   Other than not being able to cross-examine witnesses who spoke, Plaintiff was not precluded or barred from presenting evidence at the hearing. <u>See</u> Pl.'s Depo. p. 168.

88.   Plaintiff was not prohibited from presenting and documents to the Board at the meeting. <u>See</u> Pl.'s Depo. p. 168.

89.   Plaintiff was not barred from offering any witnesses to testify on her behalf. <u>See</u> Pl.'s Depo. p. 168.

90.   Plaintiff was notified of the hearing, given an opportunity to be heard and was in fact heard from at the hearing. <u>See</u> M. Sanborn ltr. to L. Moran dtd. 6/17/04; <u>see also</u> A. DiPasqua Depo. p. 67.

91.   The Board of Water Commissioners had notified Plaintiff that there would be no cross-examination at the hearing based upon the advise of the Onset Fire District's Attorney Dan

Murray.  See A. DiPasqua Depo. p. 20-21; see also M. Sanborn Depo. pp. 46-47; 49-50.

92.    At the end of the meeting, the Water Commissioners took a vote of two in favor and one abstaining to terminate Plaintiff's employment.  See Pl.'s Depo. pp. 135-136.

93.    Defendant DiPasqua voted to terminate Plaintiff's employment because after hearing the testimony of the witnesses he felt she had "[un]justifiably threatened the Superintendent." See A. DiPasqua Depo. p. 31.

94.    Defendant Sanborn voted to terminate Plaintiff because he takes threats made in the workplace very seriously, and he believed Plaintiff had threatened the Superintendent.  See M. Sanborn Depo. pp. 59-61.

95.    Plaintiff next received a letter from the Board confirming they had voted to terminate her effective June 30, 2004.  See Pl.'s Depo. pp. 136; see also M. Sanborn Ltr. to L. Moran dtd. 7/1/04 (attached hereto as **Exhibit M**).


**No Evidence of Bias**

96.    Plaintiff's evidence of bias of the Water Commissioners consists of an unsworn, unattested, handwritten letter by Maurice Harlow made in the presence of Plaintiff and her attorney.  See Pl.'s Depo. pp. 154-155.

97.    Plaintiff had no other evidence of bias by either Defendant Sanborn or DiPasqua other than the Harlow letter.  See Pl.'s Depo. pp. 156-157.

98.    The Harlow letter relates an alleged conversation he had with Defendant DiPasqua and does not even mention Defendant Sanborn.  See M. Harlow ltr. dtd. 7/24/04 (attached hereto as **Exhibit N**).

99.  The Harlow letter quotes Defendant DiPasqua as stating before the disciplinary meeting that "D—d if I do, and D—d if I don't.  The other four said they will sue."  See M. Harlow ltr. dtd. 7/24/04.

100.  Defendant DiPasqua denies he ever said anything about the other four suing.  See A. DiPasqua Depo. pp. 37-40.

101.  Defendant DiPasqua further denies stating after the meeting that he didn't have a choice because Billy Gay has the water licenses.  See A. DiPasqua Depo. pp. 39-40.

102.  Prudential Committee member Mary McCoy had spoken to Defendant DiPasqua before the June 30, 2004 meeting started and advised that prior to the meeting no decision had been made regarding the discipline.  See M. McCoy Depo. pp. 18-20.

103.  Defendant Sanborn testified that he did not make any pre-judgments before the hearing because he "didn't hear the whole story of what happened that day."  See M. Sanborn Depo. pp. 32-33.

104.  In fact, Plaintiff herself had approached both Defendants DiPasqua and Sanborn prior to the hearing to obtain their support for her version of events.  See M. Sanborn Depo. pp. 33-34 (contacted by Plaintiff in parking lot); see also A. DiPasqua Depo. pp. 7-9 (Plaintiff hosted candidates party for DiPasqua).

105.  Defendant DiPasqua had asked the Water Department employees to all be present because he wanted to hear the whole story, and he was remaining impartial.  See M. Sanborn Depo. p. 52.

**Plaintiff's Post-Termination Proceedings**

13

106.  As a result of the termination decision, Plaintiff filed a grievance through her attorney. <u>See</u> Pl.'s Depo. pp. 136-137; <u>see also</u> Onset Water Dept. Grievance Form dtd. 7/2/04 (attached hereto as **Exhibit O**).

107.  Plaintiff then attended a grievance hearing with her attorney on July 24, 2004. <u>See</u> Pl.'s Depo. pp. 139-140.

108.  The minutes of that hearing reflect that Plaintiff's attorney argued that the Board was not impartial and discussion of the timing of the meeting and whether the Employee's Association had to first approve the grievance. <u>See</u> Meeting Minutes dtd. 7/24/04 (attached hereto as **Exhibit P**).

109.  The minutes indicate that Commissioner DiPasqua moved to deny the grievance and "let it go up from there" on further appeal. <u>See</u> Meeting Minutes dtd. 7/24/04 at pp. 5, 7; <u>see also</u> A. DiPasqua Depo. pp. 35-36.

110.  The Board then voted two to one to deny the grievance. <u>See</u> Meeting Minutes dtd. 7/24/04 p. 8.

111.  Thereafter, on July 26, 2004, Plaintiff, through her attorney, filed a request for grievance mediation with the Massachusetts Board of Conciliation and Arbitration. <u>See</u> Req. for Grievance Mediation dtd. 7/26/04 and accompanying Atty. Ishihara Cover Ltr (attached hereto as **Exhibit Q**).

112.  As of October 24, 2005, the Massachusetts Board of Conciliation and Arbitration still listed the Plaintiff's case as open, and one month later Plaintiff's counsel requested the case remain open. <u>See</u> J. Kelley ltr. to M. Ishihara dtd. 10/24/05 (attached hereto as **Exhibit R**); M. Ishihara email to K. Leach dtd. 11/23/05 (attached hereto as **Exhibit S**).

**Co-Worker Kathi Semple's Employment**

113.  Plaintiff had a "friendly working relationship" with Kathi Semple.  See Pl.'s Depo. p. 50.

114.  In August 2003, Plaintiff had a dispute with Kathi Semple over accusations made by Kathi Semple against Superintendent Gay.  See Pl.'s Depo. p. 54.

115.  At that time, a special meeting of the Water Commissioners was held concerning Kathi Semple's accusations of sexual harassment against Superintendent Gay.  See Pl.'s Depo. p. 55.

116.  Kathi Semple never actually accused the Superintendent of sexual harassment, which instead was an area of questioning by one of the Water Commissioners to Kathi Semple, who denied being sexually harassed.  See W. Gay Depo. pp. 27-30; see also M. Sanborn Depo. p. 12.

117.  At the meeting Superintendent Gay was told to stop his conduct, and Plaintiff objected because Kathi Semple told Plaintiff that Kathi did not truly feel she was being sexually harassed.  See Pl.'s Depo. p. 58.

118.  Plaintiff did not think that Superintendent Gay had done anything wrong.  See Pl.'s Depo. p. 59.

119.  Plaintiff alleges that Kathi Semple told her never to go to her with a problem again.  See Pl.'s Depo. p. 58.

120.  Superintendent Gay, in response, made himself available to Plaintiff for any questions she may have.  See Pl.'s Depo. pp. 60-61.

121.  Plaintiff remained on speaking terms with Kathi Semple, however, after this incident.  See Pl.'s Depo. p. 94.

122. Plaintiff contends that she witnessed an argument between Superintendent Gay and Kathi Semple in March 2004 wherein they each accused the other of lying. See Pl.'s Depo. pp. 62, 66; see also W. Gay Depo. pp. 119-120.

123. In the March 2004 incident Plaintiff asserts that Ms. Semple called Superintendent Gay "a f___king liar" and a "frigging liar." See Pl.'s Depo. pp. 66-67.

124. Plaintiff admits she was not present for any discussion between Kathi Semple and Superintendent Gay concerning the Superintendent's assigning snow shoveling to Water Department employees after a February blizzard. See Pl.'s Depo. pp. 144-145.

125. Superintendent Gay denies that any other employees ever swore at him or ever raised their voices in the manner that Plaintiff did. See W. Gay Depo. p. 115.

126. Superintendent Gay testified Kathi Semple and he had a discussion about the snow shoveling, but there were no raised voices or vulgarity. See W. Gay Depo. pp. 122-123.

127. Kathi Semple has never sworn or used vulgarities towards Superintendent Gay, with the exception of occasionally using the word "frigging" as an adjective instead of swearing. See K. Semple Aff. ¶ 10.

128. Kathi Semple's discussion with Superintendent Gay over the snow shoveling lasted only 5 to 10 minutes, and although voices may have been slightly raised, there was no yelling by either me or the Superintendent. See K. Semple Aff. ¶ 14.

129. According to Kathi Semple, it was Lori Ann Moran who was incorrectly advising the Superintendent that Kathi Semple was attempting to get him fired, while at the same time incorrectly advising Kathi Semple that the Superintendent was going to "put me in my place" in order to create friction between the two of them. See K. Semple Aff. ¶ 19.

130.    Plaintiff told the Superintendent the other employees were out to get him. <u>See</u> W. Gay Depo.

pp. 130-131.

Respectfully submitted,

The Defendants,
ANDREW DIPASQUA, MICHAEL SANBORN,
WILLIAM F. GAY, III, and the ONSET FIRE
DISTRICT,
By their attorneys,

**PIERCE, DAVIS & PERRITANO, LLP**

John J. Cloherty III, BBO#566522
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

<u>CERTIFICATE OF SERVICE</u>
I hereby certify that on this day a true copy of the
above document was served upon each attorney of
record, by first class mail & electronic filing.

4/3/06
Date

17

# EXHIBIT "A"

1

# ORIGINAL

Volume:   I

Pages:    1 - 187

Exhibits: See Index

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS


------------------------------
                             :
LORI ANN MORAN,
              PLAINTIFF :

VS.                  : C.A. NO. 05-10033NG

ANDREW DIPASQUA, MICHAEL,    :
SANBORN, WILLIAM F. GAY, III,
and the ONSET FIRE DISTRICT, :
              DEFENDANTS
                             :
------------------------------


        DEPOSITION of LORI ANN MORAN, a witness called
on behalf of the Defendants, pursuant to the provisions
of the Federal Rules of Civil Procedure, before Nancy M.
Walsh, Certified Shorthand Reporter (#118593)/Registered
Professional Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the law office of
Pierce, Davis & Perritano, LLP, 10 Winthrop Square,
Boston, Massachusetts  02110, on Wednesday, January 4,
2006, commencing at 10:13 a.m.


-------------------------------


CURRAN COURT REPORTING
21 Rowe Hill Road
Stoneham, Massachusetts  02180
(781) 279-8400

5

1   days, it will be deemed signed.

2             MS. ISHIHARA:  Fine.

3             MR. CLOHERTY:  Also, I understand that the

4   Plaintiff forgot to bring her photo I.D. to the

5   deposition.  And you're making a representation that she

6   is who she says she is for the purposes of the

7   deposition?

8             MS. ISHIHARA:  That's correct.

9             MR. CLOHERTY:  Any further stipulations?

10            MS. ISHIHARA:  No.

11  Q   Ma'am, where do you currently live?

12  A   88 Main Avenue.

13  Q   And what town is that in?

14  A   Onset.

15  Q   And what's your date of birth?

16  A   1/21/62.

17  Q   And Social Security number?

18  A   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.

19  Q   Have you ever given deposition testimony like this

20      before?

21  A   No.

22  Q   I'll go over some of the rules of how we proceed.  I'm

23      sure your attorney has already done so, but I'd like to

24      go over them again.  I'll ask that you answer all

CURRAN COURT REPORTING

11

| | | |
|---|---|---|
| 1 | A | Five years. |
| 2 | Q | Before living in Wareham, Mass., where did you live? |
| 3 | A | 51 Ellis Ave., and that was in Onset.  That's |
| 4 | | approximately two years. |
| 5 | Q | Before that, have you lived in Onset, Mass. your entire |
| 6 | | life? |
| 7 | A | Yes. |
| 8 | Q | Other than that five-year period when you lived in |
| 9 | | Wareham, have you ever lived in any other towns outside |
| 10 | | of Onset? |
| 11 | A | No. |
| 12 | Q | Is Onset a village in the Town of Wareham? |
| 13 | A | Yes. |
| 14 | Q | Other than the property at 88 Main Avenue, do you have |
| 15 | | any other property that you own, ma'am? |
| 16 | A | There's two houses on that property. |
| 17 | Q | And do you rent out the other property? |
| 18 | A | It's a two-apartment property in the back. |
| 19 | Q | And you rent that out, ma'am? |
| 20 | A | Yes. |
| 21 | Q | Is that a source of income for you and your family, the |
| 22 | | rental income? |
| 23 | A | Yes. |
| 24 | Q | Do you rent that to another family member? |

CURRAN COURT REPORTING

12

```
1    A    No.

2    Q    Any other property that you own, ma'am?

3    A    No.

4    Q    Do you hold any licenses or certifications in any trade

5         or profession?

6    A    No.

7    Q    Do you have a driver's license?

8    A    Yes.

9    Q    Has your driver's license ever been suspended or revoked

10        for any reason?

11   A    No.

12   Q    Are you a member of any professional or trade

13        organizations?

14   A    No.

15   Q    Are you a union member, ma'am?

16   A    No.

17   Q    Have you ever been a union member?

18   A    No.

19   Q    When you were employed by the Onset Fire District --

20        were you employed by the Onset Fire District, ma'am?

21   A    Yes.

22   Q    Were you a member of any union --

23   A    No.

24   Q    -- at that time?
```

CURRAN COURT REPORTING

13

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Do you belong to any civic organizations or clubs, |
| 3 | | ma'am? |
| 4 | A | No. |
| 5 | Q | Are you active politically within the Town of Onset? |
| 6 | A | No. |
| 7 | Q | Did you ever serve in the military? |
| 8 | A | No. |
| 9 | Q | Are you currently married? |
| 10 | A | Yes. |
| 11 | Q | And what's your husband's name? |
| 12 | A | James. |
| 13 | Q | James Moran? |
| 14 | A | Yes. |
| 15 | Q | And how long have you been married to Mr. Moran? |
| 16 | A | 24 years. |
| 17 | Q | Any other marriages, ma'am? |
| 18 | A | No. |
| 19 | Q | Do you have any children from your marriage? |
| 20 | A | Yes. |
| 21 | Q | How many children do you have? |
| 22 | A | Two. |
| 23 | Q | And are they adult children? |
| 24 | A | Yes. |

CURRAN COURT REPORTING

16

| | | |
|---|---|---|
| 1 | Q | How was it that you came to be employed at that company? |
| 2 | A | I worked there previous to the Water Department. |
| 3 | Q | Do you hold any other employment besides a part-time job |
| 4 | | with Capeway today? |
| 5 | A | No. |
| 6 | Q | Before working for Capeway, who did you work for? |
| 7 | A | I would have to go back to my teenage job.  Is that what |
| 8 | | you mean? |
| 9 | Q | No, ma'am.  You were employed at one point in time for |
| 10 | | the Onset Fire District? |
| 11 | A | Can you ask me the question again? |
| 12 | Q | Let me ask you this way.  You say you've been working |
| 13 | | for Capeway Frame & Trailer for the past 15 months, |
| 14 | | correct? |
| 15 | A | Right. |
| 16 | Q | Now, before, 15 months prior to that, who were you |
| 17 | | working for? |
| 18 | A | The Onset Water Department. |
| 19 | Q | How long did you work for the Onset Water Department |
| 20 | | for? |
| 21 | A | About 15 months, also. |
| 22 | Q | I'm going to ask you in more detail about your |
| 23 | | employment in a little while.  But before working for |
| 24 | | the Onset Water Department, who did you work for? |

CURRAN COURT REPORTING

18

1    Q    Is there any reason, to your knowledge, why you're not

2         working full-time for Capeway Frame & Trailer today?

3    A    Because during my leave to go to work for the Water

4         Department, they replaced me with someone else.

5    Q    And who was the person that replaced you?

6    A    That person no longer works there.  But Stephen Santos

7         took on more job -- more of my duties after the other

8         person left.

9    Q    Who was the other person that came in to replace you?

10   A    I only know her first name, she was there when I wasn't,

11        Virginia, and I don't recall her last name.

12   Q    So by the time you returned to employment with Capeway,

13        this woman Virginia had already left employment?

14   A    Yes.

15   Q    And Mr. Santos was doing the job of office manager?

16   A    Right.

17   Q    Have you spoken to Mr. Santos about bringing you on

18        full-time?

19   A    Numerous times.

20   Q    And what's your understanding of his position of having

21        you go full-time?

22   A    At this point, no.

23   Q    Has he indicated to you that there's any potential for

24        you returning to full-time employment with Capeway?

CURRAN COURT REPORTING

24

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | I ask this of all witnesses.  Have you ever been |
| 3 | | convicted of a felony within the past ten years or a |
| 4 | | misdemeanor within the past five years? |
| 5 | A | No. |
| 6 | Q | I'm going to ask you some questions now about your |
| 7 | | employment with the Onset Water Department.  When did |
| 8 | | you first come to be employed by the Onset Water |
| 9 | | Department? |
| 10 | A | April 1, 2003. |
| 11 | Q | And how was it that you first became aware of a position |
| 12 | | at that department? |
| 13 | A | It was advertised in the newspaper. |
| 14 | Q | And in response to seeing that advertisement, what did |
| 15 | | you do? |
| 16 | A | Went to the Water Department, filled out an application. |
| 17 | Q | Were you interviewed for the position? |
| 18 | A | No. |
| 19 | Q | Did you do any -- take any steps besides filling out the |
| 20 | | application? |
| 21 | A | No. |
| 22 | Q | And what was the position that you were applying for? |
| 23 | A | Office clerk. |
| 24 | Q | And do you remember the salary or wages that were |

39

1    A    Within a week or two, shortly thereafter.

2    Q    And you got a call that you were hired for the position?

3    A    Yes.

4    Q    And who called you?

5    A    Kathi.

6    Q    And what do you recall from that discussion?

7    A    For me to start on April 1st.

8    Q    So there was no formal interview process?

9    A    No.

10   Q    Did you have to go down and fill out paperwork before

11        starting?

12   A    No.

13   Q    Did you fill out that paperwork when you started?

14   A    Yes.

15   Q    And did you, in fact, start on that April 1st?

16   A    Yes.

17   Q    And the position you -- was there a title to the

18        position you held when you started your employment?

19   A    Part-time office clerk.

20   Q    And who was your immediate supervisor in that position?

21   A    Kathi Semple.

22   Q    And what were your job duties in that position?

23   A    Answering the phone, helping customers at the counter,

24        reading meter sheets.  I believe that's it.

40

```
1    Q    And you were working 16 hours a week, ma'am, or 20 --
2    A    Less than 20.
3    Q    And so what was your weekday?  Did you work every day of
4         the week or how did that less than 20 hours work?
5    A    I think it was eight to twelve, and one day I would
6         leave at 11 -- I was unable to work 20 hours.  The 20
7         hours benefit kicked in within the district.
8    Q    And your location that you worked at was where, ma'am?
9    A    15 Sand Pond Road, Onset.
10   Q    And that's in the offices of the Water Department?
11   A    Yes.
12   Q    And who else worked out of that office at the time you
13        first started working there?
14   A    Thorton Brown.
15   Q    Anyone else?
16   A    William Gay, Gwen Semple, Kathi Semple, and Chris
17        Poirier.
18   Q    And at that time, Thorton Brown was the Superintendent,
19        correct?
20   A    Yes.
21   Q    And what position did Mr. Gay hold at that time?
22   A    I don't know what his title was.
23   Q    And Gwen Semple, what was her position?
24   A    I don't know.
```

41

| | | |
|---|---|---|
| 1 | Q | Was she another office clerk? |
| 2 | A | Office clerk, maybe. |
| 3 | Q | And Kathi Semple's position was? |
| 4 | A | She was the office manager at that time. |
| 5 | Q | And what was Chris Poirier's position? |
| 6 | A | I don't know. |
| 7 | Q | Was he a meter reader or anything like that? |
| 8 | A | Yeah. |
| 9 | Q | Did he have an office job, administrative job? |
| 10 | A | No. |
| 11 | Q | Were there other employees of the Water Department that |
| 12 | | did not work out of the office at that time? |
| 13 | A | No. |
| 14 | Q | So that was the sum and substance of the whole |
| 15 | | department? |
| 16 | A | I believe, yes. |
| 17 | Q | How long did Mr. Brown serve as Superintendent during |
| 18 | | your employment? |
| 19 | A | Approximately seven months. |
| 20 | Q | Do you have any understanding of why he left his |
| 21 | | employment? |
| 22 | A | Retirement. |
| 23 | Q | And who took over as Superintendent after he did? |
| 24 | A | William Gay. |

CURRAN COURT REPORTING

42

| | | |
|---|---|---|
| 1 | Q | Did they make any other hires of any other employees in |
| 2 | | response to Mr. Brown's retirement? |
| 3 | A | Kerry Semple. |
| 4 | Q | And who is Kerry Semple? |
| 5 | A | What do you mean? |
| 6 | Q | Is that a sister or a brother of -- is Kerry a boy or a |
| 7 | | girl? |
| 8 | A | It's a boy. |
| 9 | Q | So is that a brother of Kathi Semple? |
| 10 | A | Yes. |
| 11 | Q | And what position did he hold when he was hired? |
| 12 | A | I believe his title was laborer. |
| 13 | Q | And at any point in time, did your employment change |
| 14 | | from part-time to full-time? |
| 15 | A | Yes, on July 1st of my first year. |
| 16 | Q | And what year was that, ma'am? |
| 17 | A | 2003. |
| 18 | Q | So you were hired on April 1, 2003? |
| 19 | A | Yes. |
| 20 | Q | So about three months after you were hired? |
| 21 | A | Exactly. |
| 22 | Q | And had you requested to be switched to full-time? |
| 23 | A | No. |
| 24 | Q | How was it that that came about? |

CURRAN COURT REPORTING

48

1    Q    And before that, do you recall what you were making when

2         you first started?

3    A    I believe it was nine dollars per hour.

4    Q    Was there any other change in your employment at the

5         time or the conditions of your employment at the time

6         you went full-time that you haven't already described?

7    A    I'm not sure what you're asking me.  Are you asking

8         about job description, benefits, or all of the above?

9    Q    I was kind of asking you about all of the above because

10        you mentioned when you went full-time you received

11        health insurance, but you didn't take advantage of it,

12        correct?

13   A    Right.

14   Q    And then you had the same job duties as you were working

15        part-time, you were just doing it on a full-time basis,

16        correct?

17   A    Right.

18   Q    And your pay went up a dollar an hour, right?

19   A    Right.

20   Q    Were there any other changes in any of those categories?

21   A    I then received sick time and vacation time.

22   Q    And what was your understanding of the sick time or the

23        vacation time?

24   A    It was an automatic two weeks from the point of

CURRAN COURT REPORTING

54

1      Mrs. Semple was there, and I stopped answering the phone

2      unless I was directly told to answer the phone.

3   Q  Did Kathi Semple tell you to take those steps that you

4      just mentioned?

5   A  No.  What she said is that I had made her mother

6      uncomfortable, giving her the impression that I was

7      trying to take over her job by doing those things.  So I

8      stopped doing them.  She didn't tell them I had to.  I

9      just stopped doing them out of respect.

10  Q  Did you protest those instructions from Kathi Semple to

11     anyone else?

12  A  No.

13  Q  You didn't go to the Superintendent and say, Why is she

14     telling me to do this?

15  A  No.

16  Q  Any other disputes with Kathi or Gwen Semple after that?

17  A  I don't remember any problems with Gwen Semple.

18  Q  How about with Kathi Semple?  When was the next time you

19     had any problems with Kathi Semple?

20  A  That would be August 2003.

21  Q  And what happened in August of 2003?

22  A  Miss Kathi Semple was making an accusation towards

23     Superintendent Gay, and she called for a special meeting

24     to address her accusation.

CURRAN COURT REPORTING

55

| | | |
|---|---|---|
| 1 | Q | And what was the nature of the accusation? |
| 2 | A | I found out at that special meeting that it was about |
| 3 | | sexual harassment. |
| 4 | Q | And who was present at the special meeting? |
| 5 | A | I can remember Chairman Larry Blacker, Water |
| 6 | | Commissioner, Water Commissioner Michael Sanborn, Water |
| 7 | | Commissioner John Cook, Kerry Semple, Chris Poirier, |
| 8 | | Kathi Semple -- could you repeat the question back to me |
| 9 | | one more time?  You asked me who was at that meeting, |
| 10 | | correct? |
| 11 | Q | Right.  I'm asking you who was at the special meeting. |
| 12 | A | Winna Dean, Prudential Committee. |
| 13 | Q | And Miss Dean is a member of the Prudential Committee |
| 14 | | for the Fire District? |
| 15 | A | Mary McCoy, Prudential Committee member, other rate |
| 16 | | payers were there, but I don't remember who else was |
| 17 | | there at this point. |
| 18 | Q | And I take it William Gay was also there? |
| 19 | A | I'm sorry, yes, William Gay was there. |
| 20 | Q | Now, you mentioned that Kathi Semple called for this |
| 21 | | special meeting? |
| 22 | A | Yes. |
| 23 | Q | Does any employee of the Water Department have the |
| 24 | | authority to call a special meeting of the Water |

58

1    A    The only action that was taken against either

2         Superintendent Gay or Office Manager Semple was that

3         Billy was told, in fact, that that was sexual

4         harassment.

5    Q    I assume he was told to stop?

6    A    Yes.

7    Q    Are you aware of any other action that was taken by the

8         Board of Water Commissioners?

9    A    No.

10   Q    And as a result of that Complaint by Kathi Semple, was

11        there any incident or dispute that you had with her?

12   A    Yes.

13   Q    What was that?

14   A    During the meeting is when I found out that Kathi was

15        accusing Billy of sexual harassment.  I was shocked.

16        After Miss Semple -- Miss Kathi Semple made the claim

17        and what she based it on, I questioned her during the

18        meeting and said to her, Did you feel if when Billy said

19        that to you that he was truly sexually harassing you.

20        And Miss Kathi Semple answered me, No.

21   Q    And what happened thereafter?

22   A    With Kathi, she was upset, and she said to me across the

23        table in front of everybody, Don't you ever come to me

24        again with a problem.

59

1   Q   Did anything else transpire between you and Kathi that

2       night?

3   A   No.

4   Q   Why was it that you were asking her questions during a

5       meeting of the Board of Water Commissioners?

6   A   Because I felt someone who was there when it happened,

7       which was myself, Superintendent Gay, and Kathi Semple,

8       had to speak up on behalf of Superintendent Gay.

9   Q   So you didn't think that Superintendent Gay had done

10      anything wrong?

11   A   Correct.

12   Q   Did you typically attend the meetings of the Board of

13      Water Commissioners?

14   A   Typically, no.

15   Q   And were you specifically invited to this one?

16   A   I was asked to attend.

17   Q   By who?

18   A   Can I rephrase that answer?

19   Q   Sure.

20   A   I asked if I had to attend, and I was told yes by Kathi

21      Semple and Larry Blacker.

22   Q   The meetings, are they fairly informally run where any

23      employees can ask questions during the course of the

24      meetings?

60

| | | |
|---|---|---|
| 1 | A | They're informally run, but at the same time, they are |
| 2 | | run correctly. |
| 3 | Q | And after that statement by Kathi Semple, she told you |
| 4 | | not to ever come to her with a problem again, did you |
| 5 | | ever -- did that change your relationship with her? |
| 6 | A | Yes. |
| 7 | Q | How so? |
| 8 | A | She was my superior, and I felt as if I couldn't go to |
| 9 | | her with a problem again. |
| 10 | Q | Did you ever encounter any problems where you didn't go |
| 11 | | to her and had to go to another source? |
| 12 | A | No. |
| 13 | Q | Did you thereafter start seeking out assistance from |
| 14 | | Superintendent Gay or any other source instead of Kathi |
| 15 | | Semple? |
| 16 | A | Could you repeat the question? |
| 17 | | MR. CLOHERTY:  Read it back. |
| 18 | | (The record was read as requested.) |
| 19 | A | I did send a letter to Superintendent Gay requesting |
| 20 | | that I could bring any issues to his attention. |
| 21 | Q | And when did you send that letter, shortly after the -- |
| 22 | A | Shortly after the meeting. |
| 23 | Q | Did you receive any response to that letter? |
| 24 | A | Yes. |

CURRAN COURT REPORTING

61

| | | |
|---|---|---|
| 1 | Q | What was the response? |
| 2 | A | Verbally in his office. |
| 3 | Q | And what did he tell you? |
| 4 | A | That I could, in fact, approach him with any issues, |
| 5 | | good, bad, or indifferent. |
| 6 | Q | Did you later take him up on that offer and approach him |
| 7 | | with issues? |
| 8 | A | Yes. |
| 9 | Q | And can you characterize your relationship or working |
| 10 | | relationship with William Gay? |
| 11 | A | At that same point? |
| 12 | Q | Yes, in or around that time. |
| 13 | A | In or around that time, excellent. |
| 14 | Q | Had you known William Gay at all before going to work at |
| 15 | | the Water Department? |
| 16 | A | My whole life. |
| 17 | Q | How did you know him? |
| 18 | A | Neighborhood, same neighborhood raised up in. |
| 19 | Q | Is he the same age as you? |
| 20 | A | I believe he's two years older. |
| 21 | Q | Now, before becoming employed with the Water Department, |
| 22 | | as an adult, did you ever socialize with William Gay and |
| 23 | | his family at all? |
| 24 | A | No. |

62

1    Q    And after becoming employed with the Water Department,

2         did you ever socialize with William Gay outside of work?

3    A    No.

4    Q    Going back to Kathi Semple again, after that August 2003

5         meeting, did you ever have any other disputes with her

6         during your employment?

7    A    Not that I can remember.

8    Q    Now, you mentioned that your relationship with William

9         Gay you considered to be excellent in and around the

10        August 2003 incident?

11   A    Yes.

12   Q    Did that relationship with William Gay ever change?

13   A    Yes.

14   Q    And when did that change?

15   A    It started to change in March 2004.

16   Q    And that was shortly before your termination, ma'am?

17   A    Yes.

18   Q    Was there any particular incident that you can recall

19        that was the beginning of the change in your

20        relationship with William Gay?

21   A    Yes.

22   Q    What was that?

23   A    A conversation had taken place between myself, Kathi

24        Semple, Chris Poirier, and Jay Semple regarding the

```
1         that, in fact, I was not the one who said something to

2         him.  And when I asked him who was, he said that

3         Mrs. Semple was the one who had told him.

4    Q    Mrs. Semple meaning Gwen Semple?

5    A    Kathi Semple had been the one that had told him.  And at

6         that point, she was very upset, Kathi Semple, and they

7         had words.  And that was just a strain on me and Billy's

8         relationship.

9    Q    When you say "they had words," you mean Kathi Semple and

10        William Gay had an argument thereafter?

11   A    They had words.

12   Q    What do you mean by "having words"?

13   A    They both made accusations that they were lying, that

14        she accused him of lying for saying it was her, and he

15        accused her of lying for denying it over and over.

16   Q    Was there any vulgarity used or swear words?

17   A    Yes.

18   Q    And do you remember who used vulgarity?

19   A    Kathi Semple.

20   Q    Did you ever hear William Gay use vulgarity at that

21        time?

22   A    Not that I remember.

23   Q    What was it that Kathi Semple said that concerned

24        vulgarity?
```

67

| | | |
|---|---|---|
| 1 | A | Do I come right out and say it? |
| 2 | Q | You can characterize it in any way you feel comfortable, |
| 3 | | ma'am. |
| 4 | A | She called him a fucking liar. |
| 5 | Q | Did she use any other swear words, ma'am? |
| 6 | A | She called him a friggin' liar. |
| 7 | Q | Any other names that she called him? |
| 8 | A | Not that I recall. |
| 9 | Q | And William Gay, did -- you said this put a strain on |
| 10 | | your relationship with him; is that correct? |
| 11 | A | Yes. |
| 12 | Q | How so? |
| 13 | A | Because I felt as if I made them face each other, you |
| 14 | | know. |
| 15 | Q | Did he not interact with you the same way after that |
| 16 | | incident, ma'am? |
| 17 | A | It took a little bit for it to calm down. |
| 18 | Q | Were you still able to go to him for questions or |
| 19 | | assistance if you needed to? |
| 20 | A | If I needed to, I could have, but I didn't. |
| 21 | Q | Did he ever refuse to talk to you or discipline you or |
| 22 | | do anything negative toward you? |
| 23 | A | Ever? |
| 24 | Q | After that incident, ma'am, excluding the termination, |

| | | |
|---|---|---|
| 1 | A | It was right around election time.  This happened on |
| 2 | | April 27th.  Election time usually is around May 17th. |
| 3 | | That's what I mean by right around election time.  And |
| 4 | | one of the candidates' wives had requested some minutes |
| 5 | | of the meetings, copies of the tapes, the paperwork, et |
| 6 | | cetera. |
| 7 | Q | And who was that? |
| 8 | A | Ramona O'Hearne. |
| 9 | Q | And the election that you're describing was an election |
| 10 | | for Water Commissioners? |
| 11 | A | For the district, Water Commissioners, Prudential |
| 12 | | Committee and whichever one of the Board of Engineers |
| 13 | | was due up that year. |
| 14 | Q | And is the Superintendent's position an elected |
| 15 | | position, ma'am? |
| 16 | A | No. |
| 17 | Q | And what happened as a result of Ramona O'Hearne |
| 18 | | requesting some minutes of meetings? |
| 19 | A | We had to get them ready, "we" meaning Kathi Semple, |
| 20 | | William Gay, and myself.  Unpaid financial adviser, |
| 21 | | Peter Murphy, was there during the conversation. |
| 22 | Q | What happened? |
| 23 | A | We were discussing how long it would take to produce the |
| 24 | | amount of paperwork that Mrs. O'Hearne had requested. |

80

1           After about five or six minutes of a general discussion
2           between the four of us, the conversation drifted more
3           towards Kathi's desk, and then it was only Kathi Semple,
4           Billy Gay, and Peter Murphy.
5       Q   And where were you sitting, at your desk?
6       A   My desk.
7       Q   And how far away were the desk's?
8       A   Eight to ten feet apart.
9       Q   And were you still participating in the conversation at
10          that point in time?
11      A   No.  Billy had turned his back to me.  Kathi was working
12          on her computer, and Peter was standing directly in
13          front of Kathi's desk.
14      Q   What happened next, ma'am?
15      A   I had gone back to entering notes into the computer and
16          still half listening to what they were discussing as far
17          as preparing this information for Ramona O'Hearne.  And
18          I heard Billy Gay kept on referring to me as, Have her
19          do it; she can take care of that.  But Kathi's job was
20          to get the biannual bills out -- most important priority
21          was to get the biannual bills out for May 1st.
22      Q   And were they talking about that being her priority to
23          get these bills out?
24      A   Right.

81

1   Q    And what happened next?

2   A    They discussed how they would go about retrieving all

3        this information for Mrs. O'Hearne, and then they would

4        have me do all the copying, et cetera.  But while Billy

5        was telling Kathi what to do, he spoke of me as if I

6        wasn't there, not in the room with them anymore, not

7        part of the conversation.

8   Q    And what led you to believe that?

9   A    Because he would refer to me as "her" and "she," Have

10       her do it, she can take care of it, et cetera.

11  Q    And what happened next?

12  A    I spoke up and said to Kathi, Excuse me, Kathi, the

13       "her" and "she" that Bill is referring to is me; my name

14       is Lori, and I prefer to be called by my name.

15  Q    And then what happened?

16  A    Bill turned himself towards my desk at that point and

17       said -- give me a minute -- he said to me -- I'm sorry,

18       I've lost my train of thought.  Can I start again?

19  Q    Certainly.  I think where we're trying to go is you had

20       interjected into the conversation that your name was

21       Lori and you preferred to be called by your name.  And I

22       asked you what happened next.  And you were going to

23       state that Bill turned around towards you.

24  A    Thank you, I'm sorry.

CURRAN COURT REPORTING

82

1    Q    That's okay.

2    A    Billy then turned around and said to me, it's -- I can't

3         remember exactly what he said.

4    Q    Without the exact words, ma'am, what's your best memory

5         of what he said to you?

6    A    I don't remember what was said by Billy that exact

7         moment.  What I'm attempting to do is make sure I tell

8         you the statements that he made directed to me in the

9         exact order that they were said.

10   Q    Do you want to describe what your memory is -- memory

11        today is of what transpired, and then we can flesh it

12        out as we go?  He turned around to you.  And then what

13        happened next, ma'am?

14   A    He said a statement to me something to the effect that

15        we weren't talking bad about you.

16   Q    And then what happened?

17   A    And at that point, Kathi Semple and Peter Murphy got up

18        and went out to the back area of the office, and Billy

19        went to the Water Commissioner's office.  I just stayed

20        at my desk.  Within about two or three minutes, Billy

21        came back through the office, and I spoke up.  I said to

22        him, Bill, I'm sorry you don't understand why that

23        bothers me, but it does.  It's a real pet peeve; I hate

24        it.  He said to me, It's only words, get over it.  I

1    says, I will not get over it, Bill. He said, It's only
2    words, just get over it. I said, oh, just sh -- I
3    almost told him to shut up, but I refrained myself from
4    saying it.
5              Next I know, he walks out into the back area
6    of the office where Peter Murphy and Kathi Semple are,
7    and he says loud enough for me to hear him back in the
8    office, She'll never tell me to shut up. And I spoke
9    loud enough back for him to hear me tell them -- to hear
10   me tell him, Get it right, Bill, I did not tell you to
11   shut up.
12   Q    And then what happened?
13   A    I was just barely back to work when Mrs. Semple -- Kathi
14        Semple entered back into the office. When she came in,
15        it caught my attention, I looked up and I looked
16        outside. And I noticed that Billy Gay and Peter Murphy
17        were out front in the parking lot. And I said to Kathi
18        Semple, I just don't think what he said was right when
19        he was referring me to as "she" and "her" like that.
20        And Kathi then said, Sometimes he doesn't think.
21   Q    What happened next?
22   A    We both went back to work on our computers. I noticed
23        looking out the windows at that point that Mr. Murphy
24        and Bill Gay weren't out in the parking lot anymore.

84

1        And before I know it, Chris Poirier and Jay Semple were

2        back in the office because it was close to quitting

3        time.  And Kathi Semple called Billy Gay on the Nextel

4        and said to Bill, It's two minutes to four, are you

5        coming in and -- meaning coming off the road at the end

6        of the day.  And he said, Yeah, can you give me a ride

7        home?  And I jokingly said to Kathi, Give me the

8        Nextel -- excuse me, that was wrong.  I jokingly said to

9        Kathi, Tell him I'll give him a ride home on the bumper

10       of my van.

11    Q   And then what happened?

12    A   Kathi said no, she wouldn't tell him that.  I said, Give

13       me the Nextel, I'll tell him.

14    Q   And so did she do so?

15    A   She passed me the Nextel, and I repeated it to Billy Gay

16       that -- I said, Hey Bill, it's Lori, I'll give you a

17       ride home on the bumper of my van.

18    Q   And was there any response?

19    A   All he said was, Kathi, and she answered him back.  She

20       had taken the Nextel back from me at that point, and she

21       answered him back.  And she said, Yes, I'll give you a

22       ride home.

23    Q   And then what happened next?

24    A   Just a few minutes later, Mr. Gay came into the office.

85

1       And he said, This is your verbal warning; if you cannot

2       control your snide remarks, you will not be working here

3       anymore.

4   Q   And how did you respond?

5   A   I said, You've got to be joking; I was only trying to

6       break the ice with you.

7   Q   And what happened next?

8   A   He told me he wasn't joking, and that if I didn't like

9       it, I could leave.  To which I responded, Are you asking

10      me to leave because it's 4:00, or are you firing me?

11  Q   And what happened in response to that?

12  A   He said, You can take it any way you want or you like.

13      And I said to him, You have to clarify that for me, are

14      you sending me home or are you firing me?  He asked me

15      to wait a minute, and he went out to the back area of

16      the office, shop.  I heard his Nextel beep.  I do not

17      know who he was calling.

18  Q   And what were you doing during that time frame?

19  A   Just sitting at my desk.  I was at my desk the whole

20      time.  I never got up for anything.

21  Q   What happened after you heard him go in the other room?

22  A   That left Kathi Semple, myself, Jay -- Kerry Semple, and

23      Chris Poirier in the office.  We heard the door click

24      and realized that Billy had actually gone out the side

86

1    door of the building.  Already being after 4:00, we all

2    waited just a few more minutes and then made our way out

3    into the parking lot for Billy Gay to come out because

4    he had asked me to wait a minute.  That's why I hadn't

5    left, he had asked me to wait.

6             I'd say another couple or three minutes he

7    came out of the building, all four of us in the parking

8    lot already, and he joined us.  And I said, Bill, what's

9    the verdict?  And he said, I'll let you know.  I got in

10   my car.  He got in Kathi's van, and Chris and Jay got

11   into another vehicle by themselves.  And we all left,

12   three separate vehicles.  And that's the end of any

13   conversations that took place that day.

14            MS. ISHIHARA:  It's about 12:50.  Do you

15   want to break here?

16            MR. CLOHERTY:  I think we can take a break

17   now.  I'm going to go over it in more detail.

18            MS. ISHIHARA:  I was just waiting to finish

19   that part.

20            (A lunch recess was taken at 12:50 p.m.)

21            (Resumed at 1:46 p.m.)

22   Q   Ma'am, I want to go over the events of April 27th in a

23       little more detail.  Now, you indicated that you

24       initially objected to Mr. Gay's comments referring to

87

1      you as "her" and "she"; is that correct?

2   A   Yes.

3   Q   And you later said that that was a pet peeve of yours?

4   A   Right.

5   Q   Had you ever previously informed Superintendent Gay that

6      that was a pet peeve of yours?

7   A   No.

8   Q   Had you ever had occasion to tell anyone else in the

9      office at the Water Department that you did not like

10     being referred to as "her" or "she" in your presence?

11  A   Not that I remember.

12  Q   Were there ever any prior occasions before this date of

13     April 27th where Superintendent Gay had referred to you

14     as "her" or "she" in your presence?

15  A   Not that I remember.

16  Q   Have you ever had any prior occasions where any employee

17     of the Water Department had referred to you as "her" or

18     "she" in your presence?

19  A   Not that I remember.

20  Q   And why is it that being referred to in such a manner is

21     a pet peeve of yours?

22  A   I think it's very condescending.  I just feel as if when

23     I'm sitting right there you can use my name when you're

24     speaking of me.  I would do the same to them.

93

1    Q    And the other two were not present at that time?

2    A    They were still out back.

3    Q    And it was when he came back into the office where you

4         said you almost said shut up to him, but you didn't say

5         it, correct?

6    A    That's part of what I said.

7    Q    I'm trying to direct your attention to that particular

8         incident. Had you ever used the words "shut up" to

9         Billy Gay at any other time in your employment with the

10        Water Department?

11   A    No.

12   Q    Had you ever used the term to any other Onset Water

13        Department employees?

14   A    No.

15   Q    Was that a common phrase in the Water Department that

16        people tell each other to shut up at the Water

17        Department?

18   A    No.

19   Q    And you, in fact, are saying you didn't actually use

20        those words, did you?

21   A    I did, in fact, not say those words.

22   Q    You'll agree that it wouldn't be proper in an employment

23        situation to say shut up to your boss, correct?

24   A    Yes.

CURRAN COURT REPORTING

110

1         to take the day off with pay.

2    Q    Did you ask her for any further information?

3    A    She told me -- I did say, Do you know what's going on?

4         She said no, she did not.  She was just asked by

5         Superintendent Gay to call me.

6    Q    Any further discussions with her?

7    A    None.

8    Q    And at that time, did you have any concerns about your

9         job being in jeopardy?

10   A    I was starting to wonder.

11   Q    And what did you do in response to that phone call?

12   A    I waited to find out -- to get my next phone call back

13        that she said I'd have by the end of the day.

14   Q    Did you make any efforts to reach Mr. Gay in the

15        meantime?

16   A    No.

17   Q    And why not?

18   A    I don't know.

19   Q    What happened next?  Did you get a call later that day?

20   A    Yes.

21   Q    And who called you?

22   A    Kathi Semple did again.

23   Q    And do you remember what time she had called you?

24   A    Later in the day after 3:00.

1    Q    And what happened during that phone call?

2    A    She told me not to come back to work until the following

3         Monday with pay.

4    Q    What else happened in that phone call?

5    A    She said that they were going to have a special meeting

6         that Friday, and if I remember right the date on that

7         would be the 30th, regarding the authority of the

8         Superintendent or the Superintendent's authorities,

9         whether he had the authority to fire me or not or

10        whether it needed to be done through the Board of Water

11        Commissioners.

12   Q    What did you say in response to her on that?

13   A    I don't remember what I said to that.

14   Q    Did you have any further memory of what was said during

15        that telephone conversation?

16   A    I don't remember anything else, no.

17   Q    Did you ask Miss Semple for any further information

18        about why they were taking that step?

19   A    I didn't need to.

20   Q    Why not?

21   A    Just because of the explanation of why they were having

22        the special meeting kind of said it all.

23   Q    Did you make any efforts to contact Mr. Gay directly?

24   A    No, sir.

1    Q    At any time after you saw him drive away in the van on

2         the 27th, did you ever make any efforts to contact him

3         directly?

4    A    Never.

5    Q    What did you do next after getting that phone call in

6         the afternoon from Kathi Semple?

7    A    I don't know if I did anything that afternoon.  But the

8         next day being Thursday I believe, the 29th, I contacted

9         my attorney.

10   Q    And I don't want to get into any conversations you had

11        with your attorney.  Did you take any other steps other

12        than contacting your attorney the next day?

13   A    I'm sorry?

14   Q    Did you do anything else besides contacting your

15        attorney?

16   A    No.  There was more to the conversation with Kathi that

17        I've just remembered.  I forgot to tell you when --

18   Q    This is the second time she called you in the afternoon?

19   A    Yeah.

20   Q    What happened in that --

21   A    I forgot that I did request her to send me some type of

22        a letter from the Water Department stating that I --

23        they have told me to stay out of work because up until

24        that point I really had no proof to stay out of work.

113

1    It was just her calling me on the phone.  And if you

2    miss three days at the Water Department without calling

3    in, that can be grounds for firing you.  So I did ask

4    her for a letter to be dropped off telling me to stay

5    home for three days with pay.

6    Q    And did you, in fact, get that letter?

7    A    Yes, I did.

8    Q    How did you get the letter?

9    A    Hand-delivered by Jay Semple.

10             MR. CLOHERTY:  I'd like to have this marked.

11             (Document marked Exhibit No. 2

12             for identification.)

13   Q    I'm showing you what's been marked as Exhibit No. 2 for

14       your deposition.  I ask you to take a moment to look at

15       that, and tell me if you recognize it.

16             (Witness peruses the document.)

17   A    Yes, I recognize it.

18   Q    Is that the letter you were just referring to that was

19       hand-delivered to you?

20   A    I believe so.

21   Q    And there's a date on the bottom of that letter under

22       the Superintendent's signature.  Do you see that?

23   A    Yes.

24   Q    And it's April 28th?

1    A    Yes.

2    Q    Did you receive that on the 28th, the day after the

3         incident?

4    A    I believe this was the one that was hand-delivered to

5         me.

6    Q    I'm going to show you another document to clarify it.

7                        (Document marked Exhibit No. 3

8                        for identification.)

9    Q    Showing you, ma'am, a document that's been marked as

10        Exhibit No. 3.  And I ask you to take a moment and look

11        at that, and tell me if you recognize it.

12                       (Witness peruses the document.)

13   Q    Do you recognize that one, ma'am?

14   A    Yes.

15   Q    What is that letter?

16   A    After I received Exhibit 2 telling me not to come back

17        to work until May 3rd, I contacted Water Commissioner

18        John Cook, I believe it was on the 29th of April, and

19        asked for an explanation of why I was being put on paid

20        administrative leave.  And then I received this letter.

21   Q    Basically the entire content of that letter is you are

22        on administrative leave for events that occurred on

23        4/27/04 and are pending for disciplinary action.  Did I

24        read that correctly?

115

1    A    Yes.

2    Q    And did that answer your questions about why you were on

3         administrative leave, ma'am?

4    A    No.

5    Q    Why not?

6    A    It doesn't give me a reason for why I was put on

7         administrative leave.  What was the disciplinary -- what

8         was I being disciplined for?

9    Q    You knew that it was related to your exchange with

10        Mr. Gay on the afternoon of the 27th though, correct?

11   A    With my conversation with Mr. Gay that day?

12   Q    Yes.

13   A    The conversation, yes.

14   Q    When you called Mr. Cook, where did you reach him,

15        ma'am?

16   A    I tried to call him at his home phone.

17   Q    Did you speak to him eventually?

18   A    Eventually, yes.

19   Q    Where did you reach him?

20   A    He returned my call after I left a message for him.

21        When?  Later in the day on the 29th was the second time

22        I spoke with him.

23   Q    Describe, if you could, what transpired during that

24        conversation.

CURRAN COURT REPORTING

1    A    I asked him if he could have Superintendent Gay draw up
2         another letter with an explanation for my being put out
3         on paid administrative leave, and he said that he
4         already had.  And I read this letter to him, and he
5         said, Well, that's why you're out on paid administrative
6         leave.  I said, No, I'm looking for a reason.  What's
7         the disciplinary problem that's got me out of work right
8         now; I need a description of why I'm actually out of
9         work.  And he said he would tell -- deliver that message
10        to Bill, and I believe I did receive another letter
11        after this one.
12   Q    Why was it that you called Mr. Cook as opposed to any
13        other Board of Commissioners member?
14   A    At that point, Larry Blacker had retired from the Board.
15        So there was only a Board of two, and Michael Sanborn
16        has an unlisted unpublished telephone number.  I was
17        unable to get a hold of him, and I don't know where he
18        lives.  To this day, I don't know where he lives.
19   Q    Did you have any other discussions with Mr. Cook other
20        than you've already described?
21   A    Not that I remember.
22   Q    Did he indicate to you that he was already aware of and
23        knew that you were -- been put out on leave?
24   A    Did he give indications that he was aware of?

1   of "she" or "her"?

2   A   Could you repeat that question, please?

3              MR. CLOHERTY:  Read it back.

4              (The record was read as requested.)

5   A   I don't understand what that question means.

6   Q   Okay.  Did you receive any direct orders from the

7       Superintendent on April 27, 2004?

8   A   Not that I remember.

9   Q   Do you remember Superintendent Gay giving you a direct

10      order to stop?

11  A   No.

12  Q   Do you remember him giving you direct orders to stop

13      addressing him about your concerns of the use of "she"

14      or "her"?

15  A   He never did.

16  Q   Now, do you recall how long you were out on

17      administrative leave for, ma'am?

18  A   The whole time from that day until the day I was

19      terminated?

20  Q   Yes.

21  A   I think it was approximately 10 weeks.

22  Q   And during that 10-week time frame, were you continuing

23      to be paid?

24  A   Yes.

121

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | employment status with the Water Department?                 |
| 2  | A | I'm sorry.  Could you repeat that question one more          |
| 3  |   | time?  I'm sorry.                                            |
| 4  | Q | That's fine.  Let me ask it a different way.  After May     |
| 5  |   | 3rd of 2004, do you remember what, if anything, happened    |
| 6  |   | next relating to your employment with the Water             |
| 7  |   | Department?                                                  |
| 8  | A | I think I received another letter telling me that I was     |
| 9  |   | on paid administrative leave, but that one was like         |
| 10 |   | indefinitely, no time limit on it.                          |
| 11 | Q | Do you recall ever going to any hearings concerning your   |
| 12 |   | discipline at the Water Department?                          |
| 13 | A | Yes.                                                         |
| 14 | Q | And how many hearings did you attend?                        |
| 15 | A | I don't know the exact number.                              |
| 16 | Q | Was it more than one?                                        |
| 17 | A | Yes.                                                         |
| 18 | Q | More than five?                                              |
| 19 | A | I don't believe there was more than five meetings.          |
| 20 | Q | And of the ones that you do have a memory of attending,     |
| 21 |   | can you describe what the nature of those meetings were?    |
| 22 | A | The nature of those meetings meaning --                     |
| 23 | Q | Was there a procedural meeting?  Was it a disciplinary      |
| 24 |   | meeting or hearing?  Do you recall?                          |

CURRAN COURT REPORTING

122

| | | |
|---|---|---|
| 1 | A | I think it was a little of both.  I remember that I |
| 2 | | didn't attend any of the meetings without my attorney. |
| 3 | Q | So at each meeting of the Water Commissioner concerning |
| 4 | | your employment, you were represented by counsel? |
| 5 | A | Yes. |
| 6 | Q | Do you remember any of your meetings being rescheduled |
| 7 | | so that your attorney could appear with you? |
| 8 | A | I know we attempted to one time, but I'm not sure if we |
| 9 | | ended up -- if they honored our request or not. |
| 10 | Q | I'm going to show you the next exhibit, ma'am. |
| 11 | | (Document marked Exhibit No. 5 |
| 12 | | for identification.) |
| 13 | Q | I show you what's been marked as Exhibit No. 5.  And I |
| 14 | | ask you to take a moment to look at that together with |
| 15 | | your attorney, and tell me if you recognize that |
| 16 | | exhibit. |
| 17 | | (Witness peruses the document.) |
| 18 | Q | Ma'am, do you see that Exhibit No. 5? |
| 19 | A | Yeah. |
| 20 | Q | Do you recognize that document? |
| 21 | A | Yes. |
| 22 | Q | And up in the upper left-hand corner, it's dated June |
| 23 | | 17, 2004.  Do you see that? |
| 24 | A | Yes. |

CURRAN COURT REPORTING

123

1    Q    And it's from the Onset Fire District Board of Water

2          Commissioners.  Do you see that?

3    A    Yes.

4    Q    Do you recall receiving this in and around June 17th of

5          2004?

6    A    Yes.

7    Q    Fair to say this is notice to you of a meeting that's

8          going to be held concerning your discipline?

9    A    Yes.

10    Q    Did that satisfy your concerns or questions about the

11         basis of your discipline?

12    A    No.

13    Q    At any time prior to -- strike that.  The hearing that

14         was scheduled according to this letter for June 30,

15         2004, do you see that, ma'am?

16    A    Yes.

17    Q    Do you recall it taking place on that date?

18    A    Yes.

19    Q    At any time prior to June 30, 2004, had you received a

20         copy of Mr. Gay's rendition of events that's previously

21         been marked as Exhibit No. 1?

22    A    Did I see a copy --

23    Q    Yes.

24    A    -- of Exhibit 1 before the June 30th meeting?

124

1    Q    That's my question.

2    A    Yes.

3    Q    In fact, you had been at a meeting where a copy of

4         Exhibit No. 1 was read into the record before the June

5         30th hearing, correct?

6    A    Yes.

7    Q    So you knew before the June 30th hearing what Mr. Gay's

8         version of events was from that day, correct?

9    A    Yes.

10   Q    And you knew that those were the reasons why Mr. Gay

11        thought you should be disciplined to include terminating

12        you, correct?

13   A    Yes.

14   Q    And I guess we haven't established this yet.  But do you

15        remember when that meeting was that those were read into

16        the record?

17   A    Am I allowed to guess?

18   Q    No, but you can give your best memory, ma'am.

19   A    Because it was after the elections, after the May

20        elections.  They were looking to have a full Board back

21        on.

22   Q    At that meeting that you attended where Mr. Gay's

23        version of the events were read, there was a full Board?

24   A    Yes.

CURRAN COURT REPORTING

125

```
 1              MR. CLOHERTY:  Why don't we take a
 2      five-minute break or so.
 3                  (A recess was taken at 2:53 p.m.)
 4                  (Resumed at 3:02 p.m.)
 5   Q    Now, you did attend the June 30, 2004 hearing that was
 6        described in the notice marked as Exhibit No. 5,
 7        correct?
 8   A    Yes.
 9   Q    And did anyone accompany you to that hearing?
10   A    My attorney.
11   Q    Anyone else?  Did your husband go to the meeting with
12        you?
13   A    Yes.  I wasn't sure what you meant.  My husband went.
14   Q    Did you bring any other family members?
15   A    My mother.
16   Q    Anyone else?
17   A    My sister.
18   Q    And which sister is that?
19   A    Amy.
20   Q    Anyone else?
21   A    My niece and her husband.
22   Q    And what niece and husband is that?
23   A    Heather and Craig Elwood.
24   Q    Anyone else?
```

1    A   Marilyn Knowlton, Martha Ramsey, Marie Strawn.  Are you

2         asking for people that personally came with me or people

3         that were at the meeting?

4    Q   People that came with you either on your behalf or

5         because you requested them to be there.

6    A   Josie Post, Dick Post, Ramona O'Hearne, Maurice Harlow,

7         Roberta Besse.  I can't remember anybody else's name at

8         this point who might have gone on my behalf.  There may

9         be more.

10   Q   Now, of those people that you just described, there was

11        family members as well as were the other people friends

12        or witnesses?

13   A   Friends.

14   Q   Did you have any witnesses accompany you to that

15        hearing?

16   A   No.

17   Q   Now, Ramona O'Hearne you mentioned, she's the wife of

18        one of the Water Commissioner members?

19   A   Yes.

20   Q   And was her husband, Brian O'Hearne, a member of the

21        Water Commission at that time?

22   A   On that day, yes.

23   Q   Had he just recently been elected?

24   A   Yes.

| | | |
|---|---|---|
| 1 | Q | Does she have any prior employment or any relatives that |
| 2 | | worked for the Water Department? |
| 3 | A | Not that I'm aware of. |
| 4 | Q | How long did the hearing on the 30th take? |
| 5 | A | I don't remember. |
| 6 | Q | Fair to say it lasted more than a matter of minutes? |
| 7 | A | Yes. |
| 8 | Q | Did it last more than an hour? |
| 9 | A | It could have. |
| 10 | Q | And who was presiding over the hearing or the meeting? |
| 11 | A | The Board of Water Commissioners. |
| 12 | Q | That would have been at the time DiPasqua, O'Hearne, and |
| 13 | | Sanborn? |
| 14 | A | No. |
| 15 | Q | Who was on the Board at that time? |
| 16 | A | Oh, wait a minute. |
| 17 | Q | I don't mean it to be a trick question.  Why don't we |
| 18 | | look at Exhibit No. 5. |
| 19 | A | 30th of June. |
| 20 | Q | There's a letterhead on Exhibit 5 that identifies three |
| 21 | | Board members. |
| 22 | A | Yes, I'm sorry, those were the three men on the Board |
| 23 | | that night. |
| 24 | Q | And can you just describe briefly what transpired that |

CURRAN COURT REPORTING

1   night during the meeting or hearing?

2   A   The Water Commissioners had an attorney there, Decas &

3       Murray.  I had my attorney with me, and Superintendent

4       Gay had his attorney with him.  At that point, it was

5       Attorney Lawrie.  They announced everyone who was in the

6       room into the minutes of the meeting, the tape of the

7       minutes of the meeting.

8   Q   And what do you mean "they announced"?  They had

9       everyone stand up and say who they were?

10  A   No.  One person said, Tonight we have with us, you know,

11      and they went around the room and said everyone's name.

12      It's a small town.  They knew who everyone was in the

13      room.  I don't remember who did the announcing.

14  Q   It would be everyone in the room including your family

15      members and that type of thing?

16  A   Yes.

17  Q   What happened after they did that?

18  A   They had an opportunity to ask questions.

19  Q   And who asked questions?

20  A   The Board of Water Commissioners.

21  Q   And were you asked any questions, ma'am?

22  A   Yes, I was.

23  Q   And who asked you questions?

24  A   The Board.

131

| | | |
|---|---|---|
| 1 | Q | Before the time of asking questions, was there any |
| 2 | | presentation by Mr. Gay as to his request for |
| 3 | | discipline? |
| 4 | A | Could you repeat the question, please? |
| 5 | | MR. CLOHERTY:  Read it back. |
| 6 | | (The record was read as requested.) |
| 7 | A | No. |
| 8 | Q | Was there any presentation to you for the basis for why |
| 9 | | you were there during the meeting? |
| 10 | A | Was there a presentation for why I was there during the |
| 11 | | meeting?  Yes. |
| 12 | Q | Who made that presentation? |
| 13 | A | The Board of Water Commissioners. |
| 14 | Q | Who from the Board? |
| 15 | A | I don't remember which one it was. |
| 16 | Q | And as far as the order of questioning, was questions |
| 17 | | presented to you first, or do you recall who was given |
| 18 | | the opportunity to speak to the Board first? |
| 19 | A | It was not me that went first, and I do not recall who |
| 20 | | they chose to go first. |
| 21 | Q | How long were you asked questions for? |
| 22 | A | Maybe 10 minutes, 15 minutes total. |
| 23 | Q | And did each of the Board members ask you questions? |
| 24 | A | I believe each one of them asked me one or more |

CURRAN COURT REPORTING

1       questions.

2   Q   Were the questions all focused on the events of April

3       27th?

4   A   Yes.

5   Q   Did you get an opportunity to outside of questioning,

6       make any statement yourself as to what you did that day

7       or your reasons for being there?

8   A   I think the statement that I said was a direct result of

9       answering their questions.  No, I don't believe I was

10      given the opportunity to state my side.

11  Q   Was there any final question you were given such as do

12      you have anything further to add to what we've heard

13      today or anything to that extent?

14  A   I don't remember.

15  Q   Do you know who else was asked questions during that

16      meeting?

17  A   I believe it was Kathi Semple, Peter Murphy, Kerry

18      Semple, Chris Poirier, and possibly Superintendent Gay.

19  Q   Why is it that you only say possibly Superintendent Gay?

20  A   I don't remember if they asked him questions that night.

21      I know he read a statement, but I don't remember if

22      that's the only words that came out of his mouth that

23      night.

24  Q   Did you disagree with anything that the witnesses Kathi

1      Semple, Peter Murphy, Kerry Semple, or Chris Poirier had

2      to say?

3    A    Yes.

4    Q    You had a different version of events?

5    A    Yes.

6    Q    Were there any other witnesses who you sought to bring

7      forward to give statements before the Board other than

8      those you just identified as having spoken?

9    A    No.

10   Q    Did your attorney make any statements on your behalf

11     that night to the Board of Water Commissioners?

12   A    Yes.

13   Q    Your attorney that night was whom?  Was it Miss

14     Ishihara?

15   A    Yes.

16   Q    And do you know how long Miss Ishihara spoke for?

17   A    Between 10 and 15 minutes.

18   Q    Other than what you described as your being questioned

19     and these other witnesses being questioned and Miss

20     Ishihara speaking for 10 or 15 minutes, were there any

21     other statements or evidence put before the Board of

22     Water Commissioners?

23   A    A few of the people from the spectators had things to

24     say, opinions to voice.

134

| | | |
|---|---|---|
| 1 | Q | Were they given the opportunity to voice their opinions? |
| 2 | A | Yes, they were. |
| 3 | Q | And how was that done, by show of hands?  How did they |
| 4 | | let the Board know they wanted to be heard? |
| 5 | A | It could have been a show of hands, but I don't remember |
| 6 | | how they let them know. |
| 7 | Q | Do you remember any of the persons that did speak out? |
| 8 | A | I remember Mary McCoy. |
| 9 | Q | Anyone else you recall speaking out? |
| 10 | A | Possibly Marilyn Knowlton.  Nobody else that I can think |
| 11 | | of. |
| 12 | Q | And Mrs. McCoy, is that the same person that was on the |
| 13 | | Prudential Committee? |
| 14 | A | Yes, sir. |
| 15 | Q | And what's your memory of what she had to say? |
| 16 | A | My memory is that she advised the Board to make |
| 17 | | decisions that were in the best interest of the |
| 18 | | district. |
| 19 | Q | Did she specifically advocate on your behalf that you |
| 20 | | should not be disciplined? |
| 21 | A | No. |
| 22 | Q | How about Marilyn Knowlton, what was your memory of what |
| 23 | | she had to say? |
| 24 | A | Basically to not make a rash decision, advising the |

135

1      Board not to make a rash decision.

2   Q   Did she advocate on your behalf that you should not be

3       terminated or fired?

4   A   No.

5   Q   Do you recall any other statements made?

6   A   No, I don't recall.

7   Q   Did the Board make a decision that night of the meeting?

8   A   Is this the June 30th -- yes, they did.

9   Q   Did they make it in front of the whole meeting that was

10      convened?

11  A   Yes, they did.

12  Q   What's your memory of what that decision was or how that

13      was conveyed?

14  A   They just told me across the table that they had made a

15      decision by a vote of two to zero.

16  Q   Did they take the vote in front of you and at that

17      meeting?

18  A   Yeah.

19  Q   A show of hands or how --

20  A   No, yea and nay, two voted yes and one abstained from

21      the vote.

22  Q   And the abstention, was that Mr. O'Hearne?

23  A   Yes.

24  Q   And why did he abstain?

| | | |
|---|---|---|
| 1 | A | I don't know. |
| 2 | Q | Did he state why he did on the record? |
| 3 | A | Yes, I believe he may have. |
| 4 | Q | You don't have a memory of it today though? |
| 5 | A | No. |
| 6 | Q | Is it because of his relationship with your friend |
| 7 | | Ramona O'Hearne? |
| 8 | A | No, I don't believe so. |
| 9 | Q | And did you later receive a written notice of their |
| 10 | | decision as well? |
| 11 | A | Yes, sir. |
| 12 | | MR. CLOHERTY:  Can I have that marked? |
| 13 | | (Document marked Exhibit No. 6 |
| 14 | | for identification.) |
| 15 | Q | I'm showing you what's been marked as Exhibit No. 6. |
| 16 | | And I, for the record, ask you to take a look at that, |
| 17 | | and tell me if you recognize it. |
| 18 | A | Yes, I do. |
| 19 | Q | And what do you recognize that to be? |
| 20 | A | My letter of termination from the Board of Water |
| 21 | | Commissioners. |
| 22 | Q | As a result of the decision to terminate your |
| 23 | | employment, ma'am, did you take any further steps to |
| 24 | | review that decision? |

CURRAN COURT REPORTING

137

| | | |
|---|---|---|
| 1 | A | Through my attorney, yes, I did. |
| 2 | Q | And what steps did you take through your attorney? |
| 3 | A | I'm not sure what they're called, but one of them was |
| 4 | | like filing a Grievance. |
| 5 | Q | And do you remember when that Grievance was filed? |
| 6 | A | Not the exact date, no. |
| 7 | | MR. CLOHERTY:  Let me have this marked. |
| 8 | | (Document marked Exhibit No. 7 |
| 9 | | for identification.) |
| 10 | Q | I'm showing you and your attorney what's been marked as |
| 11 | | Exhibit No. 7.  I ask you to take a moment and look at |
| 12 | | that and ask you if you recognize it. |
| 13 | | (Witness peruses the document.) |
| 14 | A | Yes, I recognize it. |
| 15 | Q | And what is that, ma'am? |
| 16 | A | This is a Grievance that I dropped off at the Water |
| 17 | | Department. |
| 18 | Q | Is that your signature, or is that your handwriting |
| 19 | | anywhere on that document, ma'am? |
| 20 | A | Yes, it is. |
| 21 | Q | Where is your handwriting? |
| 22 | A | The date written in and my signature at the bottom. |
| 23 | Q | What's the date, July 2, 2004? |
| 24 | A | Yes. |

CURRAN COURT REPORTING

138

1    Q    You see how the union official signed it as well?

2    A    Yes.

3    Q    And Kathi Semple was the union official at the Water

4         Department?

5    A    That's not a union.

6    Q    Do you know why Kathi Semple -- is that Kathi Semple's

7         signature there?

8    A    Yes.

9    Q    Do you recognize it?

10   A    Yes.

11   Q    Do you know why she signed it?

12   A    They operate the Water Department as if it's a union and

13        it's not.  I don't know.

14   Q    At the top of the document, it's captioned Onset Water

15        Department Employees Association Grievance.  Do you see

16        that, ma'am?

17   A    Yes.

18   Q    Were you a member of the Employees Association?

19   A    There is an association.  It's an agreement between the

20        employees and the Water Commissioners.  No dues are paid

21        or anything like that.

22   Q    Do you know whether the terms of your employment at the

23        Water Department were collectively bargained through the

24        Employees Association?

139

1    A    I don't know.

2    Q    Do you know whose handwriting is underneath the

3         signature of Kathi Semple?

4    A    That's Superintendent Gay.

5    Q    Do you recall any action being taken by the Board of

6         Water Commissioners after the filing of this Grievance?

7    A    I don't recall.

8    Q    Do you remember going into any further meetings before

9         the Water Commissioners where you disputed the decision

10        to terminate your employment?

11   A    Yes, I believe I did go to another meeting.

12   Q    Do you remember when that meeting took place?

13   A    The day of the week was a Saturday.

14              MR. CLOHERTY:  Can I have that marked as an

15        exhibit?

16              (Document marked Exhibit No. 8

17              for identification.)

18   Q    I'm showing you what's been marked as Exhibit No. 8.  I

19        recognize it's a lengthy document.  I don't need you to

20        read the whole thing.  I ask you to take a moment to

21        look at that, and tell me if you recognize what that is.

22              (Witness peruses the document.)

23   A    It's the minutes to the meeting.

24   Q    And is there a date associated with those minutes in the

1        upper left-hand corner, ma'am?

2  A   July 24, 2004.

3  Q   And in the body of those minutes, it references Agenda

4      Item 2, Grievance of Lori Ann Moran.  Do you see that,

5      ma'am?

6  A   Yes.

7  Q   Do you recall your Grievance being heard by the Board of

8      Water Commissioners on July 24, 2004?

9  A   I don't recall it, but ...

10  Q   Having seen this, does that refresh your memory?

11  A   Yes.

12  Q   Is it consistent with your memory that it would have

13      taken place about that time?

14  A   Yes.

15  Q   And accepting that these minutes will speak for

16      themselves, ma'am, what's your memory of what transpired

17      during that meeting of your Grievance?

18  A   My memory of what happened during this Grievance?

19  Q   Yes.

20  A   I was the only one with an attorney at that point.

21      There was no attorney to represent the Board of Water

22      Commissioners.  And they just said that I wasn't due the

23      process, the Grievance process.

24  Q   Did they deny your Grievance?

141

1   A   They just said the process -- I had already been

2       terminated.

3   Q   So they said you didn't have a right to file a Grievance

4       or something to that extent?

5   A   Basically.

6   Q   Did you bring anyone with you to that hearing or that

7       Grievance hearing, ma'am?

8   A   I could have, yes.

9   Q   It says at the roll call on the minutes there was some

10      Water Department officials present, and then it lists

11      the residents, including yourself, Attorney Ishihara,

12      and seven other unidentified residents.  Do you see

13      that, ma'am?

14  A   Yes.

15  Q   Do you know who those people were?

16  A   No.  I can't remember which ones went to which meeting.

17      So without giving me any hint, I really don't know which

18      seven that could have been.

19  Q   I'd like to turn your attention to Page 6 of 8 of the

20      minutes, ma'am.

21  A   Okay.

22  Q   Down towards the bottom of that page, there's a

23      rendition of a resident speaking out at the meeting.  Do

24      you see that?

| | | |
|---|---|---|
| 1 | A | Resident, Can I say something? |
| 2 | Q | Correct. I'd like you to read that paragraph saying, |
| 3 | | Resident, Can I say something. And I ask you if you can |
| 4 | | identify who that person is. |
| 5 | | (Witness peruses the document.) |
| 6 | A | Do you want me to tell you if I know who it is. |
| 7 | Q | Yes. |
| 8 | A | Robert Anderson. |
| 9 | Q | And who is Mr. Anderson? |
| 10 | A | A friend of mine. He's a distant cousin of my husband. |
| 11 | Q | Had you asked him to accompany you to the meeting that |
| 12 | | night? |
| 13 | A | Yeah, probably. |
| 14 | Q | Do you recall anyone else besides Mr. Anderson speaking |
| 15 | | out on your behalf at that meeting, without going |
| 16 | | through all the minutes, ma'am? |
| 17 | A | No, I'm sorry. |
| 18 | Q | Did you take any further steps after this meeting of |
| 19 | | July 24th concerning your employment with the Water |
| 20 | | Department other than filing the present lawsuit? |
| 21 | A | No, not that I remember. |
| 22 | Q | Do you know if today there is still a -- any grievance |
| 23 | | proceedings pending? |
| 24 | A | I can't answer that. No, I don't know. |

CURRAN COURT REPORTING

144

| | | |
|---|---|---|
| 1 | | at that, and let me know when you've had a chance to |
| 2 | | read it. |
| 3 | | (Witness peruses the document.) |
| 4 | A | I've read it. |
| 5 | Q | In here it refers to an incident in the winter of 2003 |
| 6 | | between Kathi Semple and William Gay; is that correct? |
| 7 | A | Can you say the question again? |
| 8 | Q | I'm asking you -- I'm making a prefatory question.  This |
| 9 | | paragraph refers to an incident between Kathi Semple and |
| 10 | | William Gay in 2003, correct? |
| 11 | A | Yes. |
| 12 | Q | Were you present when this incident took place? |
| 13 | A | No. |
| 14 | Q | And the date is referred to generally as winter of 2003. |
| 15 | | Can you today be more specific as to when that incident |
| 16 | | took place that's described in Paragraph 9? |
| 17 | A | February 18th or 19th. |
| 18 | Q | And how do you know that that was the date? |
| 19 | A | Because they called it the blizzard of 2003. |
| 20 | Q | And were you employed by the Onset Water Department at |
| 21 | | that time? |
| 22 | A | Yes. |
| 23 | Q | When did you begin your work for them? |
| 24 | A | 2003 I thought. |

145

1    Q    I thought you were hired in April of 2003, ma'am.  Maybe
2         I'm wrong, but July 2003 is when you went full-time.
3         You were hired in April of 2003?
4    A    I might have --
5    Q    Did you hear about this incident secondhand?
6    A    No.  I was working there.
7    Q    Do you think the date of 2003 is wrong, ma'am?
8    A    I think it could be.
9    Q    But you have a memory of being an employee of the Water
10        Department when you heard about this incident?
11   A    Yes, I was.
12   Q    And earlier I asked you if you were present at the time,
13        and you said no, you were not?
14   A    Not at the time of the screaming is what you asked me.
15   Q    How did you first come to hear about the incident that's
16        described in Paragraph 9 of your Complaint?
17   A    The screaming part or the incident part?
18   Q    How did you learn anything about the incident, ma'am?
19   A    When I was at work that morning at 8:00, Miss Semple,
20        Kathi Semple, came into work at 9:30 and informed me of
21        the incident that had happened with the other two Water
22        Department employees.
23   Q    Is it fair to say she was approximately an hour and a
24        half late for work?

152

| | | |
|---|---|---|
| 1 | A | About her size (indicating). |
| 2 | Q | The record is not going to reflect what that is? |
| 3 | A | Five seven, 120 pounds.  I don't know. |
| 4 | Q | Do you know how old she is? |
| 5 | A | A guesstimate that she could be 45. |
| 6 | Q | How about William Gay, how big a person is he? |
| 7 | A | Five seven, 150 pounds. |
| 8 | Q | And how old is he? |
| 9 | A | Approximately the same age, 45, a couple years older |
| 10 | | than I am. |
| 11 | Q | And you're how old today, ma'am? |
| 12 | A | 43. |
| 13 | Q | And how tall are you? |
| 14 | A | Five eight. |
| 15 | Q | And I'm going to ask you a personal question.  Please |
| 16 | | don't be offended. |
| 17 | A | I'm not going to answer that question. |
| 18 | Q | How much do you weigh, ma'am? |
| 19 | A | I'm not going to answer that question. |
| 20 | Q | Do you weigh more than Mr. Gay? |
| 21 | A | Yes, I do. |
| 22 | Q | You're aware that he's contending that he felt |
| 23 | | physically threatened by you? |
| 24 | A | Yes. |

CURRAN COURT REPORTING

154

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | -- for his conduct towards you? |
| 3 | A | No, sir. |
| 4 | | (Document marked Exhibit No. 10 |
| 5 | | for identification.) |
| 6 | Q | I want to direct your attention to Page 9 of your |
| 7 | | Complaint, ma'am? |
| 8 | A | Okay. |
| 9 | Q | And in Paragraph 40 of your Complaint, you make an |
| 10 | | allegation that the Defendants DiPasqua and Sanborn were |
| 11 | | biased against you.  Do you see that, ma'am? |
| 12 | A | Yes. |
| 13 | Q | What evidence do you have today that they were, in fact, |
| 14 | | biased against you in deciding your termination hearing? |
| 15 | A | Evidence I have today would be attached in here, right? |
| 16 | | (Witness peruses the documents.) |
| 17 | A | I don't see the evidence in the file that I was |
| 18 | | referring to. |
| 19 | Q | What were you referring to? |
| 20 | A | A letter from Maurice Harlow. |
| 21 | Q | I have that here, and I'll show that to you. |
| 22 | | (Document marked Exhibit No. 11 |
| 23 | | for identification.) |
| 24 | Q | Showing you what's been marked as Exhibit No. 11, and |

CURRAN COURT REPORTING

1      we're going out of order because I had another exhibit

2      marked first, but looking at Exhibit 11, do you

3      recognize that?

4  A   Yes.

5  Q   Is that the letter you were referring to before?

6  A   Yes.

7  Q   And that's dated July 24, 2004?

8  A   Yes.

9  Q   It's from Mr. Harlow.  You previously identified him,

10     correct?

11 A   Yes.

12 Q   How is it that you came to obtain this letter, ma'am?

13 A   This was obtained through my attorney.

14 Q   Do you recognize the handwriting on this letter, ma'am?

15 A   To be that of Maurice Harlow's?

16 Q   Yes.

17 A   Yes.

18 Q   Is it your handwriting?

19 A   No.

20 Q   Did you see him write this out?

21 A   Yes.

22 Q   Did you see him sign his name at the end of this?

23 A   Yes.

24 Q   And who else was present at the time this was written

156

1     and signed?

2   A   My attorney.

3   Q   And who else?

4   A   No one.

5   Q   And you and Mr. Harlow?

6   A   Yes.

7   Q   What was discussed at that meeting?

8   A   What he had heard said to him through Andy DiPasqua.

9   Q   Mr. DiPasqua -- how did it come to your attention that

10      Mr. Harlow had spoken to Mr. DiPasqua?

11  A   He called me and told me that Andy had spoke to him.

12  Q   Mr. Harlow called you?

13  A   Yes.

14  Q   The content of what their discussion was is reflected in

15      that letter, ma'am?

16  A   Yes.

17  Q   Do you know if anyone else was present at the time

18      Mr. Harlow spoke to Mr. DiPasqua?

19  A   I don't know that.

20  Q   You weren't present?

21  A   I wasn't present, no.

22  Q   Other than that letter, ma'am, from Mr. Harlow, do you

23      have any other evidence of bias by either Mr. DiPasqua

24      or Mr. Sanborn?

157

| | | |
|---|---|---|
| 1 | A | Not at this time. |
| 2 | Q | Do you have a present anticipation of locating any other |
| 3 | | evidence of bias by Mr. Sanborn or Mr. DiPasqua? |
| 4 | A | I'm not sure. |
| 5 | Q | In that letter, Mr. Harlow never told you that he spoke |
| 6 | | to Mr. Sanborn at all, did he? |
| 7 | A | No, I don't think he wrote that in here. |
| 8 | Q | Mr. Harlow's evidence only relates to Mr. DiPasqua, |
| 9 | | correct? |
| 10 | A | Yes. |
| 11 | Q | I want to direct your attention to Paragraph 47 of your |
| 12 | | Complaint on Page 10. |
| 13 | A | I have it. |
| 14 | Q | In there, there's an allegation that there was no |
| 15 | | disciplinary action taken against Kathi Semple.  Do you |
| 16 | | see that? |
| 17 | A | Yes, sir. |
| 18 | Q | How do you know that, ma'am? |
| 19 | A | Because she still works there.  And I would have |
| 20 | | observed if something had happened because I worked |
| 21 | | there, too. |
| 22 | Q | You weren't privy to her personnel files, were you, |
| 23 | | ma'am? |
| 24 | A | No, I wasn't. |

168

1      stating the manner in which or by whom.  We weren't

2      allowed to cross-examine or ask any questions back to

3      the people that were making statements against me.  We

4      weren't allowed to ask them questions back.

5   Q  Other than not being able to cross-examine other

6      witnesses who spoke, was there any evidence that you

7      were precluded or barred from presenting?

8   A  Not that I can think of.

9   Q  Did you offer any documents to the Board of

10     Commissioners where they said, no, we won't take that or

11     anything to that extent?

12  A  I don't believe so.

13  Q  Did you offer up any witnesses who were there on your

14     behalf who were prohibited from speaking?

15  A  No.

16  Q  I just want to go through some further documents with

17     you.

18  A  Am I done with this one?

19  Q  You can put that away.  Thank you.  Ms. Moran, you're

20     not contending that you were denied any pay or didn't

21     receive any pay you were due for the time that you were

22     employed by the Onset Water Department?

23  A  No, I'm not.

24  Q  Did you ever see any of the meetings being posted on a

171

1        give you one of these.

2    Q   Did you go to meetings for the association or anything?

3    A   Never.

4    Q   And there were no dues you said?

5    A   No.

6    Q   Did you ever participate in any negotiations between the

7        association and the Water District?

8    A   No.  They wouldn't do it that way.

9    Q   What way did they do it?

10   A   It would be between the employees and the Water

11       Commissioners.

12   Q   So there wasn't a central negotiating party?

13   A   No.

14   Q   And how many employees were party to this association?

15   A   Five.

16   Q   Did the association have a president or anything like

17       that?

18   A   I don't think there was a president, no.

19   Q   And did you rely upon this agreement to set forth the

20       terms of your employment?

21   A   The terms of my employment?  No.

22   Q   Were there any other documents you received from the

23       Fire District outlining any of the terms and conditions

24       of your employment?

172

1    A    No.

2    Q    Did you receive any employee handbook or anything like

3         that?

4    A    Not that I remember.

5    Q    Did you ever see any subsequent modifications to the

6         agreement that's marked as Exhibit H?

7    A    Yes.

8    Q    When did you see those?

9    A    The first Christmas that I worked at the Water

10        Department, they had to modify holidays.

11   Q    Exhibit H is dated -- what's the date of that agreement

12        on the last page?

13   A    It looks like this one is May 15, 2001.

14              MR. CLOHERTY:  Why don't I show you another

15        exhibit.

16              (Document marked Exhibit No. 15

17              for identification.)

18   Q    I show you what's been marked as Exhibit 15 and ask you

19        to take a moment to look at that with your attorney, and

20        tell me if you recognize that.

21   A    I recognize it as the updated version of the original

22        from 1979.  That's what they told me this was dated back

23        to.  The original comes from 1979.

24   Q    And that appears to be a similar Employee Association

CURRAN COURT REPORTING

# EXHIBIT "B"



UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                                        \*
LORI-ANN MORAN,                         \*
                    Plaintiff           \*
                                        \*    CIVIL ACTION
                    VS                  \*    NO. 05-10033NG
                                        \*
ANDREW DIPASQUA, MICHAEL                \*
SANBORN, WILLIAM F. GAY,                \*
III, AND THE ONSET FIRE                 \*
DISTRICT,                               \*
                    Defendants          \*
                                        \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


            DEPOSITION OF MARY E. McCOY, taken on behalf
of the plaintiff pursuant to the Massachusetts Rules of Civil
Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand
Reporter and Notary Public in and for the Commonwealth of
Massachusetts at the offices of Margaret A. Ishihara, Esq.,
86 Church Street, Mattapoisett, Massachusetts, on Wednesday,
January 25, 2006, commencing at 9:57 a.m.


APPEARANCES:

MARGARET A. ISHIHARA, ESQ., 86 Church Street, Mattapoisett,
MA 02739, For the plaintiff

JOHN J. CLOHERTY, III, ESQ., Pierce, Davis & Perritano, LLP,
Ten Winthrop Square, Boston, MA 02110-1257, For the defendant

ALSO PRESENT:

Lori-Ann Moran

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

9

1  Committee for the Onset Fire District?

2      A.   Raising appropriation of monies, borrow monies for

3  the district and pay expenditures.

4      Q.   And can you tell us what the relationship is

5  between the Prudential Committee for the Onset Fire

6  District and the Onset Water Department?

7      A.   They're two governing boards and the day-to-day

8  operation of the Prudential Committee corresponds or talks

9  with the Water Department, the water commissioners or Water

10 Department, and the most that we would probably meet is

11 during the budget time in a district meeting.

12     Q.   Okay, let me just make sure I'm understanding this

13 correctly.   Are you saying that the day-to-day operation of

14 the Water Department is the responsibility of whom?

15     A.   Is the water commissioners or the superintendent.

16     Q.   So does the Prudential Committee in your view have

17 any oversight, financial or otherwise, over the Board of

18 Water Commissioners?

19     A.   No.

20     Q.   What about any of the operations of the Water

21 Department?

22     A.   No.

23     Q.   But the Prudential Committee establishes a budget

18

1    A.  Yes.

2    Q.  Did you speak with him in person?

3    A.  Yes.

4    Q.  Do you recall where?

5    A.  At the water office.

6    Q.  The water office up on Sand Pond Road?

7    A.  Yes.

8    Q.  Did you just happen to be there and saw him or had

9  you asked to meet with him?

10   A.  I attended the meeting.

11   Q.  So you spoke to Andrew DiPasqua on June 30, 2004?

12   A.  The date of the meeting.

13   Q.  The date of the meeting?

14   A.  Yes.

15   Q.  Was this before the meeting actually started?

16   A.  Yes.

17   Q.  Was anyone else present other than yourself and

18 Mr. DiPasqua during this conversation?

19   A.  Engaging in the conversation?

20   Q.  Or present within hearing distance?

21   A.  There were other people around but my conversation

22 was with Andy DiPasqua.

23   Q.  And what did you say and what did Mr. DiPasqua say?

19

1    A.  I don't recall the exact words.  It was a

2  discussion pertaining to the meeting of June 30th that I

3  was there to attend.

4    Q.  Well, did you talk about Lori-Ann Moran?

5    A.  Her name did come up, yes.

6    Q.  Do you recall generally what the discussion was

7  about?

8    A.  I can't recall if this was the first meeting that

9  was, that started the special meeting pertaining to Lori

10  Moran, and if I recall, I had asked questions as to what

11  was going on.

12    Q.  And what if anything did Mr. DiPasqua say when you

13  asked what was going on?

14    A.  I believe he gave me a brief statement of an

15  incident that occurred in the office.

16    Q.  Do you recall what he said about the incident in

17  the office?

18    A.  I can't recall the exact words other than a

19  discipline problem between the water superintendent and

20  Lori Moran.

21    Q.  Is there anything else that you can recall that

22  Mr. DiPasqua said?

23    A.  I can't recall other than the basic conversation as

20

1  to what transpired in the office.

2      Q.  And what if anything did you say?

3      A.  I asked him, I believe, where did the board sit or

4  how did he feel about it, and I believe they weren't sure

5  or he wasn't sure.  I made the comment that perhaps there

6  should be a letter of reprimand given to Lori and Mr. Gay.

7      Q.  Did you say anything -- I'm sorry, you were

8  continuing.

9      A.  I asked if there was going to be a letter of

10 reprimand given to Lori and Mr. Gay, and I recall no

11 decision was made at that point, I think.

12     Q.  So you recall Mr. DiPasqua saying what?

13     A.  At that --

14             MR. CLOHERTY:  Objection to form.

15     A.  Prior to this meeting there was no decision to be

16 made with this hearing.

17     Q.  So you had stated that perhaps a letter of

18 reprimand should be given to Lori Moran and Mr. Gay, and

19 what was Mr. DiPasqua's response to that?

20     A.  No decision was made.

21     Q.  Was anything further said in that conversation

22 between yourself and Mr. DiPasqua?

23     A.  I don't recall.

# EXHIBIT "C"



UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                                    \*
LORI-ANN MORAN,                     \*
              Plaintiff             \*
                                    \*   CIVIL ACTION
              VS                    \*   NO. 05-10033NG
                                    \*
ANDREW DIPASQUA, MICHAEL            \*
SANBORN, WILLIAM F. GAY,            \*
III, AND THE ONSET FIRE            \*
DISTRICT,                           \*
              Defendants            \*
                                    \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


          30 (b)(6) DEPOSITION OF WILLIAM F. GAY, III,
and Individually, taken on behalf of the plaintiff pursuant
to the Massachusetts Rules of Civil Procedure before Kathleen
M. Benoit, CSR # 1368F94, Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts at the
offices of Margaret A. Ishihara, Esq., 86 Church Street,
Mattapoisett, Massachusetts, on Monday, January 23, 2006,
commencing at 10:12 a.m.


APPEARANCES:

MARGARET A. ISHIHARA, ESQ., 86 Church Street, Mattapoisett,
MA 02739, For the plaintiff

JOHN J. CLOHERTY, III, ESQ., Pierce, Davis & Perritano, LLP,
Ten Winthrop Square, Boston, MA 02110-1257, For the defendant

ALSO PRESENT:

Lori-Ann Moran

## Leavitt Reporting, Inc.

*1207 Commercial Street, Rear*
*Weymouth, MA 02189*

*Tel. 781-335-6791*
*Fax: 781-335-7911*
*leavittreporting@att.net*

*Hearings ◆ Conferences ◆ Legal Proceedings*

9

1  other.

2      Q.  And you're also captain in the Onset Fire

3  Department, is that right?

4      A.  Yes, ma'am.

5      Q.  And for how long have you been a captain?

6      A.  I've been captain for over a year.

7      Q.  And before that did you have any other position

8  with the Fire Department?

9      A.  Yes, I was lieutenant.  I worked my way up from the

10 bottom to captain.  There's several different steps.

11     Q.  Do you recall what time period you were a

12 lieutenant?

13     A.  A lieutenant, I'll say somewheres from 2000 to

14 sometime last year.

15     Q.  And before that what was your position?

16     A.  Operator, firefighter operator.

17     Q.  And during what time period did you have that

18 position?

19     A.  I had that position approximately from '80 when I

20 first became operator because when I started back -- I had

21 left the Fire Department for a little while, and then when

22 I started back was in '84 I believe, and by '86, '87 I was

23 a step one operator, a firefighter.

13

1    Precast Company.

2        Q.   And during what time period did you work for

3    Linear's Precast?

4        A.   Approximately '87 to '1990, '91.  It was '90, I

5    think.

6        Q.   And where are they located?

7        A.   They were located in South Yarmouth.

8        Q.   What was your job with Linear's Precast?

9        A.   Truck driver, installer.

10       Q.   And what was the reason that you left Linear's?

11       A.   They laid people off and eventually they went out

12   of business.

13       Q.   And where, if anywhere, did you next go to work?

14       A.   Onset Water Department.  There was some laid off

15   time in between.

16       Q.   So when did you start with the Onset Water

17   Department then?

18       A.   Part-time 1990.

19       Q.   And what was your job when you first started with

20   them part-time?

21       A.   Meter reader, basic laborer.  The first job I

22   actually did was meter reading and then laborer.  If

23   something happened like a water leak, whatever, I'd be the

14

1  laborer.

2      Q.  At some point did you change positions at Onset

3  Water Department?

4      A.  A few times.

5      Q.  For how long were you a part-time meter reader?

6      A.  I was approximately September of '90 to February of

7  '91.

8      Q.  And what was your next job?

9      A.  The next job after that was laborer, then it was

10  skilled laborer, then it was tech, then it was foreman,

11  then superintendent.

12      Q.  Starting with laborer, during what years were you a

13  laborer?

14      A.  Laborer went from when I was hired to, it had to be

15  two or three years later when I got my licenses to do the

16  water, the D and the T license, and then I became a water

17  tech.  I don't remember the exact years.

18      Q.  So the D and the T licenses you think were sometime

19  in 1991 or '92, does that sound right?

20      A.  Yes, yes.

21      Q.  So once you received those, you went to the tech

22  position?

23      A.  The tech position, yes.

15

1    Q.   And what were your job duties in the tech position?

2    A.   Everything to do with the water system as far as

3 the stations, the pipes, reading the meters, et cetera,

4 jobs like that.  No administrative jobs, you know,

5 paperwork type, you know, total paperwork type at that

6 point, no.

7    Q.   And then you say you became the foreman.  When did

8 that occur?

9    A.   2001.

10    Q.   What were your job duties as foreman?

11    A.   To oversee the jobs plus participate in them, the

12 same jobs as I mentioned before.

13    Q.   And you became superintendent when?

14    A.   In I believe it was 2002.

15    Q.   Are you currently the water superintendent?

16    A.   Yes, ma'am.

17    Q.   When you first became the water superintendent in

18 2002, can you tell us what your job duties were?

19    A.   Okay, its day-to-day operations, overseeing of all

20 day-to-day operations.

21    Q.   Do you have anyone report -- I'm sorry, go ahead.

22    A.   Also, once I received that, all necessary

23 delegation and doing of DEP, the M & O budget, things like

16

1    that.

2        Q.    The M & O budget stands for what?

3        A.    Maintenance operation.

4        Q.    And when you started as superintendent in 2002, did

5    you have any other employees reporting to you?

6        A.    The employees, every -- it still goes, it's

7    superintendent.  If the superintendent's unavailable, it

8    becomes to the foreman.  After that point it becomes the

9    next person highest in seniority for day to day.

10       Q.    Is there any administrative clerical staff that

11   reported to you back in 2002?

12       A.    Yes.

13       Q.    And who were those people in 2002?

14       A.    It was Mrs. Moran and Mrs. Semple.  Miss Semple,

15   excuse me.

16       Q.    And what were their job titles?

17       A.    Office manager.

18       Q.    That was Miss Semple, is that right?

19       A.    Yes.  And clerical.

20       Q.    And in 2002, to whom did you report?

21       A.    To the water commissioners.

22       Q.    During the period from 2002 when you first became

23   the water superintendent up until the present time, have

20

1      A.   No, ma'am.

2      Q.   So that was the Board of Water Commissioners who

3  would do that?

4      A.   Yes, ma'am.

5      Q.   In 2002 when you first became water superintendent,

6  can you tell us the names of the people that worked for the

7  Onset Water Department?

8      A.   As I became the superintendent?

9      Q.   Yes, at the time that you became water

10  superintendent who was employed there?

11      A.   Myself, Kathi Semple, Chris Poirier, Jay Semple I

12  believe was there at the time or came right afterwards, and

13  Mrs. Moran.  I don't know, they were close.  I'm not sure

14  which one came first.

15      Q.   And with regard to Chris Poirier, can you tell us

16  what his job title was in 2002?

17      A.   In 2002 when I became superintendent, he became

18  foreman and before that point he was laborer and I was

19  foreman.

20      Q.   And what about Jay Semple?

21      A.   He was a laborer.

22      Q.   And Chris Poirier is still the foreman, is that

23  right?

27

1      Q.  You don't remember that statement being made by

2  Kathi Semple?

3      A.  Not at this time.

4      Q.  After you received the letter of September 2, 2003,

5  what if anything did you do?

6      A.  I wrote a letter back to Miss Moran I believe

7  stating that she could come to me with any type of problem

8  she had.

9      Q.  And did you meet with Mrs. Moran after receiving

10 the letter of September 2, 2003?

11     A.  I don't believe so.

12     Q.  You don't recall specifically whether you did or

13 you didn't?

14          MR. CLOHERTY:  Objection.  You can answer.

15     Q.  You can answer.

16     A.  I think it was a brief conversation.  I don't

17 remember the exact contents of the conversation.

18     Q.  Do you recall Kathi Semple accusing you of sexual

19 harassment at that meeting in August of 2003?

20     A.  No, ma'am, I don't.

21     Q.  Do you recall her making that accusation at any

22 time?

23     A.  Not to me, no.

28

1    Q.  To anyone, did you hear that she made that to

2  anyone else?

3    A.  Not at that time.  Not until this, that meeting.

4  It was Mr. Blacker saying it, not really Mrs. Semple, Miss

5  Semple.

6    Q.  So at the August 2003 meeting, Mr. Blacker -- let

7  me go back a minute.  Mr. Blacker at the time was a water

8  commissioner, is that right?

9    A.  Yes.

10    Q.  And that's Lawrence Blacker?

11    A.  Yes.

12    Q.  And you're saying that Mr. Blacker made a statement

13  to you that you were being accused of sexual harassment, is

14  that what you're telling us?

15    A.  Yes, ma'am.

16    Q.  And did he say who had made that accusation?

17    A.  I don't remember at that point in time who.  It was

18  the office people.

19    Q.  And do you recall what if anything you said in

20  response?

21    A.  I have never done no such thing.

22    Q.  That's what you said at the meeting?

23    A.  Yes, if I remember correctly.  It was a long time

29

1  ago.

2     Q.  And who else was present at that meeting?

3     A.  I believe all the employees and the water

4  commissioners.

5     Q.  Did anyone else who was at that meeting say

6  anything after you spoke?

7     A.  Mrs. Moran, Miss Semple and Mr. Blacker were having

8  a detailed conversation, but I don't remember all the

9  details.  They were just talking back and forth.

10    Q.  Were they talking loud enough for you to hear them?

11    A.  Yes, at a table like this.

12    Q.  But you don't recall what they said?

13    A.  They were talking about the sexual harassment

14 thing, harassment, that I was accused for the sexual

15 harassment and Miss Semple saying that I have never done

16 that to her.  That's the basic what I remember out of it.

17    Q.  Miss Semple said you had never done that to her?

18    A.  Yes.

19    Q.  Did she say that in response to anything that

20 someone else had said to her?

21    A.  I believe it was Mr. Blacker.  He wanted to know if

22 I sexually harassed her.  I believe that was the

23 conversation.

30

1    Q.   So he asked that directly of Kathi Semple?

2    A.   I believe so.

3    Q.   And she said no that you had not?

4    A.   Right, yes, ma'am.

5    Q.   Was any action taken against you as a result of

6  that meeting in August of 2003?

7    A.   No, ma'am.

8    Q.   Did you ever hear anything else about it again?

9    A.   No, ma'am.

10    Q.   Other than the meeting that you had had, the brief

11  meeting that you had had with Lori Moran after you received

12  the letter of September 2, 2003, did you do anything else

13  in response to her letter?

14    A.   I just kept an overview of the office situation.

15    Q.   Did you ever speak with any of the other employees

16  about the letter of September 2, 2003?

17    A.   I believe Miss Semple knew about the letter.

18    Q.   Did she know about it because you told her?

19    A.   I believe I told her.

20    Q.   Do you recall what you said to her and what she

21  said to you?

22    A.   No, ma'am, not word, no.

23    Q.   Not word for word?

42

1  anything?

2       A.   Yes, ma'am.

3       Q.   And who was that?

4       A.   Mrs. Moran.

5       Q.   And what did Mrs. Moran say?

6       A.   Innocently, when I was talking to Kathi, I had told

7  Kathi I want you to get the minutes from the back room,

8  innocently I called Mrs. Moran "she" can copy them and I

9  will do the tapes, and Mrs. Moran got up, started to get

10 loud, "I'm only a she; I'm only a she."

11      Q.   So you say she raised her voice?

12      A.   Yes.

13      Q.   Did she remain seated at her desk?

14      A.   No, she did get up and approach the other desk.

15      Q.   About how far away was she from you when she made

16 that statement to you?

17      A.   I'm not good on distances.  Somewheres around the

18 area of the desk, somewheres on the side and I was still

19 standing in the front area (indicating).

20      Q.   You mean somewhere on the side of Kathi Semple's

21 desk?

22      A.   Yes.

23      Q.   And was Kathi Semple still there when Lori Moran

43

1  made that statement?

2      A.  Yes, ma'am.

3      Q.  What about Jay and Chris?

4      A.  I'm not sure if they were right in the office area

5  or if they were in the meter room.

6      Q.  And do you recall where Peter Murphy was?

7      A.  Mr. Murphy I think was still I believe out in the

8  front in the right-hand side area.

9      Q.  After Lori Moran made that statement to you, what

10  if anything did you say?

11      A.  I apologized for making the statement, not knowing

12  that what I had said to offend her.

13      Q.  Well, so what were the words that you used?

14      A.  Well, she told me --

15          MR. CLOHERTY:  What were the words that he

16  used what, in apologizing?

17          MS. ISHIHARA:  What were the words that he

18  said.  He seems to be adding on to his thoughts at the

19  time.

20      Q.  What were the words that were said by you?

21          MR. CLOHERTY:  Objection.  You can answer.

22      A.  Lori says "I'm only a she; I'm only a she," and I

23  says "If I offended you, I'm sorry.  I did not mean to do

LEAVITT REPORTING, INC.

44

1  that."

2      Q.  And what if anything did Ms. Moran say?

3      A.  She kept persisting that, the word I'm only a "she"

4  and she did not take the apology.

5      Q.  Did she say I don't take the apology?

6      A.  No, she just persisted badgering me about the word.

7      Q.  Do you recall what she said?

8      A.  "I'm only a she.  I'm more than a she," and I don't

9  remember what else besides that.

10     Q.  And what was the next thing that happened after

11  that?

12     A.  I proceeded to go to the loading dock where at this

13  point I knew Mr. Murphy was out on the loading dock and

14  Miss Semple.

15     Q.  Do you recall when in your exchange with Lori Moran

16  the others left?

17     A.  I think it all moved as a whole out there.

18     Q.  Are you saying that Lori Moran also came out to the

19  loading dock?

20     A.  She came behind me I know that, yes.

21     Q.  Does the meter room have a separate doorway into

22  the open office area where the desks are?

23     A.  Yes, it does.

46

1  out to each side, and the door would be actually more in

2  that area.  (Indicating.)

3            (The witness wrote on the document.)

4      Q.  So you're saying that Mrs. Moran followed you

5  through the door into the meter room and then through the

6  door onto the loading dock --

7      A.  Mm-hmm.

8      Q.  -- is that right?

9            MR. CLOHERTY:  You have to say yes or no.

10     A.  Yes.

11     Q.  And after you were out in the loading dock area,

12 what if anything did she say and what if anything did you

13 say?

14     A.  She kept persisting about the word "she" again, so

15 I went back into the commissioner's room avoiding the

16 confrontal, hoping that Mrs. Moran would calm down to get

17 the paperwork and the tapes that needed to be completed for

18 the job assignment.

19     Q.  And where if anywhere did Lori Moran go?

20     A.  I'm not sure where she was at that moment because I

21 was back here.  She may have gone back to her desk.

22 (Indicating.)

23     Q.  But she didn't follow you into the commissioner's

47

1  office?

2      A.  No.  And Peter Murphy was still with me or he was

3  in the general area.

4      Q.  And what about Kathi Semple?

5      A.  I think Kathi eventually came back into the main

6  office too.  I don't remember exactly the time frame.

7      Q.  And Chris Poirier, where was he?

8      A.  I'm not sure where Chris was at that time.

9      Q.  What about Jay Semple?

10     A.  I'm not sure at that point in time.  I know

11  Mr. Murphy was definitely in the office though.

12     Q.  Definitely in the water commissioner's office?

13     A.  In the water commissioner's office, this area.  He

14  may have come back here for a minute or two but that's

15  about it.  (Indicating.)

16     Q.  And after you went into the water commissioner's

17  office, what was the next thing that happened if anything?

18     A.  As I came back out with some of the paperwork that

19  had to be done, Mrs. Moran again kept badgering me about

20  how I had called her a she, and at this point I told her

21  stop, it's only a word, I'm sorry, and I had given Kathi

22  that work at that time.  Now Kathi was not in the room, I

23  was going to give Kathi the work, and as I passed her desk,

48

1    she told me to shut up, which Mr. Murphy was in this

2    right-handed sided area (indicating) at this point in time

3    which he heard it too.

4        Q.  How do you know he heard it?

5        A.  Because afterwards I had asked him.

6        Q.  When you say afterwards, on the same day or at some

7    other date?

8        A.  Right after it happened again walking to the

9    loading dock platform.

10       Q.  So when you came out from the water commissioner's

11   office, you say Lori Moran was at her desk, is that right?

12       A.  Yes, ma'am.

13       Q.  And then you proceeded back to the meter room, is

14   that right?

15       A.  Yes.

16       Q.  And Peter Murphy was behind you?

17       A.  He was in this area at this point in time

18   (indicating).

19           MR. CLOHERTY:  The record is not going to

20   reflect where you're pointing, so if you could describe it.

21   The record is not reflecting where you just pointed, sir.

22       A.  To the right-hand side in front of the desk by the

23   counter area.

51

1      A.  I was heading back into the office.

2      Q.  Did something happen while you were heading back

3   into the office?

4      A.  I received a Nextel call.

5      Q.  From who?

6      A.  Miss Semple.

7      Q.  And what did she say and what did you say?

8      A.  She wanted me not to forget some books that she had

9   for my wife, and I also asked her for a ride home because

10  my vehicle was broken at the time.

11     Q.  Was there any further conversation between yourself

12  and Miss Semple?

13     A.  Not at that moment.

14     Q.  And what happened after Miss Semple reminded you

15  about the books?

16     A.  I asked her for the ride home, and then Miss Moran

17  came onto the Nextel and said "I will give you a ride home

18  on the front end of my bumper."

19     Q.  And what if anything did you say?

20     A.  I did not answer Mrs. Moran's comment.  I asked

21  Kathi again, "Kathi, could I please have a ride home?"

22     Q.  And did Miss Semple respond to you?

23     A.  She said she'd give me a ride home.

53

1    A.  Again, it was mainly "I'm only a she; I'm only a

2    she."  That's what I remember.

3    Q.  And did you say anything in response?

4    A.  And at that point I had told her that what she had

5    said to me on the Nextel was totally unnecessary.

6    Q.  Did you say anything else?

7    A.  At that point Lori again was just on that word that

8    I had used and she was getting very upset, loud.

9    Q.  Now, when you were having this conversation with

10   Miss Moran, were you by her desk?

11   A.  I was --

12              MR. CLOHERTY:  Objection.  You can answer.

13   You can answer.

14   A.  I was somewheres in this vicinity between the two,

15   somewheres in here (indicating).

16   Q.  Between the two desks?

17   A.  Yes, and the counter, somewheres in this area

18   (indicating).

19   Q.  Was anyone else in that area when you were speaking

20   with Lori Moran?

21   A.  Miss Semple and Chris was also in that area.

22   Q.  And what was the next thing that happened?

23   A.  I had -- it was almost four.  I told Lori, "Lori,

54

1  just go home, I will pay you," meaning just go home, cool

2  off, it will be okay.

3      Q.  But the words that you used to her were "Lori, just

4  go home, I will pay you"?

5      A.  Yes.

6      Q.  And what was the next thing that happened?

7      A.  Lori did not go home.  She was still on the same

8  badgering question, word, and I think that's when I left

9  upstairs again.  I'm pretty sure I got in my truck or

10 walked back down and stayed downstairs until after

11 4 o'clock just to stay away from the situation, hoping that

12 Lori would settle down, cool off and just return to normal

13 work.

14     Q.  Okay, so you told Miss Moran "Lori, just go home,

15 I'll pay you," and then you left the office area, is that

16 right?

17     A.  Mm-hmm.

18          MR. CLOHERTY:  You have to say yes or no.

19     A.  Yes.  And Lori was asking me at this time "Am I

20 fired, am I fired?"

21     Q.  Was she still at her desk when she said that?

22     A.  I believe so or in the area.

23     Q.  And so you're saying that after she was asking "Am

57

1   that Mrs. Semple and, Miss Semple and Mrs. Moran's van,

2   vans were still up top.

3       Q.  In the parking lot?

4       A.  In the parking lot, yes.

5       Q.  Did you see anyone up in the parking lot when you

6   went out?

7       A.  Lori was somewheres off to my left as I walked out

8   of the building, to my left.

9       Q.  Then was Kathi Semple somewhere out there?

10      A.  Kathi was pretty close to wherever Lori was exactly

11  at that time.  They weren't too far apart.

12      Q.  And what happened after you left the building?

13      A.  At that point Lori kept yelling at me, "Am I fired,

14  am I fired, am I fired," and again, I don't have the power

15  to hire and fire.  I knew the situation was way out of

16  control at this time since it went beyond the working

17  hours, and at that point I told her I would let her know

18  what her situation is as soon as I could and I left with

19  Miss Semple.

20      Q.  Did Miss Semple say anything?

21      A.  I can't remember if she said anything or not.

22      Q.  So Miss Semple drove you home, is that right?

23      A.  Yes, ma'am.

59

1    had said on the Nextel was totally unnecessary, do you

2    remember that?

3        A.   Mm-hmm.

4        Q.   And why did you say that?

5        A.   Because I felt bodily threatened.

6        Q.   And why did you feel bodily threatened?

7        A.   If somebody threatens to me to run me over, I do

8    take it seriously.

9        Q.   So you feel that her comment about the ride home on

10   the bumper was a threat to run you over?

11       A.   Mm-hmm.

12             MR. CLOHERTY:   You have to say yes or no.

13       A.   Yes.

14       Q.   After you arrived home, what if anything did you

15   do?

16       A.   I went and I found eventually two of the

17   commissioners, the two that were left, and told them what

18   the situation was.

19       Q.   So the two that were left at that point were whom?

20       A.   Mike Sanborn and John Cook.

21       Q.   And you said you found them.  Did you find them by

22   telephone or did you find them in person?

23       A.   I found them in person.

60

1    Q.  Who did you speak to first?

2    A.  I don't, don't remember.

3    Q.  But you didn't speak to them at the same time, is

4  that right?

5    A.  Right.

6    Q.  Do you recall where you spoke with Mike Sanborn?

7    A.  I believe I spoke to them both at the fire station.

8    Q.  And what did you say to Mike Sanborn and what did

9  he say to you?

10    A.  I told him the story that happened, told him how I

11  felt threatened and my authority was underminded (sic) and

12  that do we allow her to come back or what do you want to

13  do.

14    Q.  And what if anything did Mr. Sanborn say?

15    A.  He said at that point maybe put her on

16  administrative leave because I also had talked to John

17  Cook.  I didn't get nothing in stone at first.  I also had

18  talked to John Cook.  John did not get involved because

19  he's related to Mrs. Moran.  So we, not we, Mike decided to

20  put her on administrative leave until we could get it

21  sorted out.

22    Q.  But at some point on April 27, 2004, you did speak

23  directly to John Cook, is that right?

61

1    A.  Yes.

2    Q.  And he told you what?

3    A.  He did not want to make any decisions on that

4  because he is related to Mrs. Moran.

5    Q.  And at that point in time, Larry Blacker had

6  retired --

7    A.  Yes.

8    Q.  -- is that right, and that's why there was a

9  vacancy?

10    A.  Yes.

11    Q.  After speaking with Mr. Sanborn, what did you do

12  next?

13    A.  I went home.

14    Q.  And on April 27, 2004, did you do anything further

15  with respect to Lori Moran?

16    A.  Not that I recall.  I started the actual letter

17  that I had written about what had happened, the events.

18    Q.  Had someone asked you to do that?

19    A.  Nope.  I wanted to write it down as I recalled it

20  while it was still fresh in my memory.

21         MS. ISHIHARA:  I'm going to show you a

22  document which we'll mark Exhibit No. 3.  It states "To

23  whom it may concern," April 27, 2004.

62

1          (Exhibit No. 3 marked.)

2     Q.   Looking at the document that's now been marked

3 Exhibit No. 3, can you tell us what that is?

4     A.   This is a report on the events that happened on

5 April 24, 2004.

6     Q.   April 27, 2004?

7     A.   Yes, excuse me.

8     Q.   And is this the letter that you were just referring

9 to in your previous answer?

10    A.   Yes.

11    Q.   And you say you started that on April 27, 2004, is

12 that right?

13    A.   I started it and finished it.  You know, I didn't

14 just sit down and do the whole thing.  I got up and ate and

15 came back and did it in between, just to make sure it was

16 all pretty much there.

17    Q.   Did you have any assistance in putting together the

18 document that's Exhibit No. 3?

19    A.   No, ma'am.

20    Q.   Did anyone type any portion of this for you?

21    A.   No, ma'am.

22    Q.   Did you talk to anyone about the statement or

23 letter?

63

1    A.  No, ma'am.

2    Q.  Is this something you did on your home computer?

3    A.  Yes.

4    Q.  After you completed the April 27, 2004, letter,

5  what did you do with it?

6    A.  At that point I didn't do anything with it until we

7  had a Board of Water Commissioners meeting where everybody

8  was there, I believe, was there to present it to the Board

9  of Water Commissioners.  Or even before that I may have

10 showed it to John and Mike when they had a meeting at one

11 point when they wanted to decide what the power of the

12 superintendent was of hiring and firing.

13   Q.  When you say John and Mike, you mean John Cook --

14   A.  Cook.

15   Q.  -- and Mike --

16   A.  And Mike Sanborn.

17   Q.  You might have but you're not sure if you did or

18 you didn't?

19   A.  I think I did show it to them.

20   Q.  Do you remember anything they said to you when you

21 showed them this statement?

22   A.  Again, I think I showed them, told them, showed

23 them what was going on, and they wanted to have a meeting

64

1   to see what the power of the superintendent was of hiring

2   and firing.

3       Q.  So at the time it wasn't clear if the water

4   superintendent could hire or fire clerical staff?

5       A.  From people in the past and the people that were

6   there, some people said yes, some people said no, so they

7   had a meeting on it to decide that for sure if it was an

8   option or not.

9               MS. ISHIHARA:  I'm going to show you a letter

10  which we'll mark Exhibit No. 4 dated April 28, 2004, from

11  yourself to Lori Moran.

12              (Exhibit No. 4 marked.)

13      Q.  Mr. Gay, looking at Exhibit No. 4, can you tell us

14  what that is?

15              (Document Perusal.)

16      A.  It's a letter to clarify what power the

17  superintendent has.

18      Q.  And that's a letter that you wrote?

19      A.  To the Board of Water Commissioners, yes.

20      Q.  So did you have some conversation with either of

21  the water commissioners about sending this letter?

22      A.  Yes, that was the night of the 27th I believe.

23      Q.  The night when you spoke to them at the fire

74

1      A.  No, not, no.

2      Q.  Do you recall having any conversations with any of

3   the water commissioners about any of the content of the

4   letter?

5      A.  The only thing I remember the meeting was about the

6   power of the superintendent, which at that point did not

7   involve Mrs. Moran.

8      Q.  Why do you say the power of the, you're talking

9   about the power of the superintendent to hire and fire, is

10   that right?

11      A.  Yea, you're talking about was not notified of this

12   meeting.  The meeting was just a regular open meeting about

13   the powers of the superintendent.  Nothing was brought up

14   about Mrs. Moran in this meeting at all that I remember.

15      Q.  So Mrs. Moran was not specifically discussed, is

16   that right?

17      A.  Right, as I remember.

18          MS. ISHIHARA:  I'm going to show you a

19   document which we'll mark as Exhibit No. 8.  It's a letter

20   dated May 3, 2004, from yourself to Lori Moran.

21          (Exhibit No. 8 marked.)

22      Q.  Looking at Exhibit No. 8, can you tell us what that

23   is?

75

1          (Document Perusal.)

2     A.   It's a letter that I had written to Lori.

3     Q.   What prompted you to write this letter to Lori

4  Moran?

5     A.   Because we kept getting the thing the reason why.

6     Q.   In Exhibit No. 8 it states that "You are on

7  administrative leave with pay until further notice for

8  disregard of a direct order from the superintendent."  Do

9  you see that?

10    A.   Mm-hmm.

11    Q.   And what specific direct order are you saying that

12 Miss Moran disregarded?

13    A.   To stop, to stop the continued yelling and

14 badgering of me, making bodily threats against me and in

15 not letting it go and just kept on pursuing the matter

16 until it became hostile.

17    Q.   When you say yelling and badgering, are you

18 referring to your earlier description of Miss Moran saying

19 I'm not a she, is that what you're talking about?

20    A.   I'm only a she; I'll give you a ride home on the

21 front end of my bumper; instead of leaving work when she

22 usually left work, to wait out in the parking lot for me to

23 come outside to yell at me again.

76

1    Q.  And when you say for continuing to pursue the

2  matter on April 27, 2004, to what matter are you referring?

3    A.  I'm referring to that -- I forget which exhibit it

4  is -- that letter that I had written with all the things

5  that were going on in that time period.

6    Q.  Well, is there a specific matter or matters that

7  you say that she continued to pursue on April 27, 2004?

8    A.  It's continued as right from the get-go when she

9  started, when I had misused the word, didn't misuse the

10  word "she" but she took offense to the way I used the word

11  "she," and just kept the snowball rolling and get it

12  bigger.  I had left the building numerous times to let the

13  situation defuse, and every time I came back I didn't say

14  anything.  Mrs. Moran was always there to continue on

15  pursuing the matter.

16    Q.  Did you speak with Michael Sanborn about the letter

17  that's been marked Exhibit No. 8?

18    A.  At some point in time.

19    Q.  And do you recall when?

20    A.  Not exactly to the date and the minute, no.

21    Q.  Was it in 2004 or was it sometime after that?

22    A.  It was in 2004.

23    Q.  And in that conversation, what did Mr. Sanborn say

100

1    27, 2004, statement?

2        A.   Yes, I believe that's the one.  I don't see it to

3    know the exact number of it.

4        Q.   It was the one that was attached to --

5        A.   Yes.

6        Q.   -- the cover letter which is Exhibit No. 9?

7        A.   Yes.

8        Q.   Do you recall anyone else saying anything?

9        A.   I remember you, my lawyer, Mr. Decas and the water

10   commissioners going over different matters.

11       Q.   Do you recall specifically what the matters were?

12       A.   No, I didn't keep track of them like that.

13       Q.   And you say at the conclusion of the meeting that

14   the commissioners terminated Lori Moran, is that correct?

15       A.   Yes.

16       Q.   And you mentioned earlier that there had been a

17   meeting to talk about the authority of the water

18   superintendent and whether the water superintendent could

19   hire or fire employees.  Do you recall if any conclusion

20   was reached on that subject?

21       A.   It was concluded that the superintendent did not

22   have the power to hire or fire.

23       Q.   And who had that power?

101

1          A.   The Board of Water Commissioners.

2          Q.   Was that discussed at a meeting of the Board of

3    Water Commissioners?

4          A.   They had that meeting to see where they stood on

5    the matter, and it's on one of these exhibits you have in

6    here (indicating).

7          Q.   Are you talking about the May 3, 2004, meeting?

8                    (Document Perusal.)

9          A.   It's the -- that's not it.  It was after 4/28/2004.

10   I don't remember the exact date and I don't see it here.

11                   (Document Perusal.)

12         A.   I'm not sure of the exact date.

13         Q.   But it was sometime between April 28, 2004, and the

14   meeting on June 30th --

15         A.   Yes.

16         Q.   -- 2004.  So you recall being at a Board of Water

17   Commissioners meeting at which the subject of the authority

18   of the water superintendent to hire or fire came up?

19         A.   Mm-hmm, yes.

20         Q.   And they concluded that the Board of Water

21   Commissioners were the ones that had that authority, not

22   you, is that right?

23         A.   Yes, ma'am.

115

1    that happened on April 27, 2004?

2        A.  Yes.

3        Q.  Has anyone else been insubordinate to you during

4    the time that you've been water superintendent?

5        A.  No.

6        Q.  Has anyone else raised their voice at you during

7    the time that you've been water superintendent?

8        A.  Not like Mrs. Moran did, no.

9        Q.  Well, not like she did, but have they raised their

10   voice to you?

11              MR. CLOHERTY:  Objection.

12       A.  Not to the magnitude, no.  Everybody talks a little

13   bit loud now and then but not yelling, no.

14       Q.  Has anyone threatened you while you were the water

15   superintendent?

16       A.  Only during the incident that was written on the

17   paper of the 27th.

18       Q.  Has anyone ever sworn at you while you were water

19   superintendent?

20       A.  Not that I recall.

21              MS. ISHIHARA:  I'm going to show you a

22   document that's titled "Agreement" which we'll mark Exhibit

23   No. 16.

1  me being on the contract or me not being on the contract,

2  the same thing with Miss Moran.

3      Q.  Do you recall Miss Semple calling you a liar?

4      A.  Vaguely.

5      Q.  Do you recall what she said specifically?

6      A.  No.

7      Q.  But you vaguely recall she called you a liar?

8      A.  Vaguely.

9      Q.  But you can't recall why she said she thought you

10  were a liar?

11          MR. CLOHERTY:  Objection.  You can answer.

12      A.  Something about how I found out about me getting

13  voted, they may vote me on or off the contract.

14      Q.  And when she called you a liar, didn't she call you

15  an effing liar?

16          MR. CLOHERTY:  Objection.

17      A.  Kathi uses another word.

18      Q.  And what's that?

19      A.  It's, she'll say friking.  It's F R I K -- it's an

20  odd word she uses.

21      Q.  So she called you a friking liar in that

22  conversation about whether you should be in the union or

23  not, is that right?

120

1    A.   I believe.

2    Q.   You believe she did?

3    A.   Yes, if I remember correctly.

4    Q.   Do you recall anything else she told you?

5    A.   No, it was a long time ago.

6    Q.   Did you say anything to her?

7    A.   I think the discussion was something about, to do

8    with who informed me of me getting either on or off this

9    contract.

10   Q.   Did you say anything in response to her when she

11   said you're a friking liar?

12   A.   I don't remember what I said.   I didn't get rude to

13   her or anything.

14   Q.   But you don't remember what you said?

15   A.   No, I think I told her something like I'm not a

16   liar.

17   Q.   Did either of you raise your voices during this

18   conversation?

19   A.   Not yelling, no.

20   Q.   Did you raise your voices at all above normal

21   level?

22   A.   Maybe a little bit above normal level but not

23   dramatically.

122

1      A.   Not right offhand.

2      Q.   Do you ever recall an occasion when you were having

3  an argument with Miss Semple which a firefighter named

4  Jimmy Franklin overheard?

5               MR. CLOHERTY:   Objection.

6      A.   We had a discussion not an argument.

7      Q.   Do you recall the topic of the discussion?

8      A.   Something to do with the snow.

9      Q.   Do you recall when it took place?

10     A.   No.

11     Q.   Was this at the Water Department building?

12     A.   Yes.

13     Q.   And do you recall specifically where you were?

14     A.   In the office.

15     Q.   And what did you say and what did Miss Semple say?

16     A.   I don't remember the conversation hardly at all.

17     Q.   Well, was Miss Semple angry at you?

18               MR. CLOHERTY:   Objection.

19     A.   No, I think she was trying to find out the reasons

20  why things went the way they did.

21     Q.   Do you recall specifically what she said?

22     A.   Again, it was a long time ago.   No.

23     Q.   When you say it was about the snow, was it about

123

1  shoveling snow?

2    A.   Shoveling, plowing, something in that matter.

3    Q.   And did it concern either Chris Poiria or Jay

4  Semple, her relatives?

5    A.   I believe so.

6    Q.   And what makes you think that?

7    A.   Because they were the ones that would be doing it.

8    Q.   But you don't recall what if anything Miss Semple

9  said on that subject?

10    A.   Not really.

11    Q.   She didn't raise her voice to you?

12    A.   Not that I remember.

13    Q.   She didn't use any vulgar language towards you?

14    A.   Not that I remember.

15    Q.   She didn't call you any names at that time?

16    A.   Not that I remember.

17    Q.   Was any disciplinary action ever taken against

18  Kathi Semple for calling you a friking liar?

19    A.   Not that I know of.

20         MS. ISHIHARA:  I'm going to show you the

21  Complaint and Jury Demand in this case which we'll mark

22  Exhibit No. 17.  John, did you want to -- I haven't made a

23  separate copy of this.  Do you want a copy?

130

1  whether you should be a member of the Employees Association

2  contract, do you remember that, sir?

3      A.  Yes.

4      Q.  And you related the discussion that you had with

5  Ms. Moran on that topic.  Do you recall that testimony,

6  sir?

7      A.  Yes.

8      Q.  I believe you stated something to the extent of the

9  content of discussion was whether the rest of the employees

10 were out to get you and throw you off the contract.  Do you

11 recall that, sir?

12     A.  Yes.

13     Q.  Did you say that or was that something Ms. Moran

14 said?

15     A.  Something Mrs. Moran said.

16     Q.  And did you, did you yourself have any fear that

17 the other employees were out to get you and throw you off

18 the contract?

19     A.  Not at that time.

20     Q.  And did Ms. Moran ever tell you why she thought

21 that that was the case?

22     A.  I don't remember the exact words.

23     Q.  What's your understanding of what she told you,

1    your memory of what she told you?

2        A.   That the other employees wanted me off the

3    contract.

4        Q.   And how did you respond to that?

5        A.   If that's what they wanted to do, there's nothing I

6    I can do to really stop them.

7        Q.   Today you remain on the contract?

8        A.   Yes.

9                MR. CLOHERTY:   That's all I have.

10                   REDIRECT EXAMINATION

11       Q.   (By Ms. Ishihara) You say you received complaints

12   from Kathi Semple about once a week about Lori Moran's job

13   performance, is that what you're saying this afternoon?

14       A.   About that, yes.

15       Q.   And did you ever make any written memorandum about

16   those complaints?

17       A.   No, I always tried to resolve them without any

18   problems.

19       Q.   So you never put anything in Ms. Moran's file about

20   these complaints?

21       A.   No.

22       Q.   And before April 27, 2004, would you say that

23   generally you were satisfied with Ms. Moran's job

# EXHIBIT "D"

VOLUME:     I
PAGES:      1-85
EXHIBITS:   I-17

U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-10033NG

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

LORI ANN MORAN,
                Plaintiff,

vs.

ANDREW DIPASQUA, MICHAEL SANBORN,
WILLIAM F. GAY, III and the ONSET
FIRE DISTRICT,
                Defendants.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**DEPOSITION OF MICHAEL SANBORN**, a witness

called on behalf of the Plaintif, pursuant to Federal

Rule of Civil Procedure, 30(a) before Carolyn McGill,

a Shorthand Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of

Margaret A. Ishihara, 86 Church Street, Mattapoisett,

Massachusetts, on Wednesday, February 15, 2006

commencing at 10:05 a.m.

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1    Q.    What was your job with Defiance?

2    A.    Shipping.

3    Q.    Before working at Defiance did you work

4    anywhere else?

5    A.    That was it.

6    Q.    So was Defiance your first job after you

7    graduated from high school?

8    A.    Yes.  That was my first full-time job.  I

9    had part-time jobs.

10    Q.    At some point you were an Onset water

11    commissioner, is that right?

12    A.    Right.

13    Q.    Can you tell us when you were first

14    elected to the Board of Water Commissioners in

15    Onset?

16    A.    I believe it was 1999.

17    Q.    Are you still on the Board of Water

18    Commissioners?

19    A.    No, I'm not.

20    Q.    When did you stop being on the Board of

21    Water Commissioners?

22    A.    It was last year.

23    Q.    But you were on the Board of Water

1    Commissioners continuously from 1999 to 2005?

2        A.    Yes, I was.

3        Q.    Have you held any other elected offices?

4        A.    No.

5        Q.    Have you held any other appointed offices?

6        A.    No.

7        Q.    You also mentioned that you are a

8    firefighter, is that right?

9        A.    Yes.

10        Q.    For how long have you been a firefighter

11    with the Onset Fire District?

12        A.    Going on twenty-one years.

13        Q.    What is your rank at the Onset Fire

14    Department?

15        A.    Firefighter.

16            MS. ISHIHARA:  We've already marked

17    the Notice of Taking Deposition as Exhibit One.

18    I'd also like to mark a letter dated September 2,

19    2003 from Lori Moran to Superintendent William F.

20    Gay.

21            (Exhibit No. 2, 9/2/03 Letter; so

22    marked).

23        Q.    Looking at Exhibit Number Two, can you

1      A.    The issue was that supposedly Bill Gay had

2   sexually harassed Kathi Semple.

3      Q.    How was that brought to your attention

4   other than at the meeting itself?

5      A.    I believe Mr. Blacker was notified.  He

6   was the Chairman of the Board.

7      Q.    So then the August 27, 2003 special

8   meeting was called after Mr. Blacker was notified?

9      A.    Yes, it was.

10     Q.    At the meeting who was present?

11     A.    I believe Lori Ann Moran, Kathi Semple,

12   Larry Blacker, John Cook, and myself.

13     Q.    At that meeting what was said if anything

14   by Kathi Semple?

15     A.    She said just it got blown out of

16   proportion and there was nothing to it.

17     Q.    Did Mr. Gay say anything?

18     A.    I think he said it was the same reaction.

19   It was kind of blown out of proportion and there

20   was nothing there.

21     Q.    Was anything said by Lori Moran that you

22   recall?

23     A.    I believe she was defending Mr. Gay.

1    for the men that was out in the field during the

2    day.

3        Q.    What's your understanding of the person to

4    whom Lori Moran reported?

5        A.    She reported to Kathi Semple.  She was the

6    office manager.

7        Q.    Did you have any input into the decision

8    to hire Lori Moran?

9        A.    We took applications as I remember.  The

10   applications we had we left to Kathi Semple.  Kathi

11   looked over the applications and she recommended

12   Lori.  And we looked over them too and we voted to

13   hire Lori Ann.

14       Q.    So during the time period that you were on

15   the Board of Water Commissioners was the board

16   responsible for the hiring and firing of employees

17   at the Onset Water Department?

18       A.    Yes.

19       Q.    Now, you're aware that there was an

20   alleged incident on April 27, 2004 involving Lori

21   Moran and William Gay, are you not?

22       A.    Yes.

23       Q.    Before the April 27, 2004 alleged incident

1      Q.    So at that time there was not a third

2    water commissioner, is that right?

3      A.    There wasn't, no.

4      Q.    What do you say led to the sending of this

5    April 28, 2004 letter to Lori Moran?

6                MR. CLOHERTY:    Objection.

7      A.    There was an issue that they said during

8    the different meetings that Billy Gay didn't have

9    any power as superintendent to put anybody on

10    administrative leave or he didn't have any power

11    inside the water office.    That was the issue.

12      Q.    Well, it says that Lori Moran specifically

13    is being placed on administrative leave.    What led

14    to her being placed on administrative leave and the

15    sending of this letter?

16      A.    It was what occurred during the day in

17    question when Lori Ann and Billy Gay was in the

18    office that day.

19      Q.    When you say the day in question are you

20    talking about April 27, 2004?

21      A.    Right.

22      Q.    Who brought that to your attention?

23      A.    Mr. Gay.

1    Q.    And when did he bring that to your

2    attention?

3    A.    It was that day.

4    Q.    Did he call you on the phone or did you

5    see him in person?

6    A.    Actually it was just I saw him.  I was at

7    the fire department and he got out of work and he

8    bumped into me.  I guess he was trying to get a

9    hold of me.

10    Q.    Was anyone else there other than yourself

11    and Mr. Gay?

12    A.    No.

13    Q.    In that conversation with Mr. Gay what did

14    you say and what did Mr. Gay say?

15    A.    Mr. Gay said that there was a problem at

16    the water department and Lori Ann threatened him.

17    And he said that he couldn't deal with it the

18    following day.  He was scared and stuff like that

19    and he didn't know what was going to happen.  And

20    he was going to go see John Cook.

21    Q.    Did he say anything else?

22    A.    That was it.

23    Q.    Did he give any specifics as to how he

1    is that what he said to you?

2        A.    Word to word I wouldn't know what he said.

3    I know he said he posted a meeting.   Put it that

4    way.

5        Q.    Do you recall what if anything you said?

6        A.    I said that's fine.

7        Q.    Before the special meeting date of April

8    30, 2004 did you speak with anyone other than John

9    Cook about setting up that meeting?

10        A.    No.

11        Q.    Did that meeting of April 30, 2004

12    actually take place?

13        A.    I believe it did.

14        Q.    John Cook was present, is that right?

15        A.    Yes.

16        Q.    And you were present?

17        A.    Yes.

18        Q.    Was anyone else present?

19        A.    I believe Lori Ann was there, her husband,

20    different family members and friends.

21        Q.    What was said at that meeting?

22            MR. CLOHERTY:  Objection.  You can

23    answer.

1      A.    It was the same thing.  The meeting was

2   about the authority of the superintendent if he can

3   fire and hire in his normal duties of the day.

4            I said we were down to one person on

5   the board.  And John really didn't want to get

6   involved in it because he was related to Lori Ann.

7   And we just went on again for another meeting.

8      Q.    Well, did you reach any conclusions at the

9   April 30, 2004 meeting?

10           MR. CLOHERTY:  Who is you?  Did he or

11  did the board?

12     Q.    Did the Board of Water Commissioners?

13     A.    Yeah, we did.  That we felt that Billy Gay

14  had the authority.  He had day to day operations to

15  put Lori Ann on administrative leave if he had just

16  reason.  He was the boss eight hours a day, five

17  days a week there.

18     Q.    I'm going to show you another letter from

19  William Gay to Lori Moran.  This one is dated April

20  29, 2004 which we'll mark as Exhibit Number Six.

21           (Exhibit No. 6, 4/29/04 Letter; so

22  marked).

23     Q.    Looking at Exhibit Number Six, can you

1          MR. CLOHERTY:  What was discussed, the

2    sending of the letter?

3          MS. ISHIHARA:  Right.

4     A.   No.

5     Q.   Was there some sort of conversation then

6    in which the letter was authorized?

7          MR. CLOHERTY:  Objection.

8     A.   I believe John Cook called me and said

9    that we were going to have a meeting and we were

10   going to send a letter.

11    Q.   Did you speak with William Gay about the

12   sending of the letter that's been marked as Exhibit

13   Number Six?

14    A.   I could have.

15    Q.   But you don't have any specific

16   recollection whether you did or did not?

17    A.   I couldn't tell you.

18    Q.   The letter says that you are on

19   administrative leave for events that occurred on

20   4/27/04 and are pending for disciplinary action.

21          At that point what if any disciplinary

22   action was being contemplated by the Board of Water

23   Commissioners?

1              MR. CLOHERTY:  Objection.

2       A.    Really there wasn't any.  We didn't hear

3    the whole story.  Actually, I didn't hear the whole

4    story of what happened that day so how could I say

5    something if I didn't know the whole story of what

6    happened that day.

7       Q.    So you had spoken to William Gay on April

8    27, 2004 when you ran into him at the fire

9    department?

10      A.    Right.

11      Q.    Did you speak to Lori Moran at any time

12   before the letter that's been marked as Exhibit

13   Number Six about what happened on April 27, 2004?

14      A.    Actually, I believe I did see Lori Ann

15   once in the parking lot in the fire department.

16      Q.    Did you have any conversation with her?

17      A.    She said that what was said wasn't true.

18      Q.    Did she say anything else?

19      A.    That was about it.  Like I said, I didn't

20   hear both sides of the story.

21      Q.    Did you say anything when you ran into

22   Lori in the parking lot?

23      A.    I didn't run into her.  She ran into me.

1    Q.    Did you say anything when Lori Ann ran

2    into you in the parking lot?

3    A.    No.  Like I said, we're still friends, I

4    mean.  Actually, I saw her husband.

5    Q.    Well, limiting yourself to the time period

6    before the letter that's been marked Exhibit Number

7    Six, you say that Lori Moran ran into you in the

8    parking lot?

9    A.    Right.

10    Q.    And said that what was being said was not

11    true?

12    A.    Right.

13    Q.    Was her husband with her at that time?

14    A.    No, she was all by herself.

15    Q.    And what if anything did you say?

16    A.    I said we're going to have a meeting and

17    actually see what happened.

18    Q.    Was there any further conversation at that

19    time?

20    A.    No.

21    Q.    Was anyone else present when that

22    conversation was taking place?

23    A.    No.

1    happened?

2        A.    We asked to talk to counsel about the

3    matter.  And like I said, we actually didn't have a

4    board to do any action.  It was myself and John

5    Cook and John Cook could not vote on anything

6    because he was related to Lori Ann.

7        Q.    But at the meeting of May 4, 2004 was the

8    meeting actually open?

9        A.    Sure.

10       Q.    Then what happened after that?

11       A.    That was it.

12       Q.    Then the meeting was closed?

13       A.    Yeah.

14       Q.    I will show you a letter dated June 17,

15   2004 from yourself as Chairman of the Board of

16   Water Commissioners to Lori Ann Moran which we'll

17   mark as Exhibit Number Eleven.

18            (Exhibit No. 11, 6/17/04 Letter; so

19   marked).

20       Q.    If you can take a look at Exhibit Number

21   Eleven, can you tell us what that is?

22       A.    That is a letter that was sent to Lori Ann

23   Moran and it was sent from me.  And we held a

1    public meeting at 7:00 o'clock on Wednesday, June

2    30 at the Onset Fire Department on what actually

3    occurred April 27, 2004.

4          Q.    So as of June 17, 2004 there were now

5    three water commissioners?

6          A.    Yes.    There was an election and we had

7    three water commissioners.

8          Q.    So Brian O'Hearne was elected and Andrew

9    DiPasqua was also elected?

10         A.    Right.

11         Q.    Did you speak with either of the other

12   water commissioners about sending this letter to

13   Lori Moran before it went out?

14         A.    I believe I talked to counsel about it.

15         Q.    But not to the other water commissioners?

16         A.    I believe I also talked to Andy DiPasqua

17   and Brian O'Hearne.

18         Q.    Did you speak with them separately or at

19   the same time?

20         A.    Separately.

21         Q.    Were those phone conversations or in

22   person?

23         A.    More than likely phone conversations.

1    Eleven?

2        A.    No.

3        Q.    Did you speak with anyone else about

4    sending out the letter that's been marked as

5    Exhibit Number Eleven?

6                MR. CLOHERTY:  Objection.  Other than

7    counsel?

8        Q.    Other than counsel?

9        A.    No.

10       Q.    Who drafted the letter that's been marked

11   Exhibit Number Eleven?

12               MR. CLOHERTY:  Objection.  I'm going

13   to let him answer, Miss Ishihara, but to the extent

14   it's getting into attorney/client communication I'm

15   going to ask the witness not to reveal any

16   attorney/ client communication.

17               MS. ISHIHARA:  It's not clear whether

18   it's the attorney who drafted it or not.

19               MR. CLOHERTY:  Right, it's in

20   anticipation of his response.

21       A.    I believe it was myself and also Dan

22   Murray.

23       Q.    In that letter it states at the very

1    bottom, please be advised that cross-examination or

2    questioning of persons who present oral testimony

3    at the meeting will not be an allowed except for

4    questions by the water commissioners.  Do you see

5    that?

6        A.    Yes.

7        Q.    Was that a decision of the Board of Water

8    Commissioners to limit cross-examination?

9        A.    It was.

10            MR. CLOHERTY:    Objection.   Go ahead.

11       A.    It was through the Board of Water

12   Commissioners also counsel.

13       Q.    Did you speak with Mr. DiPasqua about the

14   subject of cross-examination at the meeting?

15            MR. CLOHERTY:    At what time?

16            MS. ISHIHARA:    At any time.

17            MR. CLOHERTY:    You mean before the

18   meeting?

19            MS. ISHIHARA:    Right.

20       A.    I know he saw the letter.  And also during

21   the meeting I brought it up that there would be no

22   cross-examination on any of the employees that came

23   forward.

1    there at the request of the Board of Water

2    Commissioners?

3            MR. CLOHERTY:  Objection.

4        A.    I asked them to come to hear the whole

5    story.  I was impartial.  I didn't know what was

6    going on and I'd like to hear the whole story.

7        Q.    So how did you ask them to be there, did

8    you speak with them in person or did you give them

9    a memorandum?

10       A.    No, actually I talked to either Kathi

11   Semple or Billy Gay, one of them, and asked if the

12   employees could attend.  I didn't go around and ask

13   every one of them.

14       Q.    But you're not sure if you asked Kathi

15   Semple or William Gay?

16       A.    It was one of them.

17       Q.    Do you have any recollection of what one

18   of them said to you if anything?

19       A.    No.

20       Q.    Was Peter Murphy employed by the Onset

21   Water Department at that time?

22       A.    Yes, he was.

23       Q.    What was his position with the Onset Water

1     Q.   You saw it at the June 30, 2004 meeting

2   but you had not seen it before then, just the

3   statement itself, not the letter that it's attached

4   to?

5     A.   The statement?

6     Q.   Mr. Gay's statement.

7     A.   No, I didn't see the letter until I

8   believe it was the 30th.

9     Q.   Did you ever speak with Mr. Gay about

10   making any sort of written statement about what he

11   said happened on April 27, 2004?

12     A.   No.

13     Q.   In regard to the June 30, 2004 meeting, as

14   best you can tell us what was said at that meeting?

15     A.   At the June 30 meeting?

16     Q.   Yes.

17     A.   I know we brought the meeting to order.  I

18   believe I asked if there were any questions.  I

19   believe you asked a few.  I asked Lori Ann if she

20   wanted to say anything but I believe you said --

21   and also Billy Gay, I believe his attorney was

22   there.  I believe he made statements.  And then

23   later I asked the witnesses to come in and make

1    their statements.

2        Q.    And when you say the witnesses are you

3    talking --

4        A.    The water department --

5        Q.    The water department personnel?

6        A.    Yes.

7        Q.    Did they all make statements?

8        A.    Yes.

9        Q.    Do you recall what any of them said?

10            MR. CLOHERTY:    Objection.

11       A.    They all said what happened as they could

12   remember during that day in the office.

13       Q.    Do you recall what Mr. Gay said?

14            MR. CLOHERTY:    Objection.

15       A.    Mr. Gay said that he told us --  we were

16   looking at the statement here.  He said the same

17   exact thing.

18       Q.    When you say the statement you mean the

19   one that's dated April 27, 2004 that's attached to

20   Exhibit Number Eleven?

21       A.    Right.

22       Q.    Are there any written minutes for the

23   meeting of June 30, 2004?

1    A.    I don't believe so.  Everything was on

2    tape.

3    Q.    Before the June 30, 2004 meeting, at least

4    during the time period for which you were a member

5    of the Board of Water Commissioners, what was the

6    policy with regard to written minutes for the water

7    commissioners meetings if any?

8    A.    We tried to keep everything on tape.  We'd

9    jot down things here and there but other than

10   that just to say well, we have a meeting scheduled

11   or more of a reminder.  That was kind of what we

12   had.  We had everything on tape though.

13   Q.    After Mr. Gay spoke and the Onset Water

14   Department employees spoke did Miss Moran also

15   speak?

16   A.    I believe she said a few words but I

17   believe you said you represented her.

18   Q.    So was there anything else that was said

19   at that meeting?

20        MR. CLOHERTY:   Objection.

21   A.    For the employees and the commission, no.

22   I don't believe so.

23   Q.    What if anything happened at that meeting

1    after the various people spoke?

2        A.    The commissioners went back and forth

3    talking over what we had heard and we came up with

4    a vote.

5        Q.    What was the vote?

6        A.    It was two to one to dismiss Lori Ann.

7        Q.    Was there any discussion amongst the board

8    members before that vote was taken?

9        A.    Yes, there was.

10       Q.    What was the discussion?

11             MR. CLOHERTY:  Objection.

12       A.    What was said.

13       Q.    What was said?

14       A.    What was said that was in front of us

15   between what Billy Gay said and the water

16   department employees told us what happened during

17   that day.

18       Q.    And you voted to terminate Miss Moran, did

19   you not?

20       A.    Yes.

21       Q.    Can you tell us the reasons that you voted

22   to terminate Miss Moran?

23             MR. CLOHERTY:  Objection.

1        Q.    You can answer.

2               MR. CLOHERTY:  There's actually a

3    deliberative process privilege I think.  To the

4    extent that that applies I'm asserting it.  But I'm

5    going to let the witness answer the question.

6        A.    I believe what it came down to, it came

7    down to somebody being afraid and hostile.  And I

8    take everything serious.  I'm everybody's friend on

9    the outside but I took my job very serious.  When

10   somebody approaches me and says that something

11   happened I take it serious.

12       Q.    So you say that Miss Moran to your way of

13   thinking threatened Mr. Gay?

14               MR. CLOHERTY:  Objection.  You can

15   answer.

16       A.    When it came down to it, yes.  Like I

17   said, during the meeting it wasn't a court of law,

18   but what was put in front of us --

19       Q.    How do you say that Miss Moran threatened

20   Mr. Gay?

21               MR. CLOHERTY:  Objection.

22       A.    I believe when he told her to stop and she

23   kept going after him.  And then when they were on

1 the telephone and he said that Lori said -- that

2 Lori Ann said that she was going to put him on the

3 bumper of her car, that's a threat.

4  Q. Before the June 30, 2004 meeting did you

5 speak with anyone other than counsel about

6 potential disciplinary action to be taken against

7 Lori Moran?

8  A. No.

9  Q. Did you speak with anyone about the

10 alleged events of April 27, 2004 concerning Lori

11 Moran before the June 30, 2004 meeting?

12   MR. CLOHERTY: Other than what he's

13 already testified to?

14   MS. ISHIHARA: Right.

15  A. No.

16  Q. Did you ever speak with Mary McCoy about

17 Lori Moran?

18  A. No.

19  Q. And Mary McCoy was a member of the Onset

20 Prudential Committee?

21  A. Right.

22  Q. I'm going to show you a letter dated July

23 1, 2004 which we'll mark as Number Twelve.

# EXHIBIT "E"

# ORIGINAL

*Moran*

EXHIBIT NO. *15*

*1 14 106* NMW

AGREEMENT

This Agreement, entered into by and between the Onset Fire District, Water Department, hereinafter referred to as the "Employer", and the Onset Water Department Employee's Association, hereinafter referred to as the "Employee's Association", has as its purpose, the promotion of harmonious relations between the Employer and the Employee's Association, the establishment of an equitable and peaceful procedure for the resolution of differences, and the establishment of rates of pay, hours of work, and other conditions of employment.

## ARTICLE 1 - RECOGNITION

*A.)* This agreement relates to and covers all permanent, full-time employees of the Water Department, including the following:

1) Equipment Operators
2) Skilled Laborers
3) Laborers
4) Clerical Employees
5) The Superintendent
6) The Business Manager
7) The Foreman

B.) The Employer recognizes the Employee's Assoc. as the sole and exclusive representative for all of its present and future permanent, full-time employees covered by this agreement, now engaged, governing hours of labor, wages, and rates of pay, and other conditions of employment.

C.) The Employer shall not enter into any agreement or contract with it's employees, individually or with any officer or representative of the Employee's Assoc., Which in any way conflicts with the terms and provisions of this Agreement. Any such agreement or contract shall be considered null and void.

D.) Organizational Activities: Except where prohibited by is agreement, the employees shall have, and be protected in the exercise of, the right to act as Association representatives, to engage in Assoc. activities for the purpose of collective bargaining. In the exercise of such rights, the employees shall be free from any and all interference, restraint, or coercion and from any discrimination in regard to tenure, promotion, or other conditions of employment. The Association agrees that it shall represent the interest of all employees without discrimination and without regard as to whether an employee is a member of the Association.

## ARTICLE 2 – MANAGEMENT RIGHTS

Except as modified by this Agreement, the rights of the Employer shall be respected at all times and the provisions of this Agreement shall be observed for the orderly settlement of all questions. The Employer shall retain the right to issue procedures, rules and regulations governing the internal conduct of the employees included in the Assoc. and subject to all District By-Laws, Local, State and Federal Laws.

The Employer also retains the right to take whatever action is necessary to insure the protection, health, welfare, and safety of the District generally or citizens individually.

## ARTICLE 3 – STEWARD

The duly elected or appointed Steward may use reasonable time during his normal working hours to investigate and present legitimate grievances in accordance with the provisions of this Agreement.

The Steward has no authority to take strike action or any other action interrupting the Onset Fire District Water Dept. operations.

The Steward shall be placed on the seniority list as number one employee until such time as he is replaced for any reason, when he will be returned to his original position on the seniority list.

## ARTICLE 4 - ASSOCIATION SECURITY

All present permanent, full-time employees covered by this Agreement as a condition of employment shall become and remain members of the. Employee's Association in good standing, on and after the thirty-first (31st) day following the signing of this Agreement. All future permanent, full-time employees covered by this Agreement shall be required to become Assoc. members or pay their commensurate costs of collective bargaining on or after the thirty-first (31st) day following their date of employment. The failure of an employee to comply with this requirement will result in the employees' dismissal within thirty (30) days after receipt of written notice to the Employer and the Association.

## ARTICLE 5 - SENIORITY & PROMOTIONS

The length of service in the Onset Fire District Water Department of the permanent full-time employees shall determine seniority. Length of service shall be the total accumulated uninterrupted service with the Water Dept. Seniority rights accrued to an employee under this article shall be lost in the event of a break in his continuous service caused by one of the following:

## CONT.- ART. 5:

1)   Voluntary resignation,
2)   Absence from work for three (3) consecutive days without notice to the Employer.
3)   Failure to return to work three (3) days after the expiration of any Leave of Absence.
4)   Failure to return to work within three (3) days after a registered or certified letter is mailed to the employee at his last known mailing address requesting the employee's return to work. Employees must notify the Employer of his intent to return to work upon receipt of said notice of recall.

The principle of seniority shall govern and control in most cases of promotion within the bargaining unit, transfer, decrease of the working force as well as preference of vacation periods.

A seniority list showing the status of each employee must be posted in a place accessible to the employees. The Assoc. may request, from time to time, a copy of such a list.

## ARTICLE 6 – JOB BIDDING AND POSTING

Any job opening covered by this Agreement shall be filled by employees in order of their seniority, provided an employee has the ability and necessary qualifications to perform the work required. If in the Employer's opinion, there is no applicant employee with the necessary qualifications to perform the required work, the Employer may fill the vacancy from outside the bargaining unit.

Job opening shall be posted for a period of five (5) days. All employees shall have an opportunity to apply for promotion. However, until said position is filled, in accordance with the above procedure, the Employer shall have the right to temporarily fill the position as he sees fit.

Any employee bidding for such job maybe allowed a thirty- (30) day period to see if he is qualified. After the thirty (30) day period, or if in the opinion of the Employer the employee has not performed satisfactorily, he shall be returned to his former position.

## ARTICLE 7 – HOURS OF WORK

A)   The regular workweek for permanent full-time employees shall be forty (40) hours for the labor force and forty (40) hours for the clerical staff, respectively. The regular workday for permanent full time employees working a regular workweek shall be eight (8) hours for the labor force and eight (8) for the clerical staff, respectively. The regular workweek shall consist of five (5) regular days.

B)   All hours worked in excess of forty (40) for the labor force and forty (40) for the clerical staff in any regular workweek shall be paid at the rate of time and one half  (1 ½) the employee's regular straight time hourly rate of pay.

## ARTICLE 7 CONT:

*C.)* Employees shall work overtime, when requested, without advance notice should an emergency arise. If an emergency does not exist, an employee shall work overtime when required as long as reasonable notice is given when possible. The Superintendent or other officers of the District shall have the right to determine an emergency.

*D.)* Rest Periods: Employees shall be allowed fifteen (15) minute rest periods during each on half shift, on the job site.

*E.)* Lunch Periods: Employees shall be granted a meal period of one half (1/2) hour duration during the fourth and fifth hour of the work shift. If however, work conditions do not permit a meal period, employees may be granted an additional fifteen (15) minute rest period during the remainder the workday. Employees who are requested to and work beyond their usual shift shall be granted a reasonable time off, not to exceed one half (1/2) hour, to eat with pay, when said work shift is extended at least two hours beyond their normal work day.

## ARTICLE 8 - MILITARY CLAUSE

Employees entering into or enlisting in the military or naval service of the United States, pursuant to the provisions of the Selective Service Act of 1948, shall be granted all rights and privileges provided by the Act.

## ARTICLE 9 – LEAVE OF ABSENCE

Leave of absence, without pay, may be granted upon written request and at the discretion of the Water Department.

If a holiday falls within the leave of absence period, this holiday will not be considered a paid holiday.

## ARTICLE 10 – GROUP INSURANCE PLAN

The Employer shall continue for the duration of this Agreement to provide a group insurance plan on substantially the same basis as present. The Employer shall not itself operate the plan but the insurance company or companies shall administer the benefits, which shall be subject to such conditions and limitations as are provided by the Law and in the applicable insurance policies or contracts. The premiums for such plan shall be paid, at least ninety-nine (99%) percent, by the Dept.. Any claim or disputes concerning eligibility for or payment of benefits under this Article shall be determined in accordance with the applicable insurance policies or contracts and shall not be subject to grievance or arbitration procedures herein.

ARTICLE 10 cont.:

The Employer shall provide a Dental Plan to members of the Assoc., similar to that provided by the Dept. at present. This Plan shall be provided in the same manner as the Group Insurance Plan.

Pennanent full-time employees shall receive improved benefits or coverage, which may be adopted by the Water Dept. during the life of this Agreement.

ARTICLE 11 -Holidays

A.) All permanent full-time employees covered by this Agreement who are regularly employed shall receive the following paid holidays:

New Years Day
Martin Luther King Day
President's Day
Patriot's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran Day
Thanksgiving Day
Christmas Day

B.) All permanent full-time employees covered by this Agreement who are regularly employed shall receive a paid half (1/2) holiday for the day before, Thanksgiving, Christmas and the day after. New Years shall be a (1/2) day before and New Years Day.

C.) Any employee covered by this Agreement who is required to work on a holiday shall receive in addition to the regular holiday pay, an amount equal to time and one half (1 ½) the regular rate of pay for all hours worked, but in no case shall be less than an amount equal to one (1) hour working at the rate at the rate above. Any employee called to work on a holiday shall remain on call for the full one (1) hour without additional pay but need not remain on the job site during the entire period unless there is actual work to be performed.

D.) If a paid holiday falls during the work week, the overtime premium of time and one half (1 ½) shall apply to all hours worked in excess of thirty-two (32) hours.

E.) If a paid holiday falls during a weekend, the day off shall be taken either on the Friday proceeding the Saturday holiday or the Monday following the Sunday holiday.

ARTICLE 12 – VACATIONS

The vacation policy for employees of the Water Dept. shall be as follows: Those with service of at least: Shall be granted vacation and pay at the flat rate and classification of:

|  |  |
|---|---|
| *1 Year* | *2 Weeks* |
| 5 Years | 3 Weeks |
| 10 Years | 4 Weeks |

ARTICLE 15 - LONGEVITY

Employees covered by this Agreement shall be granted longevity payments as follows:

After the completion of:

| | |
|---|---|
| 5   Years of service | $ 75.00 |
| 10 Years of service | $ 100.00 |
| 15 Years of service | $ 200.00 |
| 20 Years of service | $ 300.00 |
| 25 Years of service | $ 400.00 |

The Anniversary date shall be used to determine eligibility for payments prior to
December 31st, of each calendar year. Longevity payments shall be paid on the first payday in December. .

ARTICLE 16 - FUNERAL LEAVE

Emergency leave without loss of pay up to four (4) consecutive calendar days, but not to exceed beyond
the day of the funeral, provided the employee actually attends the funeral of said deceased, may be allowed
for a death in an employees family.  The employee family shall include:

| | |
|---|---|
| Wife | Sister |
| Husband | Grandparent |
| Mother | Grandchildren |
| Father | Mother- in- law |
| Children | Father-in-law |
| Brother | |

 Any relative not included in above list shall be negotiable up to two- (2) day's leave including
the day of the funeral.

ARTICLE 11 - WEEKEND DUTY

A.) Weekend duty shall be governed by the Water Commissioners Policy as outlined in Weekend Duty
and Standby Policy.
B.). Employees covered by this Agreement shall be paid at a rate of time and one half (1 1/2) for the
following:
1-1/2 hours Stations duty -Saturday morning
1-1/2 hours Stations duty - Sunday morning

All recall or Emergency overtime calls during the weekend.
C.) Management shall post a revolving schedule listing equitably the employees responsible for
weekend duty.
D.) Weekend standby shall be handled in the same manner as weeknight standby as outlined in
policy.

## ARTICLE 18 -MISCELLANEOUS

A.) Examinations: All physical examinations, when required by the Employer and performed under his direction, shall be paid for by the Employer, not to exceed two (2) hours at the employees straight time hourly rate of pay. This applies only to physical examinations required to be performed during the employees off duty time.

B.) Injury on the Job: When an employee is injured on the job, he shall be guaranteed his day's pay for day injured, provided he is instructed to cease work by the Employer or a physician, as a result of said injury. The employee who is injured on the job shall report his injury as soon as he is able to the Dept.

C.) Dangerous Conditions: Under no circumstances shall an employee be required or assigned to engage in any activity involving dangerous conditions of work or danger to persons or property as determined by the Dept or in violation of any applicable statute or court order, or governmental regulation relating to the safety of persons or equipment.

D.) Accidents: Any employee involved in any accident shall immediately report said accident and any physical injury sustained to the Dept. The employee, before starting his next shift, shall make out an accident report in writing, and shall turn in all available names and addresses of witnesses to any accidents.

E.) Equipment Defects: Employees shall immediately report all defects of equipment. Such reports shall either be made to the Superintendent or in writing with a copy being retained by the employee. The Employer shall not ask or require any employee to take out equipment that has been reported as being and is in fact in an unsafe operating condition as determined by the Dept until same has been placed in a safe condition to the satisfaction of The Dept.

F.) Announcements: Announcements shall be posted in a conspicuous place Parties to this Agreement, both of whom may use the bulletin board for notices of routine matters agree that it would be improper to post denunciatory or inflammatory written materials.

G.) Response to Fires: Employees who are members of the Onset Fire Department may respond to alarms or other emergencies and shall continue to receive their respective compensation even though they may not be performing their specific work for the Water Dept. This authorization may be specifically denied by the Dept. if the Dept. has an emergency of its own.

H.) Uniforms: The Department shall supply to its employees, uniforms and safety equipment. This shall include, but not limited to uniform shirts and pants, hard hats, gloves, rain gear and rubber boots. The employer reserves the right to provide other portions of the uniform or specific equipment.

## ARTICLE 19 -RE-CALL

Any employee called back to work on the same day after having completed his assigned work and left his place of employment, and before his next regularly scheduled starting time, shall be paid at the rate of time and one half (11/2) for all hours worked on recall. He shall be guaranteed a minimum of one (1) hour pay at time and one half- (1 ½). Any employee so recalled shall remain on call for the full hour without additional pay but need not remain on the job site during the entire period unless there is actual work to be performed. This article excludes recall during weekend duty.

<u>ARTICILE 20 – GRIEVENCE AND ARBITRATION PROCEDURES</u>

A.) A Grievance is a dispute between the parties over the interpretation or application of the terms of this written Agreement and shall be handled in accordance with the following grievance procedure:

STEP 1: The Assoc. submits, in writing, its grievance to the Water Dept. Superintendent within five (5) days after
the grievance arises. The Superintendent has five- (5) days, (exclusive of weekends and holidays), to act upon
same.

STEP 2: Within Five (5) days (exclusive of weekends and holidays), of transmittal of an answer by the
Superintendent, either party may request that the grievance be presented to the Board of Water Commissioners
which has fifteen (15) days to act upon same.

STEP 3: If in the event of failure of the parties to settle the grievance under Steps 1 & 2, either party may request mediation by the State Board of Conciliation and Arbitration which may meet with the parties to attempt to settle
the grievance. Notice to the other party and to the Board of Conciliation and Arbitration to be within ten (10) days
of action taken Under Step 2.

STEP 4: If no settlement is reached within ten (10) days after the grievance is submitted to mediation; the matter
may go to arbitration in the following manner upon assent of both parties in writing:
a.) The Assoc. shall designate one person. b.) The Water Dept. shall designate one person. c.) A third disinterested party shall be designated upon by the representatives of the Assoc. and the Dept d.) In the event that the representatives from the Assoc. and the Dept cannot agree upon a third arbitrator within ten (10) days, then the parties agree to request the Mass. Board of Conciliation and Arbitration to select an arbitration from the panel maintained by the Board the decision of these arbitrators shall be final and binding. e.) Costs of arbitration, including fees of arbitrators, costs of records and incidental expenses shall be borne by the party found at fault. Each party shall be responsible for all costs of preparation, presentation, and appeal, if any, of its won case.

STEP 5: The Dept. has a grievance, either the Board of Water Commissioners or the Superintendent shall notify the Assoc. Steward within five (5) days, who shall meet with the person or Board requesting it, within ten (10) days, thereafter. If said matter is not resolved within five- (5) days of said meeting, it may, at the discretion of the Dept., be processed through the appropriate steps as set forth above.

STEP 6: Any grievance not processed by the Assoc. through Steps 1-4 above shall be waived.

ARTICLE 20 CONT:

B.) Grievance Procedure, Notification: The above steps that require notification will be by U.S. Certified mail. Notice to the Superintendent and the Assoc. Steward shall constitute notice to the parties respectfully.

C.) No Strike Clause: It shall be a violation of this Agreement for any employee to engage in, induce, or encourage any strike, work stoppage, slowing down or withholding of service as provided by General-Laws: Chapter 15GB, section 9A.

D.) The Board of Water Commissioners reserve the right to act as their own agent at any time, and the words, "Board of Water Commissioners" shall be synonymous with any other representative specified by this Agreement. The Board also reserves the right to specify or allow someone other than the Superintendent to act as its representative where such title appears in this Agreement. The Dept recognizes its duty to notify the Assoc. of its representative, if different from the one noted in this Agreement.

## ARTICLE 21 - WAGES

Employees covered by this Agreement shall receive the following:

An increase of pay for the fiscal year beginning July 1, and ending June 30, of an amount determined by the Board of Water Commissioners. .

The Board of Water Commissioners reserves the right to establish and reward outstanding employees with a merit increase or a onetime bonus. Said right will by no means be used to bribe or coerce any employee for any reason, but to extend our gratitude for an excellent performance above and beyond a normal call of duty.

The Board of Water Commissions reserves the right to reopen the wage articles only should the economic conditions of the District warrant doing so.

## ARTICLE 22 - DURATION OF AGREEMENT

This Agreement covers the fiscal year beginning July 1, 2003 and ending June 30, 2004, or until it is agreed upon to change such agreement. It is provided nevertheless that it may be opened upon mutual agreement. .

Notwithstanding any provisions of this Agreement, it is hereby agreed as follows:

A.) That the funds be duly appropriated at a District meeting or assured by the Water Department.

B.) That this Agreement be subject to all applicable rules, regulations and laws of the Federal Government of the United States and the Commonwealth of Massachusetts as well as the By-Laws of the Onset Fire District or the Water Department in existence at any time during the term of this Agreement.

C.) The Employees Agreement is only negotiable between the Onset Water Department employees and the Onset Water Department Board of Water Commissioners.

IN WITNESS THEREOF, the parties hereto have caused these presents to be signed
By their duly authorized representatives on the _____22_____ day of JULY, 2003.


FOR THE ASSOCIATION:


STEWARD _Kathi Semple_


ONSET WATER DEPARTMENT EMPLOYEES ASSOCIATION
ONSET FIRE DISTRICT
15 SAND POND ROAD
ONSET, MA 02558


FOR THE EMPLOYER:

_John M. Cook_
JOHN COOK-CHAIRMAN

_Michael Sanborn_
MICHAEL SANBORN-CLERK

_Laurence Blacker_
LAURENCE BLACKER


BOARD OF WATER COMMISSIONERS
ONSET FIRE DISTRICT
WATER DEPARTMENT
15 SAND POND ROAD
ONSET, MA 02558

# EXHIBIT "F"

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| LORI ANN MORAN,<br>　　　　Plaintiff<br><br>v.<br><br>ANDREW DIPASQUA, MICHAEL<br>SANBORN, WILLIAM F. GAY, III, and<br>the ONSET FIRE DISTRICT,<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)　　C.A. No. 05-10033 NG<br>)<br>)<br>)<br>)<br>) |

## **AFFIDAVIT OF KATHI SEMPLE**

I, Kathi Semple, duly under oath, do hereby swear, affirm and depose as follows:

1.　　I am a lifelong resident of the village of Onset Massachusetts.

2.　　I have been employed by the Onset Fire District and Water Department since January 1980.

3.　　My positions for the Onset Water Department included administrative clerk and for approximately the last six years I have served as Office Manager.

4.　　I also served as the Shop Steward for the Onset Water Department Employee's Association from 2002 until January 2006.

5.　　At all times during my employment, I have had a good working relationship with William Gay, the Superintendent of the Water Department.

6.　　I have known William Gay for most of my life.

7.　　I have, on occasion, had disagreements with Superintendent Gay over his workplace decisions and/or decisions affecting members of the Employee's Association.

8.　　In every such disagreement with Superintendent Gay I have been able to freely voice my concerns, and exchange opinions with Superintendent Gay in a civil and professional

manner.

9.     In every such disagreement with Superintendent Gay we have been able to resolve any disputes, or to agree that no further action be taken, and then return to our usual work activities.

10.     I do not use swear words or vulgarities in my daily work activities, nor have I sworn or used vulgarities towards Superintendent Gay, with the exception of occasionally using the word "frigging" as an adjective instead of swearing.

11.     I do recall a disagreement with Superintendent Gay concerning snow shoveling by Water Department employees after the Blizzard in February 2003.

12.     In my role as Shop Steward, I objected to the Superintendent that it was improper to have Water Department employees shoveling snow for access to the Fire Department when there are Firefighters available to do the shoveling and the Water Department employees had other duties.

13.     I do not recall using any swear words or vulgarities during the discussion over the snow shoveling with Superintendent Gay, other than the use of the word"frigging" instead of a swear word.

14.     The discussion over the snow shoveling lasted only 5 to 10 minutes, and although voices may have been slightly raised, there was no yelling by either me or the Superintendent.

15.     The discussion over the snow shoveling ended after the Superintendent stated he would talk to the Fire Chief about the issue, and the matter was never brought up again.

16.     Both Superintendent Gay and I returned to work at our usual activities that day, and the discussion had no impact on our working relationship or our ability to work together.

17. Lori Ann Moran was not present during the discussion concerning the snow shoveling because she had gone home to tend to her husband who she said was complaining of chest pains.

18. I did not send Lori Ann Moran home that day.

19. During her employment, I learned that Lori Ann Moran was incorrectly advising the Superintendent I was attempting to get him fired, while at the same time incorrectly advising me that the Superintendent was going to "put me in my place" in order to create friction between the two of us.

20. I was present on April 27, 2004 when an incident occurred between Lori Ann Moran and Superintendent Gay.

21. On April 27, 2004 at approximately 3:00-3:15 p.m. Superintendent William Gay was talking to me about copies that had to be made for a request that was made about public records. He stated to me that I could keep on with the billing and "she can do the copies."

22. As the Superintendent stated this, Lori Moran said, "now I'm a she, I have a name. I don't like being referred to as she."

23. The Superintendent left the room and I said, "Lori, he just wants you to make copies. He referred to me as 'you do the billing' and I did not find it offensive, he just stated 'she' as 'you' can make the copies when telling me this." Lori stated to me, "Thank you for calling me Lori."

24. The Superintendent then walked back into the room and Lori started yelling that she does not like that disrespect, and I left the room.

25. I heard Lori yelling at the Superintendent and he apologized. He then said, "Did you just tell

me to shut up?" Lori said, "No, I didn't, but it was on my lips."

26.   Other witnesses in the area at the time of Lori's yelling were Jay Semple and Chris Poirier, who were Water Department employees, as well as Peter Murphy, a former member of the Board of Water Commissioners.

27.   The Superintendent left the room and I came back into the room. The Superintendent left the building. Lori told me he said I said shut up and I said, "Did you?" Lori said, "No but it was on my lips."

28.   Lori stated to me that she was sick of him disrespecting her. Once again I said "I think he said 'you' to me and 'she can make the copies' and I did not think it was disrespectful."

29.   I called the Superintendent on the Nextel to let him know his wife wanted a book I had and not to forget it which he then asked me for a ride home.

30.   Lori then stated to me to tell him he could "ride on her bumper" of her van, but I would not relay the message. Lori got up and asked me for the Nextel to tell him this, and said it over the Nextel phone..

31.   The Superintendent again asked me for a ride and I said okay.

32.   At about 3:45 p.m. and the Superintendent came back into the office and told Lori to keep her remarks to herself and this is her warning. Lori then states very loudly, "Am I fired?"

33.   The Superintendent said "this is your warning" and to drop it. Lori asked again, "Why am I fired? Am I fired?"

34.   The Superintendent said to her, "Why don't you just go home and I'll pay you to leave now?" Lori again states, "Am I fired?"

35.   The Superintendent did not respond and he left the building.

36.  When it was close to 4:00 p.m. and Lori wanted to know where the Superintendent was because she wants to know if she is fired or not. At 4:00 p.m. Jay Semple left for the day and Lori said someone has to stay here with me to see if I am fired. I told Chris Poirier to leave and that I would stay.

37.  I could not find the Superintendent, and Chris Poirier needed to lock up the building, so I told Lori that I thought he was walking home so why don't we just leave and Lori said, "No, I want to know if I'm fired."

38.  I started to walk down the hill to see if the Superintendent is down below when Lori yelled to me that he was up there at the door. Lori then said to the Superintendent, "so I'm fired." The Superintendent goes to get in my van and tells Lori, "I'll let you know." That occurred at about 4:05 p.m. The Superintendent and I left and so did Ms. Moran.

39.  Later that evening, on April 27, 2004, at approximately 9:00 p.m., the Superintendent called me at home asking me to call Lori in the morning to ask her to stay home with pay and he would let her know today.

40.  On April 28, 2004, at 7:00 a.m. I called Lori at home and told her the Superintendent wanted to know if she would stay home today and he would pay her and let her know today.

41.  Lori asked me if she was fired, and I told her that I didn't know and that I thought the Superintendent had to talk to someone or something, I was just relaying the message from the Superintendent. Lori said "okay."

42.  On April 28, 2004, at 8:05 a.m., Lori's husband came into the office and wanted papers out of Lori's drawer. I gave them to him. He left and then came right back in to ask if the Superintendent was working and I told him yes.

43.  On April 28, 2004, at 3:00 p.m. I called Lori to ask her, for the Superintendent, if she would

stay home until Monday with pay and he would let her know. I also told her that they were having a meeting Friday at 4:30 p.m. to do with the authority of the Superintendent.

44. Lori asked me if this meeting was open to the public which I stated as far as I knew it was unless they go into Executive Session. I told her that the Superintendent just wanted me to let her know that he wants you to stay home and will pay you until Monday. Lori said "okay."

45. On April 29, 2004, Lori called and wanted it in writing why she was staying home. Later that day, Lori's husband came in to get Lori's check and wanted to know why she was home and if he could have it in writing.

46. I told Lori's husband that I could have Jay Semple drop off her check and the letter, and that we would have it dropped off soon.

47. On April 29, 2004, the Superintendent had me write a letter to Lori, and I asked Jay to drop it off before lunch, approximately 11:50-11:55 a.m.

48. The next day, on April 30, 2004, I received a letter from Lori's attorney at 11:00 a.m.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS ___09th.___ DAY OF
_March_, 2006

*Kathi Semple*

Kathi Semple

# EXHIBIT "G"

MORAN
EXHIBIT NO. 1
114106 NMW

To whom it may concern,                                    4/27/2004

Today at approximately 3:10 at the Onset Water Department Office, (Present at this time was myself, Kathi Semple, Peter Murphy, and Lori Moran) I was giving Kathi Semple instructions on a job assignment in the office. During the middle of the conversation I innocently said to Kathi "You get the paperwork together and she can do the copying and typing." and I will do the tape's. At this point Lori then looked at me and said, "So I'm just a "she". I apologized to Lori not knowing that I had offended Lori with a simple elementary school taught english phrase. I did not understand how or why I had offended her anyway since I was having a conversation with Kathi about a job assignment. At that time she proceeded to badger me for my usage of words several times. I left the room momentarily; at the most I was gone for 5 minutes. I came back into the main office and went to the commissioner's room to retrieve some of the materials needed for the assignment. Lori continued to badger me about the way I had referred to her in the earlier statement to Kathi. Lori angrily repeatedly said to me " I'm only a "she". At this point I told Lori that no type of disrespect was intended that it was just words in a sentence I am ordering you to stop. Lori then was abrupt with me and told me to "Shut up". I asked her "Did you tell me to shut up?" She said to me "I didn't get it all the way out, I'm not that type of person. But the words "shut up" I heard very clearly from Lori also another person heard her clearly she told me to shut up

Then I went outside to the loading dock to remove myself from the hostile environment that Lori created. Lori followed me to loading dock and proceeds to badger me again. I still did not acknowledge her unprofessional behavior. I then I got into the truck and left the Water Department property.

When I was on my way back to the office from the Fire Department. I received a Nextel call from Kathi. Kathi wanted to make sure I remembered to bring one of her personal book home for my wife. I asked Kathi if she would be able to give me a ride home. Lori responded to me back on the Nextel and said "I'll give you a ride home on the front of my bumper." I replied back to Kathi on the Nextel " can I have a ride home?" I did not acknowledge the statement made to me by Lori at this time I was in fear of my well being not knowing what Lori was capable of after being so persistent and hostile to me. I went back to the office and parked my truck. I went into the building; Kathi, Jay, and Lori were there. I do not know where Chris was at this time. Lori was sitting at her desk, as I was walking back into the room she started to make the same comments that she had made earlier. I gave Lori a verbal warning and stated this is your verbal warning. Your comments are unnecessary and disrespectful." Before I could tell Lori there would be more disciplinary actions taken for bodily threats, Lori jumped up started yelling angrily to me "Are you firing me? Are you firing me?" I ordered her to go home with pay for the remainder of the day. Lori did not go home. She told me" If you are firing me, I have enough things on you to have you fired too. "Nothing was ever said about firing and she now had degraded my personal character" I left the building again to get away from the hostile environment Lori created. When I came back upstairs to arm the building alarm for the night at approximentley 4:05 PM. Lori and Kathi were in the parking lot. As I came outside hoping to avoid Lori but she confronted me again in the parking lot repeatedly yelling violently "Am I fired? Am I fired?" Remaining calm I told her that I would let her know. I was now in fear of my life after waiting for her to go home before I came outside in the parking lot only to be stocked down and verbally abused by Lori



again. I got into Kathe's van and went home. I did not acknowledge anymore of Lori's statements as me and Kathi left. The only mistake I believe I made was not to call the police to rectify the problem. I do feel that I did my best to give Lori a chance to cool off I realize we all have bad days but this day was far beyond reason for anyone to take Lori abuse. I am willing to help and forgive anyone. I have gone the last 7 or 8 months to make sure not to say or do any wrong actions to offend Lori. I also feel Lori does not respect higher authorities because past false accusations made against the other employees and me by Lori. On this day I think she wanted to be fired. Also I went to the same sexual harassment class as Lori. And it seems all that man taught us Lori used it to put me in a position so I could not say or do any right for her. I feel she would have manipulated anything I said to her or did in her advantage against me some how. I also know if I had ever done this to Lori I would lose my job for this type of unusual actions and behavior. Because of Lori's unusual actions and behavior I can no longer feel safe working with her.

Superintendent

William F. Gay 3rd

# EXHIBIT "H"

MORAN
EXHIBIT NO. 2
114 106  NMW

### Onset Fire District
# Onset Water Department
15 SAND POND ROAD
Onset, Massachusetts 02558 Y
Telephone Wareham (508) 295-0603
FAX (508) 295-0606

Board of Water Commissioners
John Cook Chairman
Michael Sanborn/Clerk

LORI MORAN:

EFFECTIVE 4-28-04 AT 8:00 A.M. YOU WERE PLACED ON ADMINISTRATIVE LEAVE WITH PAY, UNTIL THE OUTCOME OF THE 4-30-04 SPECIAL MEETING CLARIFYING THE AUTHORITY OF THE SUPERINTENDENT.

AT 7:00 A.M. YOU WERE NOTIFIED NOT TO COME TO WORK ON 4-28-04, AND AT 3:00 P.M. YOU WERE NOTIFIED NOT TO COME BACK TO WORK UNTIL YOU ARE NOTIFIED OF YOUR STATUS ON MONDAY MAY 3, 2004.

FOR THE BOARD OF WATER COMMISSIONERS

WILLIAM F. GAY III
SUPERINTENDENT
APRIL 28, 2004


Exhibit
A

# EXHIBIT "I"

# Onset Fire District
# Board of Water Commissioners

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295- 0603
FAX (508) 295-0606

MORAN

EXHIBIT NO. 3

1 1 4106  NMW

JOHN COOK CHAIRMAN
MICHAEL SANBORN/CLERK

LORI MORAN:

YOU ARE ON ADMINISTRATIVE LEAVE FOR EVENTS THAT OCCURRED ON 4 27 04 AND
ARE PENDING FOR DISCIPILNARY ACTION.

WILLIAM F. GAY III
SUPERINTENDENT
APRIL 29, 2004

WG kt



Exhibit
B

# EXHIBIT "J"

# Onset Fire District
# Board of Water Commissioners

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295- 0603

FAX (508) 295-0606



MORAN
EXHIBIT NO. 4
1 14 06 NMW

JOHN COOK/CHARIMAN
MICHAEL SANBORN/CLERK

RE: ADMINISTRATIVE LEAVE WITH PAY

LORI MORAN:

YOU ARE ON ADMINISTRATIVE LEAVE WITH PAY UNTIL FURTHER
NOTICE, FOR DISREGARD OF A DIRECT ORDER FROM THE
SUPERINTENDENT, AND FOR CONTINUING TO PURSUE THE MATTER ON
APRIL 27, 2004.

WILLIAM F. GAY III
SUPERINTENDENT
MAY 3, 2004

Is your **RETURN ADDRESS** completed on the reverse side?

**SENDER:**
■ Complete items 1 and/or 2 for additional services.
■ Complete items 3, 4a, and 4b.
■ Print your name and address on the reverse of this form so that we can return this card to you.
■ Attach this form to the front of the mailpiece, or on the back if space does not permit.
■ Write "Return Receipt Requested" on the mailpiece below the article number.
■ The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

Lori Moran
P.O. Box 1344
Onset, MA 02558-1344

4a. Article Number
7003 1680 0002 6346

4b. Service Type
☐ Registered          ☐ Insured
☐ Express Mail        ☐ COD
☒ Certified
☐ Return Receipt for Merchandise

7. Date of Delivery
05/04/04

5. Received By: (Print Name)
Lori Moran

6. Signature: (Addressee or Agent)
X _Lori Moran_

8. Addressee's Address (Only if requested and fee is paid)

PS Form 3811, December 1994          102595-98-B-0229          Domestic Return Receipt

# EXHIBIT "K"

COMMONWEALTH OF MASSACHUSETTS
U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * *
LORI ANN MORAN,                  )
          Plaintiff,             )
                                 )
     vs.                         )Docket No. 95-10033NG
ANDREW DIPASQUA, MICHAEL         )
SANBORN, WILLIAM F. GAY, III,    )
and the ONSET FIRE DISTRICT      )
                                 )
     Defendants.                 )
* * * * * * * * * * * * * * *
```

           The deposition of Andrew Dipasqua,
a witness called on behalf of the Plaintiff,
provisions of Rule 30 of the Massachusetts Rules of
Civil Procedure, before Carmen Branson, Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Margaret A. Ishihara, 86 Church Street, Mattapoisett,
MA  02739, on Thursday, February 16, 2006, commencing
at 10 a.m.

APPEARANCES:
MARGARET A. ISHIHARA, ESQ.
Law Office of Margaret A. Ishihara
86 Church Street
Mattapoisett, MA  02739
(For the Plaintiff)

JOHN J. CLOHERTY, III
Pierce, Davis & Perritano, LLP
Ten Winthrop Square
Boston, MA  02110
(For the Defendant)



## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1      A.   Yes.

2      Q.   Can you tell us when you were first elected

3  to that Board?

4      A.   First time was in May of 1998, served three

5  years, was going to run again and became sick and had

6  to give it up with cancer and had to back out and

7  then got re-elected in 2004 of May.

8      Q.   And for what term were you re-elected?

9      A.   This is a two year term this time.   The

10  first time it was a three year.   That was a normal

11  three year.

12      Q.   So it was two year term to fill in a

13  vacant --

14      A.   Vacant.   A man who had retired.

15      Q.   Do you hold any elected offices in Wareham

16  or elsewhere?

17      A.   No.

18      Q.   Do you hold any appointed offices?

19      A.   No.

20      Q.   So you would not have been on the Board in

21  August of 2003, is that right?

22      A.   That is correct.

23      Q.   And you didn't attend any Special Meeting in

1    August of 2003 concerning William Gay?

2         A.   No.

3         Q.   Now just going back a bit.  I would like to

4    get marked as Exhibit No. 1, the Notice of taking

5    deposition in this case.

6                   (Notice marked Exhibit No. 1 for

7    identification.)

8         Q.   Do you know the plaintiff Lori Moran?

9         A.   Yes, I do.

10        Q.   Can you tell us when you first met Lori

11   Moran?

12        A.   Probably late April, early May of 2004.

13        Q.   And where did you Ms. Moran?

14        A.   I was invited to a house party.  I was

15   running for Water Commissioner.

16        Q.   Was that at her house?

17        A.   Yes, it was.

18        Q.   Do you recall who else was there?

19        A.   A few people, but I would say it was about

20   twenty people.  I mean there was a few people there.

21   Lori and her husband Jim were there.  I can see

22   faces, but I can't put names with all of them.

23   Mrs. -- oh, Lenny Gay's wife, Lenny Gay was there.  I

1    think Dick Post was there.   Leila Cast was there.

2    Eddie Ellis.   As I say there was probably a good

3    fifteen or twenty people there and trying to remember

4    all the faces and the names I can't.

5         Q.   Did you speak with Ms. Moran at that house?

6         A.   Yes, I did.

7         Q.   And do you recall what you said and what she

8    said?

9         A.   No.   I do not remember.

10         Q.   Do you have any notes or anything that might

11    help you refresh your recollection?

12         A.   From that night?

13         Q.   Yes.

14         A.   No.

15         Q.   When you met Lori Moran, were you aware that

16    she worked at the Onset Water Department?

17         A.   Yes.

18         Q.   Did you have any conversation with her that

19    evening about her being employed at the Onset Water

20    Department?

21         A.   Yes.

22         Q.   Do you recall what she said and what you

23    said?

1    **A.**   I believe at that time she was under

2    suspension.  And I said if I got in, I would look

3    into the matter.

4    **Q.**   Was there any further conversation?

5    **A.**   There may have been, but I can't remember.

6    **Q.**   Do you recall when exactly in May you

7    actually took office as a Water Commissioner?

8    **A.**   Somewhere around the 15th or 16th or 17th.

9    It is right in that general -- it is usually the

10    third Monday of the month, I'm sorry.  It is usually

11    the third Tuesday of the month is election.

12    **Q.**   And you were sworn in right after the

13    election?

14    **A.**   Yes.

15    **Q.**   I am going to show you a letter from William

16    Gay dated April 28, 2004, from the then Water

17    Commissioners.  And we will have that marked as

18    Exhibit Number 2.

19             (Letter marked Exhibit No. 2 for

20    identification.)

21    **Q.**   Looking at Exhibit Number 2, could you tell

22    us, have you seen that document before today?

23    **A.**   Yes.

1  people at without looking at the minutes of the

2  meetings.

3      Q.  Did you ever have any conversation with

4  anyone outside the meetings of the Board of Water

5  Commissioners about sending out the letter that has

6  been marked as Exhibit No. 9?

7      A.  No.

8      Q.  At the bottom of the first page of Exhibit

9  No. 9 it states, "Please be advised that

10  cross-examination or questioning of persons who

11  present oral testimony at the meeting will not be

12  allowed, except for questions by the Water

13  Commissioners."  Do you see that?

14      A.  Yes, I do.

15      Q.  Was there discussion at the Board of Water

16  Commissioners meetings about cross-examination and

17  whether it would be allowed or not?

18      A.  Under advisement from Dan Murray, he

19  said --

20          MR. CLOHERTY:  Okay.  I am going to

21  instruct the witness not to reveal any attorney

22  client communications.  He can identify, counsel

23  unless you object, he can identify whether he

1    discussed with Attorney Murray the cross-examination,

2    but I don't want him to get into the nature of the

3    discussions.

4        Q.  Well did you discuss with Attorney Murray

5    about this issue of cross-examination?

6            MR. CLOHERTY:   I am going to object.

7    I mean I think that is asking him the content of his

8    discussions.  I am going to let him answer with a yes

9    or no answer.  I am not waiving any attorney client

10   privileges to that communication.

11       Q.  You can answer?

12       A.  Yes.

13       Q.  And at that discussion were other members of

14   the Board of Water Commissioners also present?

15           MR. CLOHERTY:   Objection.  Again I

16   think you can answer yes or no to that.

17       A.  Yes.

18       Q.  Which ones?

19           MR. CLOHERTY:   I am going to object,

20   counsel.  Are you trying to determine whether this

21   was privileged or not privileged communication.

22           MS. ISHIHARA: I am trying to determine

23   who was there.

1    in April to see if we could get all the facts out and

2    resolve it.

3        Q.   Which incident back in April?

4        A.   It was an incident back in April before I

5    was on that caused her to be put on administrative

6    leave.  Okay.

7                And this is a letter from describing

8    what happened from Mr. Bill Gay, III, or William Gay,

9    III.  Do you want me to read the whole letter?

10               MR. CLOHERTY:   Well you got to point

11   out what you are referencing, sir, for the record.

12       A.   Okay.

13               MR. CLOHERTY:   What are you looking at,

14   sir.

15       A.   Exhibit 9.  Okay and it is over the argument

16   that Mr. Bill Gay and Lori Moran had and the

17   threatening of Mr. Bill Gay.

18       Q.   What are you saying the specific charges are

19   that led to the sending of the letter that has been

20   marked as Exhibit No. 9 to Lori Moran saying that

21   there may be disciplinary action imposed against her?

22               MR. CLOHERTY:   Objection.   You can

23   answer.

1    privilege, but you can answer.

2        A.   I felt as though she had justifiably

3    threatened the superintendent and had to listen to

4    the witnesses.  And I felt as though she should be

5    terminated.

6        Q.   And in what fashion do you say Ms. Moran

7    threatened the superintendent?

8        A.   From listening to the witnesses that day and

9    their testimony.

10        Q.   But what was the specific threat do you say

11    that Ms. Moran made against Mr. Gay that led to your

12    voting to terminate her?

13        A.   She had verbally threatened him.

14        Q.   And what do you say that verbal threat was?

15        A.   She had threatened to drive him home on the

16    front bumper of her car.

17        Q.   Before the vote was taken to terminate

18    Ms. Moran, other than other members of the Board of

19    Water Commissioners, had you spoken with anyone about

20    disciplinary action or potential disciplinary action

21    against Lori Moran?

22        A.   No.

23        Q.   Had you spoken with anyone other than the

Q.    And what was the purpose?

A.    The purpose was to notify us the Commissioners that she was filing a grievance.

Q.    Was the purpose of the meeting to consider the grievance by Lori Ann Moran?

A.    Yes.

Q.    Was there any vote taken at the July 24, 2004, Special Meeting concerning Lori Ann Moran's grievance?

A.    Yes.

Q.    What was that vote?

A.    I am looking for the exact Motion.  Wait a minute.

There was a Motion to let it continue on to higher up or different avenues and the vote was two to one with Sanborn and myself, yes, and Brian O'Hearne against.

Q.    Who were the higher -- you made the motion, right?

A.    Yes.

Q.    Who were the higher authorities to whom you were referring?

A.    There is a Board in Boston to hear

1  grievances or I think it is called the reconciliation

2  board, I think is how you pronounce it.  They handle

3  grievances and matters.  And I said, well, let them

4  handle, not specifically those people, but let it go

5  out to higher up.

6      **Q.**  Why did you vote to let the grievance go on

7  to higher up as you describe it?

8                  MR. CLOHERTY:    Objection.  You can

9  answer.

10     **A.**  I don't remember exactly why.

11     **Q.**  I am going to show you documents dated

12  July 24, 2004, from a Maurice Harlow which we will

13  mark Exhibit 13.

14                 (Letter dated 7-24-04 marked Exhibit

15  No. 13 for identification.)

16     **Q.**  Taking a look at Exhibit No. 13, could you

17  tell us have you seen that before today?

18     **A.**  Yes.

19     **Q.**  And what's that document?

20     **A.**  It is a handwritten statement by

21  Mr.  Maurice Harlow about some things that took place

22  or allegedly took place.

23     **Q.**  And when did you first see this document?

*LEAVITT REPORTING, INC.*

1  **A.**  I can't remember the date.

2  **Q.**  Who is Maurice Harlow?

3  **A.**  A gentleman who worked for the Water

4  Department for many years.  And he lives about four

5  streets over from me.

6  **Q.**  You know Mr. Harlow, right?

7  **A.**  Yes.

8  **Q.**  Can you tell us when you first met

9  Mr. Harlow?

10  **A.**  Exactly, no, I can't.  It would have been, I

11  believe, in the mid70s.

12  **Q.**  In Exhibit No. 13 in the third paragraph, it

13  says before the Onset Water Commissioners meeting at

14  which Lori Moran was fired, I saw Andy Dipasqua at

15  the beach and Andy DiPasqua told me "damned if I do,

16  and damned if I don't."  The other four said they

17  will sue.

18        And I said "How are they going to sue.

19  He said "I don't know."

20        And I said, "Maybe you better find out."

21  Do you see that?

22  **A.**  Yes, I do.

23  **Q.**  Do you recall having such a conversation

1    with Mr. Harlow?

2                    MR. CLOHERTY:    Objection.    You can

3    answer.

4        A.    Not this conversation because it didn't take

5    place at the time he says.

6        Q.    Did it take place at a different time?

7        A.    Yes.

8        Q.    When was that?

9        A.    Sometime after July 4.

10        Q.    And where did the conversation take place?

11        A.    At the beach down at the end of our street.

12        Q.    Is that an accurate account of what you said

13    and what Mr. Harlow said?

14                    MR. CLOHERTY:    Objection.    You can

15    answer.

16        A.    No.

17        Q.    What did you say and what did Mr. Harlow

18    say?

19        A.    I am not exactly sure what he said, but I

20    know that part of this is false.

21        Q.    Which part do you say is false?

22        A.    The last half of Section 3.

23        Q.    The last half.    Which parts specifically?

1    A.    "The other four said they were going to sue.

2    I said how are they going to sue.  He said I don't

3    know.  And I said maybe you better find out."

4    Q.    So you are saying that wasn't said?

5    A.    That was not said.

6    Q.    And what about the first part.  "The damned

7    if I do and damned if I don't." Was that said?

8    A.    Yes.

9    Q.    Do you have any further recollection as to

10   what was said in your conversation with Mr. Harlow on

11   that occasion?

12   A.    No.

13   Q.    Looking at Paragraph 5, it states, "After

14   the Hearing I spoke with Andy DiPasqua at the beach.

15   He said, quote, 'We didn't have a choice.   Billy Gay

16   has the licenses and it would be hard to find someone

17   to take his place.'"  Closed quote.

18        I said, quote, "There are lots of people

19   that have those licenses."  Closed quote.  Do you see

20   that?

21   A.    Yes.

22   Q.    Did you have such a conversation with

23   Mr. Harlow?

1      **A.**   I don't remember saying anything about

2   licenses.

3      **Q.**   Well other than the conversation that you

4   just related to us that you said took place after

5   July 4, 2004, on the beach, did you have a

6   conversation with Mr. Harlow about Lori Moran being

7   terminated?

8      **A.**   Not that I remember.

9      **Q.**   So you say that you didn't say anything

10   about licenses, did you say something else other than

11   what's related in Paragraph 5?

12                  MR. CLOHERTY:    Objection.

13      **A.**   I don't recall saying anything about

14   licenses.

15      **Q.**   Okay.  So you don't recall saying about

16   licenses.  Do you recall having a conversation with

17   Mr. Harlow other than the one that you just related

18   to us?

19                  MR. CLOHERTY:    On or about July 4.

20      **A.**   At the beach, it was only the once.

21      **Q.**   Just the one conversation?

22      **A.**   Yes.

23      **Q.**   Looking at the minutes that have been marked

1    **Q.**  Was she given an opportunity to be heard

2  prior to her termination?

3    **A.**  At the meeting of June 30.

4    **Q.**  Is that a yes, sir?

5    **A.**  Yes.

6    **Q.**  And, in fact, before given that opportunity

7  to be heard at the meeting of June 30, had she been

8  given notice of that meeting?

9    **A.**  Yes.

10    **Q.**  In fact, the notice of the meeting was

11  marked as Exhibit No. 9, is that correct?

12    **A.**  Yes.

13    **Q.**  And she appeared at the meeting of June 30,

14  is that correct, sir?

15    **A.**  Yes.

16    **Q.**  And was she, in fact, heard by the Board?

17    **A.**  Yes.

18            MR. CLOHERTY:    No further questions.

19            MS. ISHIHARA:    Nothing further.

20            (The deposition concluded at 11:40 a.m.)

21

22

23

# EXHIBIT "L"

# *Onset Fire District*
# Board of Water Commissioners

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295-0603
FAX (508) 295-0606

> *Moran*
> EXHIBIT NO. 5
> 1 14 106   NMW

MICHAEL SANBORN/CHAIRMAN
BRIAN O'HEARNE/CLERK
ANDREW DIPASQUA

JUNE 17, 2004

LORI-ANN MORAN
P.O. BOX 1344
ONSET, MA. 02558-1344

DEAR MRS. MORAN:

THIS IS TO NOTIFY YOU THAT THE ONSET FIRE DISTRICT BOARD OF WATER COMMISSIONERS WILL HOLD A PUBLIC MEETING AT 7:00 P.M. ON WEDNESDAY JUNE 30, 2004 AT THE ONSET WATER DEPARTMENT OFFICE AT 15 SAND POND ROAD IN ONSET, MA. A PURPOSE OF THE MEETING WILL BE TO CONSIDER YOUR ALLEGED ACTIONS ON APRIL 27, 2004 AS RELATED IN A MEMORANDUM OF WILLIAM F. GAY, 3RD, DATED APRIL 27, 2004 AND ENCLOSED HEREWITH.

PLEASE BE ADVISED THAT UPON CONSIDERATION OF THE MATTER, THE BOARD OF WATER COMMISSIONERS MAY IMPOSE DISCIPLINARY ACTION AGAINST YOU INCLUDING SUSPENSION WITH OR WITHOUT PAY, DISMISSAL FROM YOUR POSITION AS AN EMPLOYEE OF THE ONSET WATER DEPARTMENT OR OTHER ACTION.

YOU WILL BE AFFORDED AN OPPORTUNITY AT THE MEETING TO PRESENT ORAL STATEMENTS, DOCUMENTARY EXHIBITS AND ANY OTHER EVIDENCE. YOU WILL ALSO BE AFFORDED AN OPPORTUNITY AT THE MEETING TO HAVE ANY WITNESSES PRESENT ORAL STATEMENTS OR OTHER EVIDENCE BEARING ON THE MATTERS UNDER CONSIDERATION.

PLEASE ASK YOUR ATTORNEY TO INFORM THE BOARD'S COUNSEL, DANIEL F. MURRAY, OF THE NAME AND ADDRESS OF ANY PERSON YOU WANT THE BOARD TO ASK TO ATTEND THE MEETING.

PLEASE BE ADVISED THAT CROSS EXAMINATION OR QUESTIONING OF PERSONS WHO PRESENT ORAL TESTIMONY AT THE MEETING WILL NOT BE ALLOWED EXCEPT FOR QUESTIONS BY THE WATER COMMISSIONERS.



Exhibit
K

CONT:

YOU ARE INVITED TO ATTEND THE MEETING WITH YOUR COUNSEL.

VERY TRULY YOURS,

MICHAEL SANBORN/CHAIRMAN
ONSET FIRE DISTRICT
BOARD OF WATER COMMISSIONERS


ENCLOSURE

CC: ATTORNEY MARGARET A. ISHIHARA


SENT VIA REGULAR AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED

# EXHIBIT "M"

# Onset Fire District
# Board of Water Commissioners

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295- 0603
FAX (508) 295-0606



MICHAEL SANBORN/CHARIMAN
BRIAN O'HEARNE/CLERK
ANDREW DIPASQUA

JULY 1, 2004

LORI-ANN MORAN
P.O. BOX 1344
ONSET, MA. 02558-1344

DEAR MRS. MORAN:

ON JUNE 30, 2004 AT THE BOARD OF WATER COMMISSIONERS
SPECIAL MEETING IT WAS VOTED FOR YOUR TERMINATION EFFECTIVE
IMMEDIATELY.

THIS LETTER IS ADVISING YOU OF YOUR TERMINATION AS OF JUNE
30, 2004.

SINCERELY,

MICHAEL SANBORN/CHAIRMAN
ONSET FIRE DISTRICT
BOARD OF WATER COMMISSIONERS

ENCLOSURE

CC: ATTORNEY MARGARET A. ISHIHARA

SENT VIA REGULAR AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED

# EXHIBIT "N"



Moran
EXHIBIT NO. 11
1 14 106 NMW

July 24, 2004

I, Maurice Harlow, state that:

1. I reside at Salt ~~Marsh~~ Works Rd, Onset, MA

2. I worked for the Onset Water Dept for 18 years.

3. Before the Onset Water Commissioners meeting at which Lori Moran was fired, I saw Andy DiPasqua at the beach, and Andy DiPasqua told me "D__d if I do, and D__d if I don't. The other four said they will sue". I said "how are they going to sue — He said "I don't know" and I said "maybe you ~~would~~ better find out".

4. I was present at the hearing at which Lori Moran was fired.

5. After the hearing, I spoke with Andy DiPasqua at the beach. He said "we didn't have a choice, Billy Gay has the licenses and it would be hard to find someone to

7/24/2004 - Maurice Harlow

Take his place". I said "there are lots of people that have those licenses".

Maurice Harlow

# EXHIBIT "O"

## ONSET WATER DEPARTMENT EMPLOYEE'S ASSOCIATION
### GRIEVANCE

Name of Grievant:    Lori Ann Moran, 88 Main Ave., Onset, MA. 02558

Date: _July 2nd, 2004_

Classification:    Clerical

Moran
EXHIBIT NO. 7
114106 NMW

Nature of Grievance

On the evening of June 30, 2004, the Onset Board of Water Commissioners voted to terminate Lori Ann Moran from her position as a clerical employee with the Onset Water Department.

Ms. Moran was not given a fair hearing because a majority of the Water Commissioners were not impartial, and she was not afforded an opportunity to cross examine witnesses or otherwise properly present her case.   Ms. Moran was allegedly terminated for conduct which occurred on April 27, 2004.   However, the Onset Water Department has not issued procedures, rules, and regulations governing the internal conduct of employees, and no clear standards existed against which to measure her alleged bad conduct.   Further, under management rights, the employer has not retained the right to terminate employees.

Clause of Contract Violated

Article 2 – Management Rights

Article 7 – Hours of work

Remedy Desired:    Reinstatement of Ms. Moran to her position with the Onset Water Department with full pay, benefits and seniority.

Meeting desired: Yes, with representation by counsel.

Signature of Employee _Lori ann Moran_

Signature of Union Official _Kathi Semple 7/2/04   13:15 PM_

Administration Answer: _Chair of the_
_Grievance presented to the Board of Water Commissioners_
_on 7-9-04 Supt. William Gay_

Cc:    Michael Sanborn, Chair, Board of Water Commissioners
William Gay, Superintendent

# EXHIBIT "P"

# ONSET FIRE DISTRICT
# BOARD OF WATER COMMISSIONERS
Meeting Minutes (S-1-2005)
July 24, 2004 – 4:00 p.m.



Moran
EXHIBIT NO. 8
1 14 106 NMW

The meeting (S-1-2005) was called to order by Chairman Michael Sanborn at 4:01 p.m. at the Onset Fire District Water Department Office, 15 Sand Pond Road.

**Agenda Item 1: Roll Call**
    Commission members present: Michael Sanborn, Andrew DiPasqua and Brian O'Hearne.
    Superintendent: William Gay
    Prudential Committee Members: Mary McCoy, Jovina Dean
    Onset Fire District Residents: Lori-Ann Moran, Attorney Margaret A. Ishihara and 7 other unidentified residents.

**Agenda Item 2: Old Business**
    A.) Grievance – Lori Ann Moran.

    Chairman Sanborn read the grievance (Attachment A) that was submitted by Lori Ann Moran.

    Attorney Ishihara stated that her client was at the meeting under protest for the following reasons:
        They only way they new about the meeting was from the posting. There was no proper notice given to her client from either the Board of Water Commissioners or the Union representative.
        Under 150E, section 5, to paraphrase, the grievance belongs to the employee. They were not notified of the meeting or what was to be discussed specifically. The meeting could have convened without them knowing that it was taking place. The union representative is not present.
        There was no union representation, in fact the union representative testified against her client.

    The merits of the grievance are:
        A majority of the Board of Water Commissioners was not impartial. Commissioner DiPasqua has indicated that he voted the way he did was because of an alleged threat of a lawsuit from the employees.
    Commissioner DiPasqua stated that it was a negative that it was false and that he voted based on the information that was received from the people that came before the commission that night. There was not a threat made to him or any indication of any threat.
    Attorney Ishihara read and presented a statement from Maurice Harlow (Attachment B).
    Attorney Ishihara also pointed out the at the meeting at the end of April, which was an informal meeting to see if the issue could be resolved, Commissioner DiPasqua stated that his goal was to get everyone back to work together. Since that time something happened before the termination hearing and Attorney Ishihara believes that this is one item. There were definite considerations that took place at the hearing that had nothing to do with what was said at the hearing. This would show that it was not an impartial hearing.
    Commissioner DiPasqua: What I said with the 50/50% was that with no matter what I do, 50% of the people are going to like me and 50% of the people are going to hate me, no matter what we do. My mind was not made up; I sat here and listened to the people that night. As far as damned if I do, damned if I don't, that was what I meant that 50% of the district are going to like us and 50% of the district are going to hate us. I was

never threatened by anybody, never had been threatened and there was no coercion saying that if I don't vote this way or anything else. Nobody has come up to me saying you don't vote this way or you don't vote that way. Nobody has ever. I'd go to court on that because that is the way it was. As far as the 50/50, that is where I stood, because of the district. It had nothing to do with these workers here or anybody else. It had to do with people that testified that's who I listened to, it was like being on a jury, and that's how I went. Listened to the people. I don't know where he (Maurice Harlow) came up with that idea. Yes, he did talk to me on the beach one day and that is when I told him that it was 50/50, one way or the other. No way has anybody coerced me or anything else. I purposely stayed away from Michael and Brian during all these hearings, not to talk about it. Because it is illegal, I stayed away from it.

Attorney Ishihara: I am just telling you what Mr. Harlow is telling us and that you have his written statement. Again, I think that the hearing was not impartial.

Commissioner DiPasqua: I was very impartial.

Attorney Ishihara: There were a number of inconsistencies between the various witnesses that testified against us.

Attorney Ishihara: The other statement that was made directly at the hearing was that the majority of the commissioners said that they had to go with what the Water Superintendent said. I took that to mean that they had to go with whatever he said. Again, how is that fair and impartial? No matter what we came in and said, even if we had 50 people come in and say the same thing, if the Water Superintendent says something different then we are out the door.

Commissioner DiPasqua: I went by what I heard from all the people. Five out of the six stories seemed to fall into a line. And that is what I went by, just like being on a jury. I have been through this before.

Attorney Ishihara: The stories were inconsistent.

Commissioner DiPasqua: They were fairly close, a lot closer on a few things, and that is what I went by.

Attorney Ishihara: In my recollection there is one thing that stands out, that Mr. Gay has two of the witnesses out of the room and the witnesses themselves said they were in the room when supposedly Ms. Moran told Mr. Gay to shut up. Which of course we deny. That's one thing that just jumped out at me and it is one of many things that were inconsistent. To say that they more or less fell in line, I think is just immaculate…it is not accurate.

Commissioner DiPasqua: That's the way I looked at it.

Attorney Ishihara: The other issue that I have, directly on the contract, is under Management Rights (Article 2- Management Rights). Looking at Article 2 – Management Rights (Attachment C). Attorney Ishihara read Article 2.

Attorney Ishihara: One of the issues that Mr. O'Hearne brought up was putting together some sort of written Employee Code of Conduct. Clearly you have not issued such Code of Conduct, written rules and regulations concerning the internal conduct of the employees. So you haven't retained that as a management right and when we were at the hearing at the end of June, my client was being held up to some sort of standard that didn't exist. So our position on this is that it is a violation of the collective bargaining agreement specifically. Had there been some sort of written rules and regulations that had been issued and everyone knew about them that clearly said that you have to say this or you have to say that, then that is one thing. But you cannot have some sort of floating standard out there. I think we have a situation that if you are measuring Ms. Moran then you should have measured Mr. Gay by that standard as well and that hasn't happened. I don't want to get into a lot of past issues but I think there are some times when the union representative herself has been highly disrespectful of Mr. Gay and that nothing ever happened to her. That is the kind of things that happen when you don't have these written rules and regulations in standard where everyone gets treated the same. So you haven't retained that as a management right and you didn't have the right to terminate her on the basis on something that just didn't exist. Those are my basic points.

Commissioner DiPasqua: The only thing that I want to tell you is that when I got this contract I made some comments to myself and I have some written notes at my house that I have written up about this contract that we do have to review it, it is coming up, probably at our next meeting, and I am going to…and I have some things I'm going in put in and bring in that's going to sit down and everyone's going to sign this contract as to the agreements and the articles and changing to it and it's going to have to be done and they're going to sign it and agree to it. There's going to be three copies, one for the Commissioners, each employee's going to sign it and it's going to going into their file and that there's going to be another copy that they can take home for their personal records. This is what we are going to go after, so that they understand all of it. It has never been done by the Commissioners before us and it's going to be done. I'm in construction and that's how when we go to work on a job we read the company rules and we get a copy and they get a copy. We sign them, date them, that we've read them, understand them and that's how we know. And that's what going to happen here. Hopefully, we may not have all the paperwork done by August, but I am going to have some of it brought in and then in August we are going to go through it. Right now we are just going by this (referring to the contract).

Attorney Ishihara: You have to go by what you have.

Chairman Sanborn: I would like to just bring up about, you brought your start, and one of your complaints is about the meeting. We had the meeting, we had the last meeting and we brought up about the grievance paper and we had a certain amount of time to respond to it. I know our attorney called your attorney, called you and you never called him back.

Attorney Ishihara: What are you talking about?

Chairman Sanborn: It wasn't until later, until that night that you sent a letter. I guess you faxed a paper.

Attorney Ishihara: I faxed a letter, I learned about this meeting.

Chairman Sanborn: I mean the way you say it, you were never notified.

Commissioner DiPasqua: Our attorney called you, or attempted to call you or left a voice mail or something like that as soon as this thing came down through.

Attorney Ishihara: Here's what I have. I think we may be talking about the same timing, I'm not sure. Thursday night I learned that there was a meeting posted for today.

Chairman Sanborn: Well we were going to try to have it, we didn't actually know on Thursday, or Wednesday when we have the meeting that we didn't know what time or when we were actually going to have a meeting. Then we got a hold of Dan Murray and it ended up that he was going to contact you. That would have been what, Thursday then.

Attorney Ishihara: Well that's what I'm saying, I think we have the same timeframe. I don't think that we have a disagreement about that. Thursday night I learned that there was going to be some sort of special meeting before he Water Commissioners. After I learned that I faxed a letter out Friday morning to Attorney Murray asking him, essentially, what's going on. He wasn't in the office when I called. Then he called me sometime mid-day, I actually did speak to him late afternoon. By that time I knew about the meeting.

Chairman Sanborn: I know he did call me back later and said that he contacted you.

Attorney Ishihara: Right, right,

Chairman Sanborn: I mean it was, we tried to push it forward for your advantage, we could have gone Monday or Tuesday, but we wanted to have it within the time period.

Attorney Ishihara: So, that's my issue. We knew Thursday night we were not told about it directly, we knew about it indirectly. I think we are on the same time frame but that's not a whole lot of notice especially for a Saturday meeting. I have to rearrange some things and other people have to rearrange other things to be here on a Saturday afternoon.

Commissioner DiPasqua: I want to make a quick statement on that. My signature is on this meeting the reason being is the Superintendent William Gay contacted Mike about signing this because of our attorney said that we had so many hours to get it out and get it straightened out. Billy came to me at my work site because

Michael couldn't get up to do it, and Michael had said to him see if Andy will sign it. Billy came to me and I said let's sign it and get the paperwork out and through. At that time I knew that our attorney knew and I know that he was told to contact you and it all came down that morning, to make sure to contact you when we had set the date and the time. And he knew about it and was supposed to contact you.

Attorney Ishihara: He didn't call.

Commissioner DiPasqua: He attempted to.

Chairman Sanborn: He did Thursday.

Attorney Ishihara: I don't have a message from him Thursday.

Chairman Sanborn: Did he call you? I thought you said you were notified on Thursday.

Attorney Ishihara: Thursday night I knew about it indirectly because someone told me about the posting or whatever.

Commissioner DiPasqua: Cause someone already questioned me about it. That's why it was done.

Attorney Ishihara: I don't have an issue with that.

Commissioner DiPasqua: Cause someone called my house and questioned it.

Attorney Ishihara: I don't have an issue with that. I did not know about it on Thursday because Attorney Murray did not call me on Thursday night.

Chairman Sanborn: OK, all right that's fine.

Attorney Ishihara: I heard that there was some sort of meeting on and then we did communicate on Friday. Obviously I somehow knew it was happening because I am here but it is a shame given the rights of my client are involved here that some sort of notice should have been given.

Attorney Ishihara: The other issue of the grievance was on July 2nd.

Chairman Sanborn: We have the shop steward here. I don't know if she wants to say anything how she received it or if she wants to make a comment.

Shop Steward Kathy Semple: The only thing I have to say about it is that I told Lori that I was going to wait until I found out more about the time and that I would let her know. And we would handle it from there.

Commissioner O'Hearne: What action did the association take on it?

Shop Steward Kathy Semple: She came into work and asked me if I would sign it and turn it in. As far as the grievance, I wasn't sure because of the date of July 2nd. I then in turn followed through with it and gave it to Billy.

Commissioner O'Hearne: Andy, you said that you have a copy of the contract with you?

Commissioner DiPasqua: No, I don't. I thought I did.

Attorney Ishihara: Do you want to look at it? I've got one copy.

Commissioner O'Hearne: Ya, I just want to see one section.

Chairman Sanborn: Any more questions?

Commissioner O'Hearne: I'm just unclear on what our real role is on it. It seems with a union or association that a grievance would go through their group first and it seems that these just get signed off and end up with us. I don't know if it designed to get, if that's what the procedure is designed to be.

Chairman Sanborn: The thing that I was going to bring up, and I will try to go with the same thing the Brian was just saying. We are getting papers from, grievance paper that's not addressed to us they are addressed to their association. They can either deny it or go to arbitration or....

Attorney Ishihara: The association is supposed to represent the employee and present these with steps. Though the contract is frankly not that well written but the steps are. It gets presented by the association, on behalf of the employee or the union member. The Water Superintendent is required to take action on it. In this instance it appears that the Water Superintendent decided, and I think he probably can under that agreement, to present it to the Water Commissioners to go to step 2. That's where we are at. Obviously a grievance is not something that is ultimately settled entirely by the association. The association is supposed to represent the

mployee in these matters. There are some union contract in which there is a grievance committee set up which consists of some union members and some non-union members. Then they make a recommendation. In this instance: Water Superintendent, Water Commissioners, Mediation, and Arbitration. Those are your steps.

Chairman Sanborn: Our attorney isn't here right now and what he recommended to, it was a grievance between Lori and the association is how this is presented. It isn't going....

Attorney Ishihara: It is a grievance under the....that's why we are here; I assume that he recommended that you had to have this meeting. It's now been presented to the Board of Water Commissioners for an answer back to us or to the union. Or to the union to us.

Chairman Sanborn: I'm pretty sure that the way he is talking that it would have to go back to the union and more than likely go into arbitration.

Attorney Ishihara: Obviously I don't know what Mr. Murray said but again the steps would be: the Water Superintendent is supposed to give an answer. The Water Superintendent could say yes, no, forget it or something in between. Under your agreement the Water Commissioners can present it to the Water Commissioners for an answer back from the board. If the matter is not resolved at this level, the board level, then we could request mediation with the state board of mediation and arbitration and if that doesn't work out then we have aright to request arbitration. That is my understanding of it, I don't want to put words into his mouth either but it is not something the union has resolved. The union is supposed to be representing my client.

Chairman Sanborn: It is my understanding that the union could turn down this grievance too. Is that true? If it was presented to her.

Commissioner DiPasqua: They can deny it.

Attorney Ishihara: It was already presented to them.

Commissioner O'Hearne: It's already gone past that point.

Attorney Ishihara: It's already gone past that point.

Chairman Sanborn: I think that's a problem. Nobody actually knew what....

Attorney Ishihara: I think under 150E we have a right, if there is a grievance procedure, to at least file a grievance. Because, if you don't have a right to do that, you could have a situation where if you have a union that is not fairly representing the employee that you could never get anywhere that your grievance rights would just be null basically. The state statue says at the grievance level belongs to the employee; the union representative obviously has a right to be involved because they are the exclusive agent for the bargaining unit. We can't tell them don't come to the meeting.

Chairman Sanborn: Any recommendations?

Commissioner DiPasqua: I have a couple of thoughts on this. My recommendation would be to make a motion to go after it and just deny it and let it go further up from there, if that's where it has to go.

Chairman Sanborn: I mean the statement that you've told us....

Commissioner DiPasqua: You've got a motion.

Chairman Sanborn: I just want to say something before that. The statement that you've made. And even the letter that we're impartial, not impartial. I try to play....I try to listen to both sides. I really do. Then I saw that...I mean..if I had four employees that come in and said da.da.da.da..and I know Lori-Ann. What she says, I believe her too. But when you have so many people come in and say the same story.

Attorney Ishihara: Actually they didn't say the same story but I don't' want to beat that dead horse, cause obviously you disagree with that and shear numbers don't necessarily mean that it is more truthful maybe the people go together and got the same story but, they weren't even able to do that.

Chairman O'Hearne: The only thing that I have a concern with is the letter. You shouldn't be talking about anything outside of our meetings at all. If you were swayed by that.

Commissioner DiPasqua: I wasn't swayed by that all I said was that 50% of this district are going to like us 50% are going to hate us. It had nothing to do with persuasion or anything. That's all it was. I don't know where he came up with those other ideas because I did not say that.

Chairman Sanborn: Between that and what I just said to I think it's go to go to another level and that way the playing field would be…you'll have all new face that you'll be talking to..and you'll resolve it. That's…and I go with Andy's motion.

Commissioner DiPasqua: You seconding that?

Chairman Sanborn: I second that.

Commissioner O'Hearne: The only issue that I have is that it seems that the association is just passing all its paperwork right on up to us without taking any action.

Shop Steward Semple: They don't pay dues, we can't hire a lawyer.

Commissioner O'Hearne: But as an association you're not required to collect dues.

Shop Steward Semple: On a grievance you're supposed just to hand it in for the person.

Commissioner O'Hearne: I'm not clear on that issue. I would think just send it back to the union for their action and not just signatures.

Commissioner DiPasqua: It will be back to us and the same thing it will have to go higher. We might as well just let it go higher right now and let it go like Mike said, new faces new people and let it get go. And we will see what comes out of that. That's my personal feeling.

Chairman Sanborn: I've been on for five years and we never had this problem…and it's too bad it's not going to go anywhere and when you get statements like this it's just feeds the fire.

Attorney Ishihara: You fired my client.

Chairman Sanborn: By statement over what the employees said.

Attorney Ishihara: Over foolishness. We can't just sit around and say that that's OK.

Chairman Sanborn: And it was brought to us by the Superintendent. It'd be like any other job out there.

Attorney Ishihara: I hope not.

Chairman Sanborn: I know where I work, if the superintendent says, and I work for the town, if the superintendent tells you to do something, you've got to do it. If they don't do it, you're out the door and this….

Attorney Ishihara: Obviously I disagree that that was the situation here…I don't want to go over the last hearing.

Chairman Sanborn: I want to make sure that it is fair for everybody and further up you have a clear Playing field, you're going to deal with everybody else. New faces and everyone can explain their story. I hear the stories, I'm out in the town, and I hear the stories back and forth.

Resident: Can I say something? Don't you have a step or policy where you're reprimanded? I've been in the union for 35 years and I never heard of anything like this in my life. You get fired for the first…for something like this. You don't a policy where you get a written reprimand and then you get suspension. You don't get either one you just get fired. That doesn't make any sense. I've got 35 years in a union and I've never heard of anything like this. In any union I've been in, in order to get fired, you've got to steal ….it's just crazy…I've never heard of anything.

Commissioner DiPasqua: In my local we can be fired the same way, if the foreman or the superintendent tells us….

Resident: What local are you?

Commissioner DiPasqua: I'm out of 223 Brockton, Southeastern Mass…

Resident: What is it Carpenters?

Commissioner DiPasqua: Electricians. The only way we can justify it is if he tells us to do something that is wrong or within the state licensing law. That's the only way. If he tells to do something that as long as it falls under the state licensing board then he can fire us.

Resident: Do you have a shop steward?

Commissioner DiPasqua: Ya.

Resident: Who does your shop steward represent?

Commissioner DiPasqua: At the job I'm on right now we don't have one.

Resident: Who does your shop steward for that union or that local, who are they to represent?

Commissioner DiPasqua: They represent us.

Resident: In other words your shop steward...if you got fired, your shop steward would be going to back up you with the business agent.

Commissioner DiPasqua: Our shop steward is the business agent for all 800 of us...and then what happens it goes from there to and if they can't resolve it, it goes to the executive board and if the executive board doesn't resolve it then it moves on...like we are going to go on here.

Resident: Exactly.

Commissioner DiPasqua: You don't have an executive board here because you don't that type of a situation here.

Resident: On your job, if you raise your voice to your superintendent, you're going to get fired?

Commissioner DiPasqua: I've seen it done. I've seen it happen.

Resident: Where your shop steward is not going to go bat for you?

Commissioner DiPasqua: Well...

Resident: He's working for you.

Commissioner DiPasqua: That is correct.

Resident: She's not a shop steward, out there, she's not working for the employee.

Commissioner DiPasqua: That's something that has to change.

Resident: 22 years of teamsters and was country...retired from the sheriffs department with 25 years here and have never, never seen anything like this.

Commissioner DiPasqua: Like I said clear heads...not clear. different.

Resident: Are you going to make the changes after the fact?

Commissioner DiPasqua: Well we are going to have to make some changes, there's no question about it, if this thing ends up going elsewhere and they come down...whatever this board decides to say well this is what you've got to do and this is what you've got to do and we are going to try to write the guidelines that I think are somewhat better than what we've got and if they turn around and say to us...Oh by the way that's not right or that's not right then we will have to take it to the attorney and say you tell us the way to word it and that's the way isn't going to happen.

Resident: Your saying your guideline are no good now.

Commissioner DiPasqua: I'm not saying that they're no good, I just saying they need to be....they're not very good. They need to be brought up. Every time you have a contract, whether it's your union or not, I don't know how often you guys have your contract, our's comes up every three years. A lot of our stuff gets thrown out and new stuff put in. This one hasn't been update for what, ten, twelve years.

Chairman Sanborn: Well last year....

Commissioner O'Hearne: The question that really comes is ...do we really have an association here or just a piece of paper?

Commissioner DiPasqua: I'm not going to get into that. I just think that my motions to let it go on up higher and get it resolve up there. We'll make changes in here as necessary and whatever has to be done.

Chairman Sanborn: That's his recommendation. Have a vote ....on Andy's motion.

Commissioner DiPasqua: On my motion.

Chairman Sanborn: All in favor?

Commissioner DiPasqua: I.

Chairman Sanborn: I.
Chairman Sanborn: Opposed?
Commissioner O'Hearne: I.
Chairman Sanborn: 2-1.
Commissioner O'Hearne: I will put copies of all the items with the minutes. That ways it's all together.
Commissioner DiPasqua: I make a motion to close the meeting….anybody second it?
Chairman Sanborn: second.
Commissioner O'Hearne: Who's running this meeting….
Chairman Sanborn: On the vote…
Attorney Ishihara: One item before you vote. That is somewhat related. I just want to make a request for a copy of my clients personnel file.
Chairman Sanborn: Sure.
Chairman Sanborn: We're done.
Commissioner DiPasqua: Done.

The Onset Fire District Board Commissioners meeting was adjourned at 4:50 p.m.


Respectfully Submitted,

Brian O'Hearne, Clerk



Attested by,

Michael Sanborn, Chairman


Andrew DiPasqua, Commissioner

# EXHIBIT "Q"

**Fleming & Ishihara, P.C.**
**86 Church St.**
**Mattapoisett, MA. 02739**

Donald J. Fleming                                      Margaret A. Ishihara

26 July 2004

Commonwealth of Massachusetts
Board of Conciliation and Arbitration
399 Washington St., 6th Floor
Boston, MA. 02108

Re:    Onset Fire District Water Department
Grievance by Lori Ann Moran

Dear Sir:

Enclosed please find the original and one copy of the Request for Grievance Arbitration along with our check no. 12800 in the amount of $75.00.

Very truly yours,

Margaret A. Ishihara

Sent by express mail

ER798022735US

# Commonwealth of Massachusetts
## BOARD OF CONCILIATION AND ARBITRATION
## REQUEST FOR GRIEVANCE MEDIATION

_PLEASE TYPE OR PRINT_

1. Labor Organization Onset Water Department
Address Employees' Association /15 Sand Pond Rd *FEIN Number* _____ Phone (508 295-0603
Onset, MA. 02558                                                    Zip Code 02558

Labor Relations Representative Kathi Semple _____ Phone (508 295-0603
Address 15 Sand Pond Rd., Onset, MA. _____
                                                        Zip Code 02558

2. Employer Onset Fire District/Water Dept *FEIN Number* 04-6003625
Address 15 Sand Pond Rd, Onset, MA. 02558 _____ Phone 508 295-0603
                                                        Zip Code 02558

Labor Relations Representative Daniel Murray _____ Phone (508) 947-4433
Address Decas, Murray, and Decas
132 N. Main St., PO Box 201, Middleboro, MA.    Zip Code 02346

3. Nature of Employer's Business public water dept.
Description of Unit permanent full time employees of water dept. See CBA.
Brief Statement of Issue in Dispute and Name of Grievant            Exhibit "A"
Termination of Lori Ann Moran from employment as clerical employee
Please see attached copy of grievance. Exhibit "B"

Has Arbitration been Requested? Yes_____ No xx    At Board: Yes_____ No xx
Date of Arbitration Hearing _____
This request Brought: Individually xx    Jointly _____

_____ Date _____
Signature of Employer's Representative

_____ Date 7/26/2004
Signature of Employee's Representative
Initial to Indicate both parties have received copies of this request: _____
Initial to Indicate a Collective Bargaining Agreement copy is attached _____

| Do not write in This Space | |
| --- | --- |

Do not write in This Space

Case Number _____

Date Filed _____

Mediator Assigned _____

Telephone Number :    617-727-3466
Fax Number:    617-727-4961

_Effective 8/1/02_
Instructions: Submit the original and one copy
of this petition, _a fee of seventy-five dollars
($75.00)_ per Party and a copy of the Collective
Bargaining Agreement to:
    Board of Conciliation & Arbitration
    399 Washington Street, Fifth Floor
    Boston, MA  02108

**Revised August, 2002**

**48**

# EXHIBIT "R"



# The Commonwealth of Massachusetts

BOARD OF CONCILIATION AND ARBITRATION

399 WASHINGTON STREET, 5th FLOOR
BOSTON, MASSACHUSETTS 02108
TELEPHONE: (617) 727-3466
FAX: (617) 727-4961

WESTERN REGIONAL OFFICE
SPRINGFIELD STATE OFFICE BUILDING
436 DWIGHT STREET, ROOM 206
SPRINGFIELD, MASSACHUSETTS 01103
TELEPHONE: (413) 784-1230
FAX: (413) 784-1251

**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**JAMES F. KELLEY**
CHAIRMAN

**JOHN W. HANSON**
VICE CHAIRMAN

October 24, 2005

Margaret Ishihara
Fleming & Ishihara, P.C
86 Church Street
Mattapoisett MA 02739

Daniel Murray
Decas, Murray & Decas
132 North Main Street
Middleboro MA 02346-0201

RE:    **Onset Fire District/Water Department AND Onset Water Department Employee's
Association    OGM-013-2005 (Lori Ann Moran - Termination)**

To the Parties:

Please be advised according to our records the above captioned case is currently open.  Please
inform the Board of the status of this case.  If it is found that the case is open the Board will
reassign a staff member to it.  If a response regarding this matter is not received by November
23, 2005, we will close the case.

Responses to this matter can be addressed to the attention of Katrina Leach.  She may be
reached via telephone at (617) 727-3466 x300 or via email at Katrina.leach@state.ma.us.

If you have any questions regarding this matter please contact the Board of Conciliation and
Arbitration at (617) 727-3466.

Sincerely yours,

James F. Kelley Jr., Esq.
Chairman

# EXHIBIT "S"

Subj:     **Lori Moran vs. Onset Fire District**
Date:     11/23/2005 10:54:03 AM Eastern Standard Time
From:     mi.mattlaw@verizon.net
To:       Katrina.leach@state.ma.us
CC:       decas.murray.decas@yahoo.com

23 November 2005

Ms. Katrina Leach
Commonwealth of Massachusetts
Board of Conciliation and Arbitration
399 Washington St., 5th Floor
Boston, MA. 02108

Re:     Lori Moran vs. Onset Fire District and Onset Water Department Employee's Association, OGM-013-2005

Dear Ms. Leach;

        This letter is in response to Chairman Kelley's letter of October 24, 2005.   On behalf of Lori Moran, I am requesting that the case remain open.  At this point we have filed a complaint in the U.S. District Court about Ms. Moran's termination.  I believe that the Board was trying to schedule a mediation session with one of the Board's staff members, and was trying to contact the employer.  I have not heard whether the employer was interested in the mediation session.

Margaret A. Ishihara
Attorney at Law
86 Church St.
Mattapoisett, MA. 02739
Telephone: (508) 758-6981
Cell: (508) 737-2167

Cc:     Daniel Murray, Decas, Murray & Decas, 132 N. Main St., Middleboro, MA. 02346-0201, e-mail decas.murray.decas@yahoo.com