U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS
DOCKET NO. 05-10033 NG

LORI ANN MORAN, PLAINTIFF VS. ANDREW DIPASQUA, MICHAEL
SANBORN, WILLIAM F. GAY, III and the ONSET FIRE DISTRICT, DEFENDANTS

AFFIDAVIT OF LORI ANN MORAN

I, Lori Ann Moran, hereby state that:

1.    I reside at 88 Main Ave., Onset, Massachusetts, and I am the Plaintiff in the above

captioned case.

2.    I began working at the Onset Water Department as a clerical assistant in April

2002 on a part time basis.

3.    In July 2002 I began working as a clerical assistant at the Onset Water Department

on a full time basis.

4.    I was terminated from employment at the Onset Water Department on June 30,

2004.

5.    During the time that I worked at the Onset Water Department, I reported directly

to the office manager, Kathi Semple.

6.    Ms. Semple reported to the Defendant William F. Gay, III, the Water

Superintendent.

7.    The Defendant Gay reported to the Onset Board of Water Commissioners.

8.    The other employees of the Onset Water Department at the time that I worked

there were Chris Poirier, foreman, Kerry "Jay" Semple, a laborer, and Gwen Semple (now

deceased), a clerical assistant.    Kathi Semple is Kerry Semple's sister.    Kathi Semple is

Chris Poirier's aunt.    Kathi Semple and Kerry Jay Semple are Gwen Semple's children.

1

9.    On or about February 18, 2003 or February 19, 2003, I arrived at work at 8:00 A.M.  Kathi Semple arrived at work around 9:30 A.M.   Ms. Semple asked me what time I had arrived at work.  I told Ms. Semple at 8:00 A.M.   Ms. Semple asked how with all this snow.  I told Ms. Semple that my husband had been out since 3:00 A.M. clearing our driveway and our tenants' driveway.  Ms. Semple said that she had been out clearing snow since 7:00 A.M. since Superintendent Gay did not come and clear out her driveway for her as done by all previous superintendents during storms, and that she had hurt her shoulder shoveling and that she was going to tell Superintendent Gay that she would not be into work after anymore snowstorms if he did not clear it our for her with the Water Dept. plow.  Ms. Semple then asked me if I wanted to go home and check on my husband.  I told her no.   Ms. Semple then said are you sure with all his shoveling and heart history.  I told her no again that my husband was at work clearing sidewalks and that there was no need of checking on him at work.   Mr. Semple then said will you go home for about an hour, there is something I need to straighten out with Superintendent Gay regarding Chris [Poirier] and Jay [Semple].  I told her that I would rather not because I did not have that much time on the books, and I didn't want to waste it.  She then told me to go home and not dock myself the hour because of storm no one would question it anyway.   I said are you sure, and she said yes, and that she really needed to talk to Superintendent Gay because he was getting out of control again.  I agreed, and with her permission, I left.  After about ½ hour I called Ms. Semple from home, and I asked if I could come back.  She said yes.   Upon returning I noticed Ms. Semple was very upset.  She told me that she had "reamed him [Supt. Gay] a new asshole" about not clearing her driveway and making Foreman Poirier and Laborer Semple come in during the middle of

2

the night to shovel the walk/ramp to the office. She said that she felt that he had embarrassed them and was trying to show off to his fellow firefighters his authority as Superintendent. She also said that she felt that the firefighters should have cleared the walkway because they were there already. She claimed that they stood inside while Semple and Poirier "busted their asses" in the cold snow. She said that she was upset because she thought that by sending me home there was no one else in the building so that she could ream Superintendent Gay without any witnesses, but during the confrontation, James Franklin [a firefighter] had come up from downstairs, and she was worried that [Franklin] heard her screaming and yelling at Superintedent Gay.

10.    On August 27, 2003, Kathi Semple had left for the day around 1PM. I had a conversation with the Defendant Gay out on the the loading dock. I said to him "I would just like to give you a head's up, the meeting is not about an employee cookout, it is about Kathi accusing you of sexual harassment." Then Defendant Gay said "thank you so much, I had no idea." I said "I would want someone to do the same for me". The Defendant Gay said "I will do the same for you. I'll let you know that Kathi and Larry Blacker have been trying to put you out on unemployment all summer, and they have been trying to get me to go over there and file the paper work. I refused to do that because I knew it was a personality thing not a lack of work." I thanked him for not doing as they had requested.

That evening, I was present at an Onset Board of Water Commissioners meeting because I was required to be there by my supervisor. Kathi Semple had accused the Defendant Gay of sexual harassment over an discussion between hers and the Defendant Gay about water meters. I asked Ms. Semple outright if the Defendant Gay had sexually

Moran Affidavit pp. 1 - 17

harassed her, and Ms. Semple said no.  Immediately after the meeting Ms. Semple looked

over at me and said "Don't you ever come to me with a problem again".

11.    Before an Onset Board of Water Commissioners meeting in March 2004, Ms.

Semple asked the Defendant Gay to talk to the Water Commissioners about getting the

Foreman and Laborer more money.   The Defendant Gay told her he would try but he felt

his request would fall on deaf ears because at previous meetings the Water

Commissioners had said there would be no more raises this year.   She told him to fight

the way that he always hoped someone would have fought for him when he was the

foreman and laborer.   The day after the meeting, The Defendant Gay told Ms. Semple

that the result of the meeting was as he had expected, no more raises for anyone for the

rest of the year.   After the Defendant Gay left the office, Ms. Semple said that we should

vote to take the Defendant Gay off the contract because he didn't care about any of us and

he was no longer one of us.

   At the Water Department office, a few days later, Ms. Semple told me she needed

to talk to me about something that was eating at her.  She said Supt. Gay had called her

into his office to speak with her about something.   When I asked her "what", she did not

say anything further, so I went back to work.   Ms. Semple then spoke up and said that

she had already spoken to Foreman Poirier and Laborer Semple and that had not said

anything to Superintendent Gay about it so she wanted to know if I had spoken with

Superintendent Gay about anything in the last couple of days.  I said "no, nothing of any

importance anyway-what are you talking about?"  She then said do you remember that

conversation between myself, you, Chris, and Jay the other day about taking a vote to

kick Supt. Gay off our contract because he was not one of us anymore.  I said "yes".  She

said "well ,somebody told him about what we all talked about and like I said I already talked to Chris and Jay to see if they said anything to him, and they said no, and I know I didn't say anything and you were the only other person there."   I said "what are you insinuating?"  She said "I am not insinuating anything, but none of us said anything, and you were the only other one here that you may have said something to Superintendent Gay".  I said "you may not call it insinuating but that is what you are doing.   I repeat I did not say anything to Superintendent Gay about that subject at all and I am sick of being accused of saying and doing things I have not done and I will prove it to you once and for all when Superintendent Gay returns."  She said "no reason to get upset she was just talking to me about it and that I did not have to speak to Superintendent Gay."  I told her "this will be the last time that I am falsely accused and that I will talk to Superintendent Gay as soon as he comes in, right in front of her."

When Superintendent Gay came back in the office, Ms. Semple went out for a cigarette break.  She came back into the office and immediately fixed herself a cup of coffee.  As soon as she got back to her desk, I said "I am going to ask Superintendent Gay to come out of his office now so we could clear the air on this subject."   Ms. Semple said that "it was not necessary but it makes you feel better go ahead."  I then went to Superintendent Gay's office and asked him to come out to the main office so I could speak to him in front of Ms. Semple about something.  Ms. Semple was still at her desk. I sat at mine, and Superintendent Gay sat in a chair nearby.  I said "Kathi is insinuating to me that I have talked to you about something during the last couple of days and that you called her into the office to talk about it, is that true?"   Superintendent Gay said "no-what are you talking about?"  I said "Kathi, do you want to tell him or me. She said you started

it go ahead. I said to Superintendent Gay "after the last Water Commissioners meeting a conversation took place between everybody but you about taking you off of out contract because you are no longer like one of us."  I than said "you all know how I feel about that contract, I don't think its worth the paper its written on, but you all swear it is a protection for us from the Water Commissioners, and  with that being said the conversation about voting you off the contract was not really even that important to me but my point is Kathi is making me feel as if I started another problem which I did not.   So, did I say anything to you over the last week about the contract in any way, shape or form?"   Superintendent. Gay said "no", and  I said "thank you". Ms. Semple than spoke up and said "then who told you?" Superindent Gay said, "you did". Ms. Semple then said "you're a friggin liar." Superintendent. Gay said "no I am not", Ms. Semple said "yes you are".  Superintendent. Gay said again "no I am not, when you came into my office the other day and closed the door you asked me if I had heard about you guys talking to vote me off the contract, and I said no you told me that everyone was getting sick of the way I was treating them and they didn't want anything to do with me."  Ms. Semple said "you are fucking lying." Superintendent Gay said I'll take a lie detector test to prove it.   Ms. Semple said "I'll take a lie detector test too."  I said "I think I have proven my point, thank you!"  I turned my chair towards my desk and did not say another word.    Superintendent Gay and Ms. Semple continued accusing each other of lying (yelling and Ms. Semple swearing) a couple more times until Ms. Semple just walked away to go for another cigarette. Superintendent Gay did not reprimand or warn Ms. Semple about her yelling and swearing at him.

12.    On April 27, 2004 there was a conversation in the Onset Water Department office

Moran Affidavit pp. 1 - 17

between  Kathi Semple, Supt. William Gay, self described unpaid Financial Advisor

Peter Murphy, and myself that took place for about five minutes, the conversation drifted

to Ms. Semple's desk ; with Mr. Murphy standing in front of her desk, and Supt. Gay

standing to the side of it with his back to me. I went back to work entering notes into the

computer that Ms.Semple had requested of me earlier. The topic of the conversation

between the three of them was about preparing copies of the minutes of the meetings

requested by Ramona O'Hearne on April 26th. The request was for copies dating back for

the last 2 years, up to the present and how long it would take, and the possible cost of

what it might be to prepared.

    During that conversation Supt. Gay had told Ms. Semple "to get everything ready

that she could concerning the minutes, but that the most important thing for her was to

still continue preparing everything to get the biannual bills out on time, May 1st.   He told

her that I then could make the copies of whatever paper work she deemed necessary.

Superintendent Gay referred to me as she and her.  Statements were made like "She can

make the copies and have her do it., etc." I felt that Superintendent Gay was being

condescending to me .        After hearing that three or four times, I spoke up and said to

Ms. Semple  "Excuse me. Kathi but that she and her Bill is referring to is me. My name

is Lori and I really would like to be called by my name.      I am sitting right here and I

don't like being called she and her. Superintendent Gay then told me it's just a

conversation, and it's not like they were talking bad about me. I then told him "I do not

like being called she and her.  I have a name.  It's Lori and that is what I want to be

called".  At that time Ms. Semple and Mr. Murphy went out to the back room and

Superintendent Gay went into the Water Commissioners room. When Superintendent Gay

7

came back through the office, I said to him "I am sorry that you don't understand or agree

with me, but I have a real pet peeve about being called "she". I hate it.". He then told me

to "get over it, it's only words". I told him I would not get over it, and that it's not normal

or professional to speak of someone in that way. I requested again that he not call me "she

and her". He then said "like I said, get over it, it's only words." I said "Oh, Bill just,

Shhh" and he said "Don't tell me to shut up." I told him I did not say it. I wanted to but

controlled myself and did not say it." I did not raise my voice. He then went out to the

back room with Ms. Semple and Mr. Murphy and I heard him tell them "She'll never tell

me to shut up". I spoke up and told him "Get it right, Bill, I almost told you to shut up,

but I did not."

After a few minutes, Ms. Semple came back into the office, and I noticed

Superintendent Gay speaking to Mr. Murphy out in the parking lot by Mr. Murphy's car. I

then spoke to Ms. Semple again and told her that "I thought Superintendent Gay was

wrong for what and how he said the things he said. She agreed, and said "sometimes he

does not think." We then both went back to work and within 15 minutes Foreman Chris

Poirier and Laborer Jay Semple came into the office. Ms. Semple called Superintendent

Gay on the Nextel to inform him that it was 2 minutes till 4:00, and was he coming in.

He said "yes and could I get a ride home because I don't have a vehicle."    I said jokingly

"Kathi, tell him I'll give him a ride home on the bumper of my van." Ms. Semple said

"I'm not going to say that." All four of us laughed. Ms. Semple handed me the Nextel

and said "Hey Bill, it's Lori, I can give you a ride home on the bumper of my van".

He then said "Kathi", and Ms. Semple responded that "yes, I will give you a ride."

Superintendent Gay then came into the office and said "This is your verbal

8

warning, if you can't control your snide remarks, you will not work here anymore."

Superintendent Gay did not give any indication that he felt threatened by my remark. I

said, "What, you have got to be joking? I was only joking with you to break the ice." He

said "you need to stop saying remarks like that."     I said "then I want it in writing that I

have requested that you not refer to me as she and her."     He said "whatever, and if you

don't like it you can leave right now." I said "are you telling me to leave? Is it because it

is 4:00 and it's quitting time or are you telling me I'm fired"'. He then said "You can take

it whatever way you want". I said "No, you have to clarify it. Are you telling me to leave

or are you firing me." Then he said "Wait a minute" and went out to the back room and I

heard his Nextel beep. About five minutes later the rest of us had made our way to the

parking lot and Superintendent Gay came out of the building.     I asked him "What's

the verdict?" He said "I'll let you know". Then everyone left at the same time.

     At no time on April 27, 2004 did I raise my voice to Superintendent Gay or swear

at him.

13.    On April 28, 2004 at 6:54 AM, Ms. Semple called me and said Superintendent

Gay had called her and asked her to call me and tell me not to come to work that day with

pay, and that I would get a call by the end of the day with my status.

14.    On April 28, 2004 at 3:00 P.M., Ms. Semple called again and said Superintendent

Gay had told her to call me and tell me not to come back to work until Monday, May 3,

2004, with pay, and I would be told of my status then.  Ms. Semple said that there would

be a special meeting Friday, April 30, 2004 regarding the clarification of the authority of

the Superintendent.  I requested that Ms. Semple put the request for me to stay out of

work on paper because I had no proof that she called me, and I would walk back in on

May 3, 2004 and be fired for not showing up for 3 days without calling.  Foreman Poirier

dropped off a letter at my home around 4:00 P.M.  A copy of this letter from

Superintendent Gay dated April 28, 2004 is attached as Exhibit "A" to this Affidavit.

I called Onset Water Commissioner John Cook at 4:30 P.M. and left a message

for him to return my call and please explain the grounds for my administrative leave.

15.    On April 29, 2004 at 11:30 A.M. Commissioner Cook left a message that he had

told Superintendent Gay to write up the grounds for my paid administrative leave, and

that I would receive it at some point that day.

16.    On April 29, 2004, Jay Semple dropped off a letter from Superintendent Gay.  A

copy of this letter is attached as Exhibit "B" to this Affidavit.  Because this letter did not

state any grounds for my leave, I called and left a second message for Commissioner

Cook to call me back again.  Commissioner Cook called me back, but was very vague

and did not answer my question about the grounds for the administrative leave.

17.    On April 30, 2004 my attorney, Margaret A. Ishihara wrote to the Water

Superintendent.  A copy of that letter is attached as Exhibit "C" to his Affidavit.

18.    On April 30, 2004 Attorney Ishihara wrote to the Onset Board of Water

Commissioners.  A copy of that letter is attached as Exhibit "D" to this Affidavit.

19.    On May 3, 2004 I received a letter of that date form Superintendent Gay.  A copy

of that letter is attached as Exhibit "E" to this Affidavit.

20.    On or about June 17, 2004, I received a letter of that date from the Onset Board of

Water Commissioners, a copy of which is attached as Exhibit "F" to this Affidavit.

21.    On June 28, 2004 Attorney Ishihara sent a letter to Daniel F. Murray, the attorney

for the Board of Water Commissioners in response to the June 17, 2004 letter from the

Moran Affidavit pp. 1 - 17

Onset Board of Water Commissioners.   A copy of that June 28, 2004 letter is attached as Exhibit "G" to this Affidavit.

22.    On June 29, 2004 Attorney Ishihara sent another letter to Attorney Daniel F. Murray about a section of the statement of Superintendent Gay that was attached to the Onset Water Commissioners letter of June 17, 2004 (Exhibit "F").

23.    At the meeting on June 30, 2004, the Onset Water Commissioners present were Brian O'Hearne, and the Defendants Andrew Dipasqua and Michael Sanborn.   Also present were the Defendant Gay, Kathi Semple, Chris Poirier, Kerry "Jay" Semple, and Peter Murphy.   The Defendant Gay was represented by Attorney Christopher Lowrie, though the proposed discipline was being considered at that meeting against the Defendant Gay.  I was present with Attorney Ishihara.

Kathi Semple, Peter Murphy , Kerry "Jay" Semple, Christopher Poirier, and the Defendant Gay testified against me.   Defendant Gay relied upon his written statement (attachment to Exhibit "F")as well as verbal testimony.

Neither I nor my attorney were allowed to cross examine any witnesses.   An examination of the transcript of the hearing shows that there were contradictions between the testimony of these witnesses.  For instance, Kathi Semple and Peter Murphy did not mention that the Plaintiff followed the Defendant Gay into the loading dock area, and the Defendant Gay said that the Plaintiff followed the Defendant Gay into the loading dock arean.

Additionally, we were not allowed to bring up anything that occurred on any other date than April 27, 2004.  I would have brought up the fact that Kathi Semple, Chris Poirier, and Jay Semple  are relatives.  I would have brought up the August 27, 2003

Moran Affidavit pp. 1 - 17

statement (see paragraph 10 to this affidavit) to show bias of Kathi Semple against me. I would have brought up the February 2003 snowstorm incident (see paragraph 9 of this Affidavit); and I would have brought up the March 2004 union membership issue (see paragraph 11 of this Affidavit).

24.    At the June 30, 2004 meeting a vote was taken by the Onset Water Commissioners (DiPasqua and Sanborn in favor and O'Hearne opposed) to terminate my employment. A copy of a letter dated July 1, 2004 notifying me of my termination is attached as Exhibit "G" to this Affidavit.

25.    On July 2, 2004, I took a grievance from the termination. A copy of the grievance is attached as Exhibit "H" to this Affidavit.

26.    On July 24, 2004, the Onset Board of Water Commissioners had a meeting on my grievance, and voted to deny the grievance.

27.    I filed a grievance mediation with the Massachusetts Board of Conciliation and Arbitration, and which I understand it still pending before that Board. A copy of the Request for Grievance Mediation and cover letter is attached as Exhibit "I" to this Affidavit. The Employees' Association declined to file the grievance mediation on my behalf. The Onset Board of Water Commissioners has taken the position that only the Employees's Association could file such a grievance mediation, and therefore my grievance arbitration is not properly before the Massachusetts Board of Conciliation and Arbitration. A copy of a letter dated August 3, 2004 from Attorney Daniel F. Murray to the Board of Conciliation and Arbitration is attached as Exhibit "K" to this Affidavit.

28.    Since I was terminated by the Onset Board of Water Commissioners, I have only been able to obtain part time employment a lesser hourly rate than what I had been

12

making at the Onset Water Department  at a job without health insurance or retirement

benefits or personal time, vacation time, or sick days, which I had been receiving at the

Onset Water Department.

Signed under the pains and penalties of perjury this ___2nd___ day of

___June___ 2006.

_____

Lori Ann Moran

## CERTIFICATE OF SERVICE

I hereby certify that I have served the within document by mailing a copy first class mail postage pre paid to:

John J. Cloherty, III
Pierce, Davis, & Perritano, LLP
Ten Winthrop Square
Boston, MA. 02110

Date: _2 June 2006_

Margaret A. Ishihara

14

# EXHIBIT "A"

# *Onset Fire District*
# *Onset Water Department*

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295- 0603
FAX (508) 295-0606

Board of Water Commissioners
John Cook/Chairman
Michael Sanborn/Clerk

LORI MORAN:

EFFECTIVE 4/28/04 AT 8:00 A.M. YOU WERE PLACED ON ADMINISTRATIVE LEAVE WITH PAY. UNTIL THE OUTCOME OF THE 4/30/04 SPECIAL MEETING CLARIFYING THE AUTHORITY OF THE SUPERINTENDENT.

AT 7:00 A.M. YOU WERE NOTIFIED NOT TO COME TO WORK ON 4/28/04, AND AT 3:00 P.M. YOU WERE NOTIFIED NOT TO COME BACK TO WORK UNTIL YOU ARE NOTIFIED OF YOUR STATUS ON MONDAY MAY 3, 2004.

FOR THE BOARD OF WATER COMMISSIONERS

WILLIAM F. GAY III
SUPERINTENDENT
APRIL 28, 2004

# EXHIBIT "B"

# Onset Fire District
# Board of Water Commissioners

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295- 0603
FAX (508) 295-0606

JOHN COOK/CHAIRMAN
MICHAEL SANBORN/CLERK

LORI MORAN:

YOU ARE ON ADMINISTRATIVE LEAVE FOR EVENTS THAT OCCURRED ON 4/27/04 AND
ARE PENDING FOR DISCIPILNARY ACTION.

WILLIAM F. GAY III
SUPERINTENDENT
APRIL 29, 2004

WG/ks

**4**

# EXHIBIT "C"

**Fleming & Ishihara, P.C.**
**86 Church St.**
**Mattapoisett, MA. 02739**

Donald J. Fleming                                                    Margaret A. Ishihara

30 April 2004

William Gay
Water Superintendent
Onset Fire District
15 Sand Pond Rd.
Onset, MA. 02558

Fax 1 page to 1 508-295-0606

Re:    Lori Moran

Dear Mr. Gay;

  Please be advised that I represent your employee, Lori Moran.

  Ms. Moran is in receipt of a letter dated April 29, 2004 stating that she was placed on administrative leave for events that occurred on April 27, 2004 and that disciplinary action may be considered.  Ms. Moran still has not been advised of the specific charges against her which led to her administrative leave nor was she given any opportunity to be heard in order to contest this disciplinary action.

  Please consider this letter to be a grievance under the terms of the Agreement between the Onset Fire District, Water Department and the Onset Water Department Employee's Association.  Specifically, Ms. Moran claims that Article 7, Hours of Work has been violated as she has not been allowed to work her regular hours.

Very truly yours,

Margaret A. Ishihara
Sent by priority mail, certified mail return receipt requested no. *7002 3150 0000 4617 9248*

Telephone: (508) 758-6981          e-mail: MI.MATTLAW@VERIZON.NET
Fax: (508) 758-3406

5

# EXHIBIT "D"

**Fleming & Ishihara, P.C.**
**86 Church St.**
**Mattapoisett, MA. 02739**

Donald J. Fleming                                          Margaret A. Ishihara

30 April 2004

Board of Water Commissioners
Onset Fire District
15 Sand Pond Rd.
Onset, MA. 02558

Fax 1 page to 1 508-295-0606

Re:   Lori Moran

Dear Commissioners;

   Please be advised that I represent your employee, Lori Moran.

   Ms. Moran is in receipt of a letter dated April 29, 2004 stating that she was placed on administrative leave for events that occurred on April 27, 2004 and that disciplinary action may be considered.   Ms. Moran still has not been advised of the specific charges against her which led to her administrative leave nor was she given any opportunity to be heard in order to contest this disciplinary action, which would be required in the interests of fairness and to meet the requirements of due process of law contained in the U.S. Constitution and the Massachusetts Declaration of Rights.

   A meeting of the Board of Water Commissioners has been scheduled for this afternoon purportedly to clarify the authority of the superintendent.   Ms. Moran was not notified directly of this meeting, but only learned of it through the public posting of the meeting.   This meeting should not be used as a pretext to discuss my client or any disciplinary action against her.   My client has not been given any notice of specific charges against her, if any, or any notice and an opportunity to be heard.

   Additionally, if the Board is going to discuss my client in executive session under the Open Meeting Law, G.L. c. 39:23B, at least 48 hours notice is required.   My client would then have an opportunity to be present with her attorney.   No such notice has been given.   If my client is discussed in public session and disparaging remarks are made about her, we will consider such remarks to be defamatory.

   Also, please consider this letter to be a grievance under the terms of the Agreement between the Onset Fire District, Water Department and the Onset Water Department Employee's Association.   Specifically, Ms. Moran claims that Article 7, Hours of Work has been violated as she has not been allowed to work her regular hours.

Very truly yours,

Margaret A. Ishihara
Sent by priority mail, certified mail return receipt requested no. _7002 3150 4617 9298_

**Telephone: (508) 758-6981**              **e-mail: MI.MATTLAW@VERIZON.NET**
**Fax: (508) 758-3406**

6



**SENDER: COMPLETE THIS SECTION**

- Complete items 1 nd 3. Also complete
  Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse
  so that we can return the card to you.
- Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

Board of Water
Commissioners
Onset Fire District
15 Sand Pond Rd.
Onset, MA. 02558

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Chris Poirier   ☒ Agent  ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
CHRIS POIRIER   05/01/04

D. Is delivery address different from item 1?  ☒ Yes
   If YES, enter delivery address below:   ☐ No

P.O. Box 171

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)   7001 3150 0000 4617 9298

PS Form 3811, August 2001   Domestic Return Receipt   102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

| | | |
|---|---|---|
| Postage | $ | 3.85 |
| Certified Fee | | 2.50 |
| Return Receipt Fee (Endorsement Required) | | 1.70 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 7.70 |

Postmark Here
APR 30
USPS ONSET, MA 02730

Sent To  Bd Water Comm - Onset Fire Dist
Street, Apt. No.; or PO Box No.  15 Sand P. Rd
City, State, ZIP+4  Onset, Ma. 02558

PS Form 3800, June 2002   See Reverse for Instructions

Moran Affidavit pp. 18 to 36

# EXHIBIT "E"

## *Onset Fire District*
# Board of Water Commissioners

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295- 0603

FAX (508) 295-0606

JOHN COOK/CHARIMAN
MICHAEL SANBORN/CLERK

RE: ADMINISTRATIVE LEAVE WITH PAY

LORI MORAN:

YOU ARE ON ADMINISTRATIVE LEAVE WITH PAY UNTIL FURTHER NOTICE, FOR DISREGARD OF A DIRECT ORDER FROM THE SUPERINTENDENT, AND FOR CONTINUING TO PURSUE THE MATTER ON APRIL 27, 2004.

WILLIAM F. GAY III
SUPERINTENDENT
MAY 3, 2004

13

# EXHIBIT "F"

*Onset Fire District*

# Board of Water Commissioners

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295- 0603
FAX (508) 295-0606


MICHAEL SANBORN/CHARIMAN
BRIAN O'HEARNE/CLERK
ANDREW DIPASQUA


JUNE 17, 2004

LORI-ANN MORAN
P.O. BOX 1344
ONSET, MA. 02558-1344

DEAR MRS. MORAN:

THIS IS TO NOTIFY YOU THAT THE ONSET FIRE DISTRICT BOARD OF WATER COMMISSIONERS WILL HOLD A PUBLIC MEETING AT 7:00 P.M. ON WEDNESDAY JUNE 30, 2004 AT THE ONSET WATER DEPARTMENT OFFICE AT 15 SAND POND ROAD IN ONSET, MA. A PURPOSE OF THE MEETING WILL BE TO CONSIDER YOUR ALLEGED ACTIONS ON APRIL 27, 2004 AS RELATED IN A MEMORANDUM OF WILLIAM F. GAY, 3RD. DATED APRIL 27, 2004 AND ENCLOSED HEREWITH.

PLEASE BE ADVISED THAT UPON CONSIDERATION OF THE MATTER, THE BOARD OF WATER COMMISSIONERS MAY IMPOSE DISCIPLINARY ACTION AGAINST YOU INCLUDING SUSPENSION WITH OR WITHOUT PAY, DISMISSAL FROM YOUR POSITION AS AN EMPLOYEE OF THE ONSET WATER DEPARTMENT OR OTHER ACTION.

YOU WILL BE AFFORDED AN OPPORTUNITY AT THE MEETING TO PRESENT ORAL STATEMENTS, DOCUMENTARY EXHIBITS AND ANY OTHER EVIDENCE. YOU WILL ALSO BE AFFORDED AN OPPORTUNITY AT THE MEETING TO HAVE ANY WITNESSES PRESENT ORAL STATEMENTS OR OTHER EVIDENCE BEARING ON THE MATTERS UNDER CONSIDERATION.

PLEASE ASK YOUR ATTORNEY TO INFORM THE BOARD'S COUNSEL, DANIEL F. MURRAY, OF THE NAME AND ADDRESS OF ANY PERSON YOU WANT THE BOARD TO ASK TO ATTEND THE MEETING.

PLEASE BE ADVISED THAT CROSS EXAMINATION OR QUESTIONING OF PERSONS WHO PRESENT ORAL TESTIMONY AT THE MEETING WILL NOT BE ALLOWED EXCEPT FOR QUESTIONS BY THE WATER COMMISSIONERS.

Moran Affidavit pp. 18 to 36

CONT:

YOU ARE INVITED TO ATTEND THE MEETING WITH YOUR COUNSEL.

VERY TRULY YOURS,

MICHAEL SANBORN/CHAIRMAN
ONSET FIRE DISTRICT
BOARD OF WATER COMMISSIONERS


ENCLOSURE

CC: ATTORNEY MARGARET A. ISHIHARA


SENT VIA REGULAR AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED

15

To whom it may concern,                                          4/27/2004

Today at approximately 3:10 at the Onset Water Department Office, (Present at this time was myself, Kathi Semple, Peter Murphy, and Lori Moran) I was giving Kathi Semple instructions on a job assignment in the office. During the middle of the conversation I innocently said to Kathi "You get the paperwork together and she can do the copying and typing." and I will do the tape's. At this point Lori then looked at me and said, "So I'm just a "she". I apologized to Lori not knowing that I had offended Lori with a simple elementary school taught english phrase. I did not understand how or why I had offended her anyway since I was having a conversation with Kathi about a job assignment. At that time she proceeded to badger me for my usage of words several times. I left the room momentarily; at the most I was gone for 5 minutes. I came back into the main office and went to the commissioner's room to retrieve some of the materials needed for the assignment. Lori continued to badger me about the way I had referred to her in the earlier statement to Kathi. Lori angrily repeatedly said to me " I'm only a "she". At this point I told Lori that no type of disrespect was intended that it was just words in a sentence I am ordering you to stop. Lori then was abrupt with me and told me to "Shut up". I asked her "Did you tell me to shut up?" She said to me "I didn't get it all the way out, I'm not that type of person. But the words "shut up" I heard very clearly from Lori also another person heard her clearly she told me to shut up

Then I went outside to the loading dock to remove myself from the hostile environment that Lori created. Lori followed me to loading dock and proceeds to badger me again. I still did not acknowledge her unprofessional behavior. I then I got into the truck and left the Water Department property.

When I was on my way back to the office from the Fire Department. I received a Nextel call from Kathi. Kathi wanted to make sure I remembered to bring one of her personal book home for my wife. I asked Kathi if she would be able to give me a ride home. Lori responded to me back on the Nextel and said "I'll give you a ride home on the front of my bumper." I replied back to Kathi on the Nextel " can I have a ride home?" I did not acknowledge the statement made to me by Lori at this time I was in fear of my well being not knowing what Lori was capable of after being so persistent and hostile to me. I went back to the office and parked my truck. I went into the building; Kathi, Jay, and Lori were there. I do not know where Chris was at this time. Lori was sitting at her desk, as I was walking back into the room she started to make the same comments that she had made earlier. I gave Lori a verbal warning and stated this is your verbal warning. Your comments are unnecessary and disrespectful." Before I could tell Lori there would be more disciplinary actions taken for bodily threats, Lori jumped up started yelling angrily to me "Are you firing me? Are you firing me?" I ordered her to go home with pay for the remainder of the day. Lori did not go home. She told me" If you are firing me, I have enough things on you to have you fired too. "Nothing was ever said about firing and she now had degraded my personal character" I left the building again to get away from the hostile environment Lori created. When I came back upstairs to arm the building alarm for the night at approxmentley 4:05 PM. Lori and Kathi were in the parking lot. As I came outside hoping to avoid Lori but she confronted me again in the parking lot repeatedly yelling violently "Am I fired? Am I fired?" Remaining calm I told her that I would let her know. I was now in fear of my life after waiting for her to go home before I came outside in the parking lot only to be stocked down and verbally abused by Lori

**16**

again. I got into Kathe's van and went home. I did not acknowledge anymore of Lori's statements as me and Kathi left. The only mistake I believe I made was not to call the police to rectify the problem. I do feel that I did my best to give Lori a chance to cool off I realize we all have bad days but this day was far beyond reason for anyone to take Lori abuse. I am willing to help and forgive anyone. I have gone the last 7 or 8 months to make sure not to say or do any wrong actions to offend Lori. I also feel Lori does not respect higher authorities because past false accusations made against the other employees and me by Lori. On this day I think she wanted to be fired. Also I went to the same sexual harassment class as Lori. And it seems all that man taught us Lori used it to put me in a position so I could not say or do any right for her. I feel she would have manipulated anything I said to her or did in her advantage against me some how. I also know if I had ever done this to Lori I would lose my job for this type of unusual actions and behavior. Because of Lori's unusual actions and behavior I can no longer feel safe working with her.

Superintendent

*[signature]*

William F. Gay 3rd

Moran Affidavit pp. 18 to 36

# EXHIBIT "G"

**Fleming & Ishihara, P.C.**
**86 Church St.**
**Mattapoisett, MA. 02739**

Donald J. Fleming                                                          Margaret A. Ishihara

28 June 2004

Daniel F. Murray
Decas, Murray & Decas
PO Box 201
Middleboro, MA. 02346

Fax 1 page to 508-947-7147

Re:     Lori Ann Moran

Dear Attorney Murray;

        I am in receipt of a letter dated June 17, 2004 from the Onset Fire District Board
of Water Commissioners concerning the hearing on June 30, 2004.
        In that letter the Commissioners state that we will not be allowed to cross examine
any witnesses.   This restriction prevents us from having an adequate opportunity to be
heard in violation of the due process clause of the U.S. Constitution and the
Massachusetts Declaration of rights.   See generally <u>Mathews vs. Eldridge</u>, 424 U.S. 319,
334 (1976).
        Additionally, at the meeting on June 2, 2004, there was supposed to be a
discussion of a possible resolution of this matter.   However at that time the Water
Superintendent, William F. Gay, III, made the unfounded accusation that he did not feel
safe around Ms. Moran.   Mr. Gay was represented by an attorney at that meeting.   Our
position is that at the upcoming hearing, Ms. Moran is the one facing disciplinary action,
not Mr. Gay, and Mr. Gay is not entitled to have any attorney representing him.     Mr.
Gay is a manager for the Water Commissioners, and their interests are represented by
you.
        Please let me know your position on these matters prior to the hearing.


        Very truly yours,


        Margaret A. Ishihara


**Telephone: (508) 758-6981**            **e-mail: MI.MATTLAW@VERIZON.NET**
**Fax: (508) 758-3406**                          Moran Affidavit pp. 18 to 36

18

# EXHIBIT "H"

**Fleming & Ishihara, P.C.**
**86 Church St.**
**Mattapoisett, MA. 02739**

Donald J. Fleming                                    Margaret A. Ishihara
                                                     29 June 2004

Daniel F. Murray
Decas, Murray & Decas
PO Box 201
Middleboro, MA. 02346

Fax 1 page to 508-947-7147

Re:    Lori Ann Moran, Onset Fire Distric, Board of Water Commissioners

Dear Attorney Murray;

        In Mr. Gay's statement attached to the June 17, 2004 letter he states that "I also
feel that Lori does not respect higher authorities because past false accusations made
against other employees and me [Gay] by Lori".     What specific false accusations does
Mr. Gay say that Lori made against other employees and Mr. Gay?    We are entitled to
have this information if the Water Commissioners are relying on Mr. Gay's statement as
the statement of charges against Ms. Moran.
        Also,  please be advised that it is my intention to have a court reporter present at
the hearing tomorrow evening.

Very truly yours,

Margaret A. Ishihara

Telephone: (508) 758-6981          e-mail: MI.MATTLAW@VERIZON.NET
Fax: (508) 758-3406                Moran Affidavit pp. 18 to 36

HP Fax Series 900
Plain Paper Fax/Copier

Fax History Report for
Fleming & Ishihara, P.C.
508-758-3406
Jun 29 2004 6:02pm

---

Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Jun 29 | 4:49pm | Sent | 15089477147 | 0:24 | 1 | OK |

---

Result:
  OK - black and white fax

Moran Affidavit pp. 18 to 36

# EXHIBIT "I"

*Onset Fire District*

# Board of Water Commissioners

15 SAND POND ROAD
Onset, Massachusetts 02558
Telephone Wareham (508) 295- 0603
FAX (508) 295-0606


MICHAEL SANBORN/CHARIMAN
BRIAN O'HEARNE/CLERK
ANDREW DIPASQUA


JULY 1, 2004


LORI-ANN MORAN
P.O. BOX 1344
ONSET, MA. 02558-1344


DEAR MRS. MORAN:

ON JUNE 30, 2004 AT THE BOARD OF WATER COMMISSIONERS
SPECIAL MEETING IT WAS VOTED FOR YOUR TERMINATION EFFECTIVE
IMMEDIATELY.

THIS LETTER IS ADVISING YOU OF YOUR TERMINATION AS OF JUNE
30, 2004.


SINCERELY,

MICHAEL SANBORN/CHAIRMAN
ONSET FIRE DISTRICT
BOARD OF WATER COMMISSIONERS


ENCLOSURE

CC: ATTORNEY MARGARET A. ISHIHARA

SENT VIA REGULAR AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED

# EXHIBIT "J"

**Fleming & Ishihara, P.C.**
**86 Church St.**
**Mattapoisett, MA. 02739**

Donald J. Fleming                                        Margaret A. Ishihara


26 July 2004


Commonwealth of Massachusetts
Board of Conciliation and Arbitration
399 Washington St., 6th Floor
Boston, MA. 02108


Re:    Onset Fire District Water Department
Grievance by Lori Ann Moran

Dear Sir:

        Enclosed please find the original and one copy of the Request for Grievance
Arbitration along with our check no. _12800_ in the amount of $75.00.

Very truly yours,

Margaret A. Ishihara

Sent by express mail

ER798022735US

# Commonwealth of Massachusetts
## BOARD OF CONCILIATION AND ARBITRATION
## REQUEST FOR GRIEVANCE MEDIATION

*PLEASE TYPE OR PRINT*

1. Labor Organization Onset Water Department
Address Employees' Association /15 Sand Pond Rd. Phone (508) 295-0603
Onset, MA. 02558                                    Zip Code 02558
    Labor Relations Representative Kathi Semple          Phone (508) 295-0603
Address 15 Sand Pond Rd., Onset, MA
                                                    Zip Code 02558
2.  Employer Onset Fire District/Water Dept. FEIN Number 04-6003625
Address 15 Sand Pond Rd, Onset, MA. 02558          Phone 508 295-0603
                                                    Zip Code 02558
    Labor Relations Representative Daniel Murray       Phone (508) 947-4433
Address Decas, Murray, and Decas
        132 N. Main St., PO Box 201, Middleboro, MA.   Zip Code 02346
3.  Nature of Employer's Business public water dept.
Description of Unit permanent full time employees of water dept. See CBA.
Brief Statement of Issue in Dispute and Name of Grievant Exhibit "A"
        Termination of Lori Ann Moran from employment as clerical employee
        Please see attached copy of grievance. EXHIBIT "B"

Has Arbitration been Requested? Yes_____ No xx  At Board: Yes_____ No xx
Date of Arbitration Hearing
This request Brought: Individually xx    Jointly _____

_____ Date _____
Signature of Employer's Representative

_____ Date 7/26/2004
Signature of Employee's Representative
Initial to Indicate both parties have received copies of this request:_____
Initial to Indicate a Collective Bargaining Agreement copy is attached_____

| Do not write in This Space | **Effective 8/1/02** |
|---|---|
| | Instructions: Submit the original and one copy of this petition, *a fee of seventy-five dollars ($75.00) per Party* and a copy of the Collective Bargaining Agreement to: |
| Case Number_____ | Board of Conciliation & Arbitration |
| | 399 Washington Street, Fifth Floor |
| Date Filed_____ | Boston, MA  02108 |
| Mediator Assigned_____ | |
| Telephone Number : 617-727-3466 | |
| Fax Number: 617-727-4961 | **Revised August, 2002** |

**40**

# ORIGINAL

## AGREEMENT

This Agreement, entered into by and between the Onset Fire District, Water Department, hereinafter referred to as the "Employer", and the Onset Water Department Employee's Association, hereinafter referred to as the "Employee's Association", has as its purpose: the promotion of harmonious relations between the Employer and the Employee's Association, the establishment of an equitable and peaceful procedure for the resolution of differences, and the establishment of rates of pay, hours of work, and other conditions of employment.

## ARTICLE 1 - RECOGNITION

A.) This agreement relates to and covers all permanent, full-time employees of the Water Department, including the following:

1) Equipment Operators
2) Skilled Laborers
3) Laborers
4) Clerical Employees
5) The Superintendent
6) The Business Manager
7) The Foreman

B.) The Employer recognizes the Employee's Assoc. as the sole and exclusive representative for all of its present and future permanent, full-time employees covered by this agreement, now engaged, governing hours of labor, wages, and rates of pay, and other conditions of employment.

C.) The Employer shall not enter into any agreement or contract with its employees, individually or with any officer or representative of the Employee's Assoc., which in any way conflicts with the terms and provisions of this Agreement. Any such agreement or contract shall be considered null and void.

D.) Organizational Activities: Except where prohibited by this agreement, the employees shall have, and be protected in the exercise of, the right to act as Association representatives, to engage in Assoc. activities for the purpose of collective bargaining. In the exercise of such rights, the employees shall be free from any and all interference, restraint, or coercion and from any discrimination in regard to tenure, promotion, or other conditions of employement. The Association agrees that it shall represent the interest of all employees without discrimination and without regard as to whether an employee is a member of the Association.



EXHIBIT
A

41 Moran Affidavit pp. 37 - 54

## ARTICLE 2 - MANAGEMENT RIGHTS

Except as modified by this Agreement, the rights of the Employer shall be respected at all times and the provisions of this Agreement shall be observed for the orderly settlement of all questions. The Employer shall retain the right to issue procedures, rules and regulations governing the internal conduct of the employees included in the Assoc. and subject to all District By-Laws, Local, State and Federal Laws.

The Employer also retains the right to take whatever action is necessary to insure the protection, health, welfare, and safety of the District generally, or citizens individually.

## ARTICLE 3 - STEWARD

The duly elected or appointed Steward may use reasonable time during his normal working hours to investigate and present legitimate grievances in accordance with the provisions of this Agreement.

The Steward has no authority to take strike action or any other action interrupting the Onset Fire District Water Dept. operations.

The Steward shall be placed on the seniority list as number one employee until such time as he is replaced for any reason, when he will be returned to his original position on the seniority list.

## ARTICLE 4 - ASSOCIATION SECURITY

All present permanent, full-time employees covered by this Agreement as a condition of employment shall become and remain members of the Employee's Association in good standing, on and after the thirty-first (31st) day following the signing of this Agreement. All future permanent, full-time employees covered by this Agreement shall be required to become Assoc. members or pay their commensurate costs of collective bargaining on or after the thirty-first (31st) day following their date of employment. The failure of an employee to comply with this requirement will result in the employees dismissal within thirty (30) days after recei~t of written notice to the Employer and the Association.

## ARTICLE 5 - SENIORITY & PROMOTIONS

The length of service in the Onset Fire District Water Department of the permanent full-time employees shall determine seniority. Length of service shall be the total accumulated uninterrupted service with the Water Dept.

Seniority rights accrued to an employee under this article shall be lost in the event of a break in his continuous service caused by one of the following:

50

CONT. - ART. 5:

1)   Voluntary resignation,
2)   Absence from work for three (3) consecutive days without notice to the Employer.
3)   Failure to return to work three (3) days after the expiration of any Leave of Absence.
4)   Failure to return to work within three (3) days after a registered or certified letter is
     mailed to the employee at his last known mailing address requesting the employee's
     return to work. Employees must notify the Empl9yer of his intent to return to work
     upon receipt of said notice of recall.

The principle of seniority shall govern and control in most cases of promotion within the
bargaining unit, transfer, decrease of the working force as well as preference of vacation periods.

A seniority list showing the status of each employee must be posted in a place accessible to
the employees. The Assoc. may request, from time to time, a copy of such a list.


## ARTICLE 6 - JOB BIDDING AND POSTING


Any job opening covered by this Agreement shall be filled by employees in order of their
seniority, provided an employee has the ability and necessary qualifications to perform the work
required. If in the Employer's opinion, there is no applicant employee with the necessary
qualifications to perform the required work, the Employer may fill the vacancy from outside the
bargaining unit.

Job openings shall be posted for a period of five (5) days. All employees shall have an
opportunity to apply for promotion. However, until said position is filled, in accordance with the
above procedure, the Employer shall have the right to temporarily fill the position as he sees fit.

Any employee bidding for such job may be allowed a thirty (30) day period to see if he is
qualified. After the thirty (30) day period, or if in the opinion of the Employer the ~mployee has
not performed satisfactorily, he shall be returned to his former position.


## ARTICLE 7 - HOURS OF WORK


A)   The regular work week for permanent full-time employees shall be forty
(40)     hours for the labor force and thirty-seven and one half (37½) hours for the clerical staff,
respectively. The regular work day for permanent full-time employees working a regular work
week shall be eight (8) hours for the labor force and seven and one half (7½) for the clerical staff,
respectively. The regular work week shall consist of five (5) regular days.
B)   All hours worked in excess of forty (40) for the labor force andthir~yseven and one half
(37½) for the clerical staff in any regular work week shall be paid at the rate of time and one half
(1½) the employee's regular straight time hourly rate of pay.

**51**

ARTICLE 7 CONT.:

C.) Employees shall work overtime, when requested, without advance notice should an emergency arise. If an emergency does not exist, an employee shall work overtime when required as long as reasonable notice is given when possible. The Superintendent or other officer of the District shall have the right to determine an emergency.

D.) Rest Periods: Employees shall be allowed fifteen (15) minute rest periods during each one half shift, on the job site.

E.) Lunch Periods: Employees shall be granted a meal period of one half (½) hour duration during the fourth and fifth hour of the work shift. If however, work conditions do not permit a meal period, employees may be granted an additional fifteen (15) minute rest period during the remainder the the work day. Employees who are requested to and work beyond their usual shift shall be granted a reasonable time off, not to exceed one half (½) hour, to eat with pay, when said work shift is extended at least two hours beyond their normal work day.

## ARTICLE 8 - MILITARY CLAUSE

Employees entering into or enlisting in the military or naval service of the United States, pursuant to the provisions of the Selective Service Act of 1948, shall be granted all rights and privileges provided by the Act.

## ARTICLE 9 - LEAVE OF ABSENCE

Leave of absence, without pay, may be granted upon written request and at the discretion of the Water Department.

If a holiday falls within the leave of absence period, this holiday will not be considered a paid holiday.

## ARTICLE 10 - GROUP INSURANCE PLAN

The Employer shall continue for the duration of this Agreement to provide a group insurance plan on substantially the same basis as present. The Employer shall not itself operate the plan but the insurance company or companies shall administer the benefits, which shall be subject to such conditions and limitations as are provided by the Law and in the applicable insurance policies or contracts. The premiums for such plan shall be paid, at least ninty-nine (99%) percent, by the Dept. Any claim or disputes concerning eligibility for or payment of benefits under this Article shall be determijied in accordance with the applicable insurance policies or contracts and shall not be subject to grievance or arbitration procedures herein.

Moran Affidavit pp. 37 - 54

ARTICLE 10 cont.:

The Employer shall provide a Dental Plan to members of the Assoc., similar to that provided by the Dept. at present. This Plan shall be provided in the same manner as the Group Insurance Plan.

Permanent full-time employees shall receive improved benefits or coverage, which may be adopted by the Water Dept. during the life of this Agreement.

## ARTICLE 11 - HOLIDAYS

A.) All permanent full-time employees covered by this Agreement who are regularly employed shall receive the following paid holidays:

New Years's Day
Martin Luther King Day
President's Day
Patriot's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Christmas Day

B.) All permanent full-time employees covered by this Agreement who are regularly employed shall receive a paid half (½) holiday for the day before Christmas.

C.) Any employee covered by this Agreement who is required to work on a holiday shall receive in addition to the regular holiday pay, an a-mount equal to time and one half (1½) the regular rate of pay for all hours worked, but in no case shall be less than an amount equal to one (1) hour working at the rate above. Any employee called to work on a holiday shall remain on call for the full one (1) hour without additional pay but need not remain on the job site during the entire period unless there is actual work to be performed.

D.) If a paid holiday falls during the work week, the overtime premium of time and one half (1½) shall apply to all hours worked in excess of thirty-two (32) hours.

E.) If a paid holiday falls during a weekend, the day off shall be taken either on the Friday preceeding the Saturday holiday or the Monday following the Sunday holiday.

## ARTICLE 12 - VACATIONS

The vacation policy for employees of the Water Dept. shall be as follows:
Those with service of at least: Shall be granted vacation and pay at the flat rate and classification of:

| | |
|---|---|
| 1 Year | 2 Weeks |
| 5 Years | 3 Weeks |
| 10 Years | 4 Weeks |

**53**

## ARTICLE 12 - CONT.:

A.)  Employees vacation time shall be determined by their Anniversary date or years of service.
B.)  In calculating vacation benefits, an employee who starts work, (or terminates) on or before the 15th. of the month, shall be considered to have started work, (or terminated) on the first of the month. An employee who starts work, (or terminates) after the 15th. of the month, shall be considered to have started work, (or terminated) on the first day of the following month.
C.)  Granted vacation shall be accured monthly for all employees covered by this Agreement.
D.)  Employees shall be allowed to carry over only one year's accured vacation time. All other vacation shall be used or forfeited. E.)  in recognition of their long service to the Water Dept. all employees shall be granted an additional day each year beginning with their fifteenth (15) anniversary with a total accured not exceeding thirty (30) working days.
F.)  Terminating employees who have met the minimum vacation eligibility requirements shall be paid for all unused accured vacation.

## ARTICLE 13 - PERSONAL DAYS

Each employee covered by this Agreement shall receive three (3) personal days to be used as they may per year.

## ARTICLE 14 - SICK LEAVE

Employees of the Water Dept. shall be provided the following sick leave plan:

Earned sick leave with pay shall accrue at the rate of one and one-quarter (1~) days per month. Any sick leave time is earned only by the days worked. Consequently an employee can not accrue sick leave while he is on sick leave. Unused sick leave in excess of sixty (60) days cannot be accumulated from year to year. An employee's total accumulated sick time may exceed sixty (60) days at the end of that year. Employees shall be paid a bonus equal to one half (½) of the unused sick time so forfeited. This bonus shall be paid at the rate of pay as of June 30th... In order to qualify for the bonus, the employee must be employed with the Water Dept. on the last day of the fiscal year. An employee who retires shall, at the time of his retirement, be paid a bonus equal to all unused accumulated sick leave. Paid sick leave shall never be available except to cover actual absense from work due to illness. Sick leave must be authorized by the Dept. If an employee is absent by reason of injury sustained while on duty for which he is entitled to receive Workmen's Compensation, such absence shall not be considered sick leave under this plan. However, if an employee injured while on duty and not entitled to Workmen's Compensation, he shall be paid his regular wages, if approved by the Board and such absence shall be considered sick leave.

**54**

## ARTICLE 15 - LONGEVITY

Employees covered by this Agreement shall be granted longevity payments as follows:

After the completion of:

| | |
|---|---|
| 5 Years of service | $ 75.00 |
| 10 Years of service | 100.00 |
| 15 Years of service | 200.00 |
| 20 Years of service | 300.00 |
| 25 Years of service | 400.00 |

The Anniversary date shall be used to determine eligibility for payments prior to December 31st., df each calendar year. Longevity payments shall be paid on the first pay day in December.

## ARTICLE 16 - FUNERAL LEAVE

Emergency leave without loss of pay up to four (4) consecutive calendar days, but not to exceed beyond the day of the funeral, provided the employee actually attends the funeral of said deceased, may be allowed for a death in an employee's family. The employee's family shall include:

| | |
|---|---|
| Wife | Sister |
| Husband | Grandparent |
| Mother | Grandchildren |
| Father | Mother- in- law |
| Children | Father-in- law |
| Brother | |

Any relative not included in above list shall be negotiable up to two (2) days leave including the day of the funeral.

## ARTICLE 17 - WEEKEND DUTY

A.)  Weekend duty shall be governed by the Water Commissioners' Policy as outlined in: Weekend Duty and Standby Policytm

B.)  Employees covered by this Agreement shall be paid at a rate of time and one half (1½) for the following:

1-1/2 hours Stations duty - Saturday morning
1-1/2 hours  Stations duty - Sunday morning
All recall or Emergency overtime calls during the weekend. C.) Management shall post a revolvinq schedule listing equitably the employees responsible for weekend duty.

D.)  Weekend standby shall be handled in the same manner as weeknight standby as outlined in Policy.

55

Moran Affidavit pp. 37 - 54

## ARTICLE 18 - MISCELLANEOUS

A.) Examinations: All physical examinations, when required by the Employer and performed under his direction, shall be paid for by the Employer, not to exceed two (2) hours at the employee's straight time hourly rate of pay. This applies only to physical examinations required to be performed during the employee's off-duty time.

B.) Injury on the Job:                    When an employee is injured on the job, he shall be guaranteed his day's pay for day injured, provided he is instructed to cease work by the Employer or a physician, as a result of said injury. The employee who is injured on the job shall report his injury as soon as he is able to the Dept.

C.) Dangerous Conditions:                    Under no circumstances shall an employee be required or assigned to engage in any activity involving dangerous conditions of work or danger to persons or property as determined by the Dept. or in violation of any applicable statute or court order, or governmental regulation relating to the safety of persons or equipment. D.) Accidents: Any employee involved in any accident shall immediately report said accident and any physical injury sustained to the Dept. The employee, before starting his next shift, shall make out an accident report in writing, and shall turn in all available names and addresses of witnesses to any accidents.

E.) Equipment Defects:                    Employees shall immediately report all defects of equipment. Such reports shall either be made to the Supt., Business Manager or in writing with a copy being retained by the employee. The Employer shall not ask or require any employee to take out equipment that has been reported as being and is in fact in an unsafe operating condition as determined by the Dept. until same has been placed in a safe condition to the satisfaction of the Dept.

F.) Announcements:                    Announcements shall be posted in a conspicous place Parties to this Agreement, both of whom may use the bulletin board for notices of routine matters agree that it would be improper to post denunciatory or inflammatory written materials.

G.) Response to Fires:                    Employees who are members of the Onset Fire Department may respond to alarms or other emergencies and shall continue to receive their respective compensation even though they may not be performing their specific work for the Water Dept. This authorization may be specifically denied by the Dept. if the Dept. has an emergency of its own. H.) Uniforms: The Department shall supply to its employees, uniforms and safety equipment. This shall include, but not limited to uniform shirts and pants, hard hats, gloves, rain gear and rubber boots. The Employer reserves the right to provide other portions of the uniform or specific equipment.

## ARTICLE 19 - RE-CALL

Any employee called back to work on the same day after having completed his assigned work and left his place of employment, and before his next regularly scheduled starting time, shall be paid at the rate of time and one half (1½) for all hours worked on recall. He shall be guaranteed a minimum of one (1) hour pay at time and one half (1½). Any employee so recalled shall remain on call for the full hour without additional pay but need not remain on the job site during the entire period unless there is actual work to be performed. This artical excludes recall during weekend duty.

56

Moran Affidavit pp. 37 - 54

### ARTICLE 20 - GRIEVENCE AND ARBITRATION PROCEDURES

A.) A Grievence is a dispute between the parties over the interpretation or application of the terms of this written Agreement and shall be handled in accordance with the following grievence procedure:

STEP 1: The Assoc. submits, in writing, its grievence to the Water Dept. Supt./Business Manager within five (5) days after the grievence arises. The Supt./Business Manager has five (5) days, (exclusive of weekends and holidays), to act upon same.

STEP 2: Within Five (5) days (exclusive of weekends and holidays), of transmital of an answer by the Supt./Business Manager, either party may request that the grievence be presented to the Board of Water Com~ijssioners which has fifteen (15) days to act upon same.

STEP 3: In the event of failure of the parties to settle the grievence under Steps 1 & 2, either party may request mediation by the State Board of Conciliation and Arbitration which may meet with the parties to attempt to settle the grievence. Notice to the other party and to the Board of Conciliation and Arbitration to be within ten (10) days of action taken under Step 2.

STEP 4: If no settlement is reached within ten (10) days after the grievence is submitted to mediation, the matter may go to arbitration in the following manner upon assent of both parties in writing:
a.) The Assoc. shall designate one person. b.) The Water Dept. shall designate one person. c.) A third disinterested party shall be designated upon by the representatives of the Assoc. and the Dept. d.) In the event that the representatives from the Assoc. and the Dept. cannot agree upon a third arbitrator within ten (10) days, then the parties agree to request the Mass. Board of Conciliation and Arbitration to select an arbitration from the panel maintained by the Board the decision of these arbitrators shall be final and binding.
e.) Costs of arbitration, including fees of arbitrators, costs of records and incidental expenses shall be borne by the~party found at fault. Each party shall be responsible for all costs of preparation, presentation, and appeal, if any, of its won case.

STEP 5: If the Dept. has a grievence, either the Board of Water Commissioners or the Supt./Business Manager shall notify the Assoc. Steward within five (5) days, who shall meet with the person or Board requesting it, within ten (10) days, thereafter. If said matter is not resolved within five (5) days of said meeting, it may, at the discretion of the Dept., be processed through the appropriate steps as set forth above.

STEP 6: Any grievence not processed by the Assoc. through Steps 1-4 above, shall be waived.

51

ARTICLE 20 CONT:

B.)   Grievance Procedure, Notification: The above steps that require notification will be by U.S. Certified mail. Notice to the Supt./Business Manager and the Assoc. Steward shall constitute notice to the parties respectfully.

C.)   No Strike Clause: It shall be a violation of this Agreement for any employee to engage in, induce, or encourage any strike, work stoppage, slowing down or withholding of service as provided by General

Laws:      Chapter 150E, section 9A.

D.)   The Board of Water Commissioners reserve the right to act as their own agent at any time, and the words, "Board of Water Commissioners" shall be synonomous with any other representative specified by this Agreement. The Board also reserves the right to specify or allow someone other than the Supt./Business Manager to act as its representative where such title appears in this Agreement. The Dept. recognizes its duty to notify the Assoc. of its representative, if different from the one noted in this Agreement.


## ARTICLE 21 - WAGES

Employees covered by this Agreement shall receive the following:

An increase of pay for the fiscal year beginning July 1, and ending June 30, of an amount determined by the Board of Water Commissioners.

The Board of Water Commissioners reserve the right to establish and reward outstanding employees with a merit increase or one time bonus. Said right will by no means be used to bribe or coerce any employee for any reason, but to extend our gratitude for an excellant performance above and beyond a normal call of duty.

The Board of Water Commissions reserve the right to reopen the wage article only, should the economic conditions of the District warrant doing so.


## ARTICLE 22 - DURATION OF AGREEMENT

This Agreement covers the fiscal year beginning July 1, 2002 and ending June 30, 2003, or until it is agreed upon to change such agreement. It is provided nevertheless that it may be opened upon mutual agreement.

Notwithstanding any provisions of this Agreement, it is hereby agreed as follows:

A.) That the funds be duly appropriated at a District meeting or assured by the Water Department.

B.) That this Agreement be subject to all applicable rules, regula-tions and laws of the Federal Government of the United States and the Commonwealth of Massachusetts as well as the By-Laws of the Onset Fire District or the Water Department in existance at any time during the term of this Agreement.

Moran Affidavit pp. 37 - 54

IN WITNESS THEREOF, the parties hereto have caused these presents to be signed by their duly authorized representatives on the _____15_____ day of _____MAY_____, 2002.

FOR THE ASSOCIATION:


STEWARD _____


Onset Water Department Employee's Association
Onset Fire District Water Department
15 Sand Pond Road Onset, Ma. 02558


FOR THE EMPLOYER:


CHAIRMAN


CLERK



Board of Water Commissioners
Onset Fire District
Water Department
15 Sand Pond Road Onset, Ma.
02558


59

Moran Affidavit pp. 37 - 54

FLEMING & ISHIHARA, P.C.
ATTN: MARGARET A. ISHIHARA
RE: LORI ANN MORAN REQUEST

DEAR MARGARET ISHIHARA:

THE EMPLOYEE'S ASSOCIATION OF THE ONSET WATER DEPARTMENT IS
DECLINING LORI ANN MORAN'S REQUEST TO FILE THE REQUEST FOR GRIEVANCE
MEDIATION.

SINCERELY,

*Kathi Semple*

KATHI SEMPLE
SHOP STEWARD
ONSET WATER DEPARTMENT EMPLOYEE'S ASSOCIATION
JULY 29, 2004


SENT BY FAX : ATTY. ISHIHARA
HAND DELIVERED: ONSET WATER DEPT. BOARD OF WATER COMM.


60

Moran Affidavit pp. 37 - 54

# EXHIBIT "K"

**DECAS, MURRAY & DECAS**    ATTORNEYS AT LAW
132 NORTH MAIN STREET • MIDDLEBORO • MASSACHUSETTS 02346 • (508) 947-4433

GEORGE C. DECAS
DANIEL F. MURRAY
WILLIAM C. DECAS

REPLY TO POST OFFICE BOX 201
MIDDLEBORO, MA 02346-0201
FAX (508) 947-7147

WAREHAM OFFICE
219 MAIN STREET
(508) 295-2115



August 3, 2004

John F. Kelley, Jr., Chairman
Massachusetts Board of Conciliation and Arbitration
399 Washington Street – Fifth Floor
Boston, MA 02108

Re:    **Onset Water Department**

Dear Mr. Kelley:

I represent the Onset Fire District Board of Water Commissioners. The Board is in charge of the Onset Water Department. It has come to the Board's attention that a former employee, Lori Ann Moran, through her counsel, filed a request for grievance mediation with your agency a few days ago.

Please be advised that there is a collective bargaining agreement between the Onset Fire District Water Department as employer and the employees' labor organization, the Onset Water Department Employee's Association.

The Employee's Association did not file the request for grievance mediation. The Board is informed that the Employee's Association declined to file the request for grievance mediation.

The Board's position is that the employee did not have authority to file the request for grievance mediation. The bargaining agreement provides that the Water Department and the Employee's Association have authority to request grievance mediation. An employee has no standing or authority to file a request for grievance mediation under the agreement.

Accordingly, the Onset Water Department and its Board of Water Commissioners hereby request that the request for grievance mediation be dismissed.

Very truly yours,

Daniel F. Murray

DFM:f
04-194

cc:    Board of Water Commissioners
       Margaret A. Ishihara, Esquire

EACH ATTORNEY IN THIS OFFICE IS AN INDEPENDENT PRACTITIONER WHO IS NOT RESPONSIBLE Moran Affidavit pp. 37 - 54
FOR THE PRACTICE OR THE LIABILITY OF ANY OTHER ATTORNEY IN THE OFFICE.

54