U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS
DOCKET NO. 05-10033 NG

LORI ANN MORAN, PLAINTIFF VS. ANDREW DIPASQUA, MICHAEL
SANBORN, WILLIAM F. GAY, III and the ONSET FIRE DISTRICT, DEFENDANTS

PLAINTIFF'S RULE 56.1 STATEMENT

Background

1.      The Plaintiff is Lori Ann Moran who resides at 88 Main Ave., Onset,

Massachusetts.   Plaintiff's Affidavit, paragraph 1.

2.      The Plaintiff began working at the Onset Water Department as a clerical assistant

in April 2002 on a part time basis.   Plaintiff's Affidavit, para. 2;  Deposition of Plaintiff,

p. 42 line 15, as corrected, Exhibit #1 to this Statement.

3.      In July 2002 the Plaintiff began working as a clerical assistant at the Onset Water

Department on a full time basis.  Plaintiff's Affidavit, para.   3, Deposition of Plaintiff, p.

42 line 17, as corrected, Exhibit #1 to this Statement.

4.      The Plaintiff was terminated from employment at the Onset Water Department on

June 30, 2004. Plaintiff's Affidavit, paras. 4 and 24, Exhibit "G".

5.      During the time that the Plaintiff worked at the Onset Water Department, I

reported directly to the office manager, Kathi Semple.    Plaintiff's Affidavit, para. 5

6.      Ms. Semple reported to the Defendant William F. Gay, III, the Water

Superintendent.   Plaintiff's Affidavit, para. 6.

7.      The Defendant Gay reported to the Onset Board of Water Commissioners.

Plaintiff's Affidavit, para. 7

8.      The other employees of the Onset Water Department at the time that the Plaintiff

worked there were Chris Poirier, foreman,  Kerry "Jay" Semple, a laborer, and Gwen

Semple (now deceased), a clerical assistant.    Kathi Semple is Kerry Semple's sister.

Kathi Semple is Chris Poirier's aunt.    Kathi Semple and Kerry Semple are Gwen

Semple's children.    Plaintiff's Affidavit, para. 8

Evidence of Bias and Bad Faith

9.    On or about February 18, 2003 or February 19, 2003, Kathi Semple yelled and

swore at the Defendant Gay because he had made Chris Poirier and Kerry Semple shovel

the walkways of the Water Department building while firefighters stood around and

watched.    Affidavit of Lori Ann Moran, Para. 9.   Ms. Semple was not disciplined by the

Defendant Gay or the Board of Water Commisioners.   Deposition of William Gay, p.

110, Exhibit #2 to this Statement; Deposition of Michael Sanborn, Exhibit #3 to this

Statement, p. 81 line 2; and Deposition of Andrew DiPasqua, Exhibit #4 to this

Statement, pp. 59-60.

10.    On August 27, 2003, Kathi Semple had left for the day around 1PM.   The

Plaintiff had a conversation with the Defendant Gay out on the loading dock.   The

Plaintiff said to the Defendant Gay "I would just like to give you a head's up, the meeting

is not about an employee cookout, it is about Kathi accusing you of sexual harassment."

The Defendant Gay said  "thank you so much, I had no idea."   The Plaintiff said "I

would want someone to do the same for me".   The Defendant Gay said "I will do the

same for you.  I'll let you know that Kathi and Larry Blacker have been trying to put you

out on unemployment all summer, and they have been trying to get me to go over there

and file the paper work.    I refused to do that because I knew it was a personality thing

not a lack of work."   The Plaintiff thanked him for not doing as they had requested.

Plaintiff's Affidavit, para. 10; Deposition of Mary McCoy, pp. 24-25, Exhibit #5 to this

Statement.

That evening, the Plaintiff was present at an Onset Board of Water Commissioners meeting because she was required to be there by my supervisor.   Kathi Semple had accused the Defendant Gay of sexual harassment over a discussion between her and the Defendant Gay about water meters.   The Plaintiff asked Ms. Semple outright if the Defendant Gay had sexually harassed her, and Ms. Semple said no.  Immediately after the meeting Ms. Semple looked over at the Plaintiff and said "Don't you ever come to me with a problem again".   Plaintiff's Affidavit, para. 10.

11.    Before an Onset Board of Water Commissioners meeting in March 2004, Kathi Semple called the Defendant Gay a "frigging liar" and  yelled at him that he was "fucking lying".  The Defendant Gay did not reprimand or warn Ms. Semple about her yelling and swearing at him.  Plaintiff's Affidavit, para. 11; Ms. Semple was not disciplined by the Defendant Gay or the Board of Water Commisioners.   Deposition of William Gay, p. 110, p. 123 line 3; Deposition of Michael Sanborn, p. 81 line 2; and Deposition of Andrew DiPasqua, pp. 59-60.   After this event, the Plaintiff felt that her relationship with the Defendant Gay deteriorated.    Deposition of Plaintiff, p. 67.

12.    Maurice Harlow resides at Salt Works Road, Onset, Massachusetts.  He  worked for the Onset Water Department for 18 years as a truck driver, and he retired in 1988.  He knows the Plaintiff Lori Ann Moran and the Defendant Andrew DiPasqua.

Maurice Harlow was present at the meeting of the Onset Board of Water Commissioners when the vote was taken to fire Lori Ann Moran from employment at the Onset Water Department, and he knows that Andrew DiPasqua was one of the Onset Water Commissioners who voted in favor of terminating Lori Ann Moran from

employment at the Onset Water Department.

Before the Onset Board of Water Commissioners meeting at which Lori Ann Moran was fired he saw Andrew DiPasqua at the beach, and Andrew DiPasqua said "Damned if I do, and damned if I don't.   The other four have said they will sue."

After the termination, Maurice Harlow again spoke with Andrew DiPasqua at the beach.   Mr. Harlow said "you guys had this all set up.  You knew what knew what you were doing before that meeting.   It wasn't fair.  The vote was stacked ahead of time. She [Lori] was fighting against three firemen [DiPasqua, Sanborn, and Gay]". DiPasque said "we didn't have a choice.  Billy Gay has the licenses, and it would be hard to find someone to take his place."   Mr. Harlow said "there are lots of people that have those licenses."   Affidavit of Maurice Harlow.

<u>April 27, 2004</u>

13.      On April 27, 2004 there was a conversation in the Onset Water Department office between  Kathi Semple, Supt. William Gay, self described unpaid Financial Advisor Peter Murphy, and the Plaintiff  that took place for about five minutes.  The conversation drifted to Ms. Semple's desk ; with Mr. Murphy standing in front of her desk, and Supt. Gay standing to the side of it with his back to the Plaintiff.   The Plaintiff went back to work entering notes into the computer that Ms.Semple had requested of her earlier. The topic of the conversation between the three of them was about preparing copies of the minutes of the meetings requested by Ramona O'Hearne on April 26th. The request was for copies dating back for the last 2 years, up to the present and how long it would take, and the possible cost of what it might be to prepared.

During that conversation Supt. Gay had told Ms. Semple "to get everything ready

that she could concerning the minutes, but that the most important thing for her was to still continue preparing everything to get the biannual bills out on time, May 1st.  He told her that I then could make the copies of whatever paper work she deemed necessary. Superintendent Gay referred to me as she and her.  Statements were made like "She can make the copies and have her do it., etc."  The Plaintiff  felt that Superintendent Gay was being condescending. After hearing that three or four times, the Plaintiff spoke up and said to Ms. Semple  "Excuse me. Kathi but that she and her Bill is referring to is me. My name is Lori and I really would like to be called by my name.  I am sitting right here and I don't like being called she and her."  Superintendent Gay then told the Plaintiff it's just a conversation, and it's not like they were talking bad about me.   The Plaintiff then told him "I do not like being called she and her.  I have a name.  It's Lori and that is what I want to be called".  At that time Ms. Semple and Mr. Murphy went out to the back room and Superintendent Gay went into the Water Commissioners room. When Superintendent Gay came back through the office, the Plaintiff  said to him "I am sorry that you don't understand or agree with me, but I have a real pet peeve about being called "she". I hate it.".  He then told the Plaintiff  to "get over it, it's only words".   The Plaintiff told him I would not get over it, and that it's not normal or professional to speak of someone in that way.   The Plaintiff again requested again that he not call the Plaintiff "she and her".  He then said "like I said, get over it, it's only words."  The Plaintiff  said "Oh, Bill just, Shhh" and he said "Don't tell me to shut up."   The Plaintiff  told him "I  did not say it, I wanted to but controlled myself and did not say it."  The Plaintiff did not raise her voice. The Defendant Gay then went out to the back room with Ms. Semple and Mr. Murphy and the Plaintiff  heard him tell them "She'll never tell me to shut up". The Plaintiff spoke up and

told him "Get it right, Bill, I almost told you to shut up, but I did not."

After a few minutes, Ms. Semple came back into the office, and the Plaintiff noticed Superintendent Gay speaking to Mr. Murphy out in the parking lot by Mr. Murphy's car.   The Plaintiff  then spoke to Ms. Semple again and told her that the Plaintiff thought Superintendent Gay was wrong for what and how he said the things he said.     Kathi Semple agreed, and said "sometimes he does not think."  The Plaintiff and Ms. Semple then both went back to work and within 15 minutes Foreman Chris Poirier and Laborer Jay Semple came into the office.  Ms. Semple called Superintendent Gay on the Nextel to inform him that it was 2 minutes till 4:00, and was he coming in.  He said "yes and could I get a ride home because I don't have a vehicle."     The Plaintiff said jokingly "Kathi,tell him I'll give him a ride home on the bumper of my van."  Ms. Semple said "I'm not going to say that."  All four of them laughed.   Ms. Semple handed the Plaintiff the Nextel and the Plaintiff said "Hey Bill, it's Lori, I can give you a ride home on the bumper of my van".       He then said "Kathi", and Ms. Semple responded that "yes, I will give you a ride."

Superintendent Gay then came into the office and said "This is your verbal warning, if you can't control your snide remarks, you will not work here anymore." Superintendent Gay did not give any indication that he felt threatened by the Plaintiff's remark. The Plaintiff said, "What, you have got to be joking?  I was only joking with you to break the ice."  He said "you need to stop saying remarks like that."       The Plaintiff said "then I want it in writing that I have requested that you not refer to me as she and her."   He said "whatever, and if you don't like it you can leave right now."  The Plaintiff said "are you telling me to leave?   Is it because it is 4:00 and it's quitting time or are you

telling me I'm fired'". He then said "You can take it whatever way you want".  The

Plaintiff said "No, you have to clarify it. Are you telling me to leave or are you firing

me." Then he said "Wait a minute" and went out to the back room and the Plaintiff heard

his Nextel beep.  About five minutes later the Plaintiff, Kathi Semple, Kerry Jay Semple,

and Chris Poirier had made their way to the parking lot and Superintendent Gay came out

of the building.        The Plaintiff asked him "What's the verdict?"   He said "I'll let you

know". Then everyone left at the same time.

      At no time on April 27, 2004 did the Plaintiff  raise her voice to Superintendent

Gay or swear at him.   Plaintiff's Affidavit, para. 12.

14.     The Defendant Gay did not call the police though he claims to have been

threatened by the Plaintiff.  See Affidavit of Margaret A. Ishihara, Transcript of June 30,

2004 meeting, p. 107.

15.     The Plaintiff was placed on administrative leave, which was her status until she

was terminated from employment on June 30, 2004.   She was not given any specific

reasons why she was placed on administrative leave.    Plaintiff's Affidavit, paras. 13

through 19, Exhibits "A" through "E".

16.     By letter dated June 17, 2004 the Plaintiff was notified by the Onset Board of

Water Commissioners of a meeting at which potential disciplinary action would be taken

against her.     A copy of an April 27, 2004 statement of the Defendnat Gay was attached.

The specifics of the charges against the Plaintiff were not identified in the body of the

letter.  Plaintiff's Affidavit, paras. 20 through 22, Exhibits "F" and "G".

Termination

17.     At the meeting on June 30, 2004, the Onset Water Commissioners present were

Brian O'Hearne, and the Defendants Andrew Dipasqua and Michael Sanborn.   Also

present were the Defendant Gay, Kathi Semple, Chris Poirier, Kerry "Jay" Semple, and

Peter Murphy.   The Defendant Gay was represented by Attorney Christopher Lowrie,

though no proposed discipline was being considered at that meeting against the

Defendant Gay.  The Plaintiff  was present with Attorney Ishihara.

Kathi Semple, Peter Murphy ,  Kerry "Jay" Semple, Christopher Poirier, and the

Defendant Gay testified against the Plaintiff.    The Defendant Gay relied upon his April

27, 2004 written statement (attachment to Exhibit "F") as well as verbal testimony.   See

Affidavit of Margaret A. Ishihara, Transcript of June 30, 2004 meeting, pp. 97 through

116 and 27 through 32.

Neither the Plaitniff  nor here attorney were allowed to cross examine any

witnesses.   An examination of the transcript of the hearing shows that there were

contradictions between the testimony of these witnesses.  For instance, Kathi Semple and

Peter Murphy make no mention of the Defendant Gay's allegation that the Plaintiff

continued to badger him and followed him into the loading dock area.   Affidavit of

Margaret A. Ishihara, transcript of June 30, 2004 meeting, pp. 9 through 24.

The Defendant gave a different sequence of events at his deposition in this case

from the sequence of events in his April 27, 2004 statement.   Deposition of William

Gay, Exhibit #1, pp. 41 – 49.

Additionally, the Plaitniff was not allowed to bring up anything that occurred on

any other date than April 27, 2004.   The Plaintiff would have brought up the fact that

Kathi Semple, Chris Poirier, and Jay Semple  are relatives.   The Plaintiff  would have

brought up the August 27, 2003 statement (see paragraph 10 to the Plaintiff's Affidavit)

to show bias of Kathi Semple against the Plaintiff.    The Plaintiff  would have brought up

the February 2003 snowstorm incident between the Defendant Gay and Kathi Semple

(see paragraph 9 of this Affidavit); and the Plaintiff would have brought up the March

2004 argument between the Defendant Gay and Kathi Semple  over the union

membership issue (see paragraph 11 of the Plaintiff's Affidavit).

18.    At the June 30, 2004 meeting a vote was taken by the Onset Water

Commissioners (DiPasqua and Sanborn in favor and O'Hearne against) to terminate the

Plaintiff from  employment.    During the course of the discussion on that vote, the

Defendant Sanborn stated words to the effect that they had to stand behind the

Superintendent.    See Affidavit of Margaret A. Ishihara, Transcript of June 30, 2004

Onset Board of Water Commissioners meeting, p. 81.  Plaintiff's Affidavit, para. 24,

Exhibit "G"; p. 79 to 88.

19.    A grievance was filed by the Plaintiff and denied by the Onset Board of Water

Commissioners at their July 24, 2004 meeting.    Plaintiff's Affidavit, para. 25 and 26,

Exhibit "H".

20.    The Plaintiff filed a grievance mediation on her own behalf because the

employee's association refuse to do so.    The Onset Board of Water Commissioners has

taken the position that the Plaintiff is not entitled to file a grievance mediation on her own

behalf.    The grievance mediation is still pending in the Massachusetts Board of

Conciliation and Arbitration.    Plaintiff's Affidavit, paras. 27 and 28, Exhibits "I" and

"K".

<u>Rules and Regulations</u>

21.    The Onset Board of Water Commissioners has not issued any rules or regulations

governing the conduct of water department employees, other than the employee

association agreement.    Deposition of Michael Sanborn, Exhibit "2" to this Statement,

pp. 75-79, Exhibit " 17"; Deposition of Andrew DiPasqua, Exhibit "3" to this Statement,

pp. 49-50, Exhibit "14".


PLAINTIFF LORI ANN MORAN
By her Attorney
/s Margaret A. Ishihara
Margaret A. Ishihara, BBO#247930
86 Church St.
Mattapoisett, MA. 02739
Telephone: (508) 758-6981
e-mail mimattlaw@comcast.net
Date: 2 June 2006

CERTIFICATE OF SERVICE

I hereby certify that I have served the within document by mailing a copy first class mail postage pre paid to:

John J. Cloherty, III
Pierce, Davis & Perritano, LLP
Ten Winthrop Square
Boston, MA. 02110
Telephone: (617) 350-0950

Date: 2 June 2006                          /Margaret A. Ishihara
                                           Margaret A. Ishihara

U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS
DOCKET NO. 05-10033 NG

LORI ANN MORAN, PLAINTIFF VS.  AI-DREW DIPASQUA, MICHAEL
SANBORN, WILLIAM F. GAY, III and the ONSET FIRE DISTRICT, DEFENDANTS

DEPOSITION OF LORI ANN MORAN TAKEN ON JANUARY 4, 2006
ERRATA SHEET AND SIGNATURE PAGE

| Page | Line | Change | Reason |
|------|------|--------|--------|
| | | | |
| 24 | 10 | 2003 should be 2002 | Incorrect year |
| 38 | 15 | Thorton to Thornton | Spelling error |
| 40 | 14 | Thorton to Thornton | Spelling error |
| 42 | 17 | 2003 to 2002 | Incorrect year |
| 42 | 19 | Strike answer, Change to No, I was hired on Aril 1, 2002 | Incorrect year |
| 45 | 8 | Strike answer,Change to No, health insurance was going to go into effect in July 1, 2003 | Incorrect year |
| 47 | 20 | Strike answer, chance to No, was changed to full time catacity on July l, 2002 | Incorrect year |
| 49 | 20 | Insert "days" between words 15 and total | To clarify total hours of sick time |
| 50 | 2 | Thorton should be Brown | Brown is the last name |
| 52 | 16 | Miss Semple should be Mrs. Sem le | Referring to Gwen Semple not Kathi Semple |
| 65 | 24 | Mrs. Semple should be Miss Semple | Referring to Kathi Semple |
| 161 | 3 | Mrs. Semple should be Miss Semple | Referring to Kathi Semple |
| 178 | 23 | Strike answer, change to "Yes, I am claiming emotional distress" | Upon further reflection, answer not accurate |

I have read the foregoing transcript of my deposition and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Or                          Date:            /f
Lori Ann Moran

UNITED **STATES DISTRICT COURT**
**FOR** THE
**DISTRICT OF MASSACHUSETTS**

:rS::r:r:rsrir:rs:i;:Ys;Ors;s°i;'r'r:Ys:s:srsr~r4rsrir:;s';s;:;s;

**LORI-ANN MORAN,**
                **Plaintiff**

                                    **CIVIL** ACTION
                **VS**                  NO. 05-10033NG

ANDREW **DIPASQUA, MICHAEL
SANBORN, WILLIAM F. GAY,
*III*, AND THE ONSET FIRE**                    k
**DISTRICT,**

                **Defendants**

                30 (b)(6) DEPOSITION OF **WILLIAM F. GAY, III,**
**and Individually, taken** on **behalf of the plaintiff pursuant
to the Massachusetts Rules of Civil Procedure before Kathleen
M. Benoit, CSR # 1368F94, shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts at the
offices of Margaret A.** Ishihara, **Esq., 86 Church street,
Mattapoisett, Massachusetts, on Monday, January 23, 2006,
commencing at 10:12 a.m.**

**APPEARANCES:**

**MARGARET A. ISHIHARA, ESQ., 86 Church street, Mattapoisett,
MA 02739, For the plaintiff**

**JOHN J. CLOHERTY, *III*, ESQ., Pierce, Davis & Perritano, LLP,
Ten Winthrop Square, Boston, MA 02110-1257, For the defendant**

**ALSO PRESENT:**

**Lori-Ann Moran**

## *Leavitt Rebortin , Inc.*

1207 *Commercial Street, Rear*
*Weymouth, MA* 02189

*Tel.* 781-335-6791
*Fax:* 781-335-7911
*leavittreporting@att.net*

*Hearings # Conferences # Legal Proceedings*

41

1  your diagram?

2      A.   Yes, ma'am.

3      Q.   And at the time that you had that conversation with

4  Kathi Semple, was anyone else present?

5      A.   Mr. Murphy was still there.   I don't --

6      Q.   was he still in your office or was he out with --

7      A.   He was out in this area in front of the desk on the

8  right side of the room (indicating).

9      Q.   was anyone else there?

10     A.   I believe, I can't remember, Chris,  lay, Kathi,

11 Peter, they were all in the area I believe at that time

12 because it, you know, different things happen at different

13 times, but there was always somebody there during this

14 whole thing.

15     Q.   well, let's stick to the one period that we're

16 looking at.   Was Lori Moran also present?

17     A.   Yes, ma'am.

18     Q.   And where was Lori Moran?

19     A.   Sitting in the left desk.

20     Q.   was there any further conversation between yourself

21 and Kathi Semple?

22     A.   Not at that point.

23     Q.   Did anyone else who was present at that point say

42

1  anything?

2      A.  Yes, ma'am.

3      Q.  And who was that?

4      A.  Mrs. Moran.

5      Q.  And what did Mrs. Moran say?

6      A.  Innocently, when I was talking to Kathi, I had told

7  Kathi I want you to get the minutes from the back room,

8  innocently I called Mrs. Moran "she" can copy them and I

9  will do the tapes, and Mrs. Moran got up, started to get

10 loud, "I'm only a she; I'm only a she."

11     Q.  So you say she raised her voice?

12     A.  Yes.

13     Q.  Did she remain seated at her desk?

14     A.  No, she did get up and approach the other desk.

15     Q.  About how far away was she from you when she made

16 that statement to you?

17     A.  I'm not good on distances. Somewheres around the

18 area of the desk, Somewheres on the side and I was still

19 standing in the front area (indicating).

20     Q.  You mean somewhere on the side of Kathi Semple's

21 desk?

22     A.  Yes.

23     Q.  And was Kathi Semple still there when Lori Moran

43

1    made that statement?

2        A.    Yes, ma'am.

3        Q.    what about Jay and Chris?

4        A.    I'm not sure if they were right in the office area

5    or if they were in the meter room.

6        Q.    And do you recall where Peter Murphy was?

7        A.    Mr. Murphy I think was still I believe out in the

8    front in the right-hand side area.

9        Q.    After Lori Moran made that statement to you, what

10   if anything did you say?

11       A.    I apologized for making the statement, not knowing

12   that what I had said to offend her.

13       Q.    well, so what were the words that you used?

14       A.    well, she told me --

15              MR. CLOHERTY:    what were the words that he

16   used what, in apologizing?

17              MS. ISHIHARA:    what were the words that he

18   said.    He seems to be adding on to his thoughts at the

19   time.

20       Q.    what were the words that were said by you?

21              MR. CLOHERTY:    Objection.    You can answer.

22       A.    Lori says "I'm only a she; I'm only a she," and I

23   says "If I offended you, I'm sorry.    I did not mean to do

44

1   that."

2       Q.   And what if anything did Ms. Moran say?

3       A.   she kept persisting that, the word I'm only a "she"

4   and she did not take the apology.

5       Q.   Did she say I don't take the apology?

6       A.   No, she just persisted badgering me about the word.

7       Q.   Do you recall what she said?

8       A.   "I'm only a she. I'm more than a she," and I don't

9   remember what else besides that.

10      Q.   And what was the next thing that happened after

11  that?

12      A.   I proceeded to go to the loading dock where at this

13  point I knew Mr. Murphy was out on the loading dock and

14  miss Semple.

15      Q.   Do you recall when in your exchange with Lori Moran

16  the others left?

17      A.   I think it all moved as a whole out there.

18      Q.   Are you saying that Lori Moran also came out to the

19  loading dock?

20      A.   she came behind me I know that, yes.

21      Q.   Does the meter room have a separate doorway into

22  the open office area where the desks are?

23      A.   Yes, it does.

45

1    Q.   And then there's another door from the meter room

2    to the loading dock, is that right?

3    A.   Yes.

4    Q.   was the door to the meter room open?

5    A.   Yes.

6    Q.   what about the door out to the loading dock?

7    A.   I believe it was open too.

8              MR. CLOHERTY:   And just to clarify, Counsel,

9    is that door indicated on this, the exhibit?

10   Q.   Mr. Gay, if you could, can you show us where the

11   door is for the meter room?

12   A.   This would be the door going from the main office

13   into the meter room -- and this is really not to scale --

14   to the door leading to the loading dock. That would be

15   that mark.   (Indicating.)

16   Q.   All right.   So this area here, that's not a wall

17   here (indicating)?

18   A.   No, that's not a wall.   That's a ...

19              (The witness wrote on the document.)

20   A.   There's not two separate doors, no. It's like a

21   little L shaped, and even, this is kind of, the loading

22   dock, the building's thing, the loading dock would actually

23   be something like this with the cement with the wood coming

46

1  out to each side, and the door would be actually more in

2  that area.   (Indicating.)

3              (The witness wrote on the document.)

4     Q.   So you're saying that Mrs. Moran followed you

5  through the door into the meter room and then through the

6  door onto the loading dock --

7     A.   Mm-hmm.

8     Q.   -- is that right?

9              MR. CLOHERTY:   You have to say yes or no.

10    A.   Yes.

11    Q.   And after you were out in the loading dock area,

12 what if anything did she say and what if anything did you

13 say?

14    A.   She kept persisting about the word "she" again, so

15 I went back into the commissioner's room avoiding the

16 confrontal, hoping that Mrs. Moran would calm down to get

17 the paperwork and the tapes that needed to be completed for

18 the job assignment.

19    Q.   And where if anywhere did Lori Moran go?

20    A.   I'm not sure where she was at that moment because  I

21 was back here. She may have gone back to her desk.

22 (Indicating.)

23    Q.   But she didn't follow you into the commissioner's

47

0

1  office?

2      A.  No.   And Peter Murphy was still with me or he was

3  in the general area.

4      Q.   And what about Kathi Semple?

5      A.   I think Kathi eventually came back into the main

6  office too.   I don't remember exactly the time frame.

7      Q.   And Chris Poirier, where was he?

8      A.   I'm not sure where Chris was at that time.

9      Q.   what about Say semple?

10     A.   I'm not sure at that point in time.   I know

11 Mr. Murphy was definitely in the office though.

12     Q.   Definitely in the water commissioner's office?

13     A.    In the water commissioner's office, this area. He

14 may have come back here for a minute or two but that's

15 about it.   (Indicating.)

16     Q.   And after you went into the water commissioner's

17 office, what was the next thing that happened if anything?

18     A.   As I came back out with some of the paperwork that

19 had to be done, Mrs. Moran again kept badgering me about

20 how I had called her a she, and at this point I told her

21 stop, it's only a word, I'm sorry, and I had given Kathi

22 that work at that time. Now Kathi was not in the room, I

23 was going to give Kathi the work, and as  I passed her desk,

Concise Stmt Ex. #2
Page 8 of 12

48

1  she told me to shut up, which Mr. Murphy was in this

2  right-handed sided area (indicating) at this point in time

3  which he heard it too.

4      Q.   How do you know he heard it?

5      A.   Because afterwards I had asked him.

6      Q.   when you say afterwards, on the same day or at some

7  other date?

8      A.   Right after it happened again walking to the

9  loading dock platform.

10     Q.   So when you came out from the water commissioner's

11 office, you say Lori Moran was at her desk, is that right?

12     A.   Yes, ma'am.

13     Q.   And then you proceeded back to the meter room, is

14 that right?

15     A.   Yes.

16     Q.   And Peter Murphy was behind you?

17     A.   He was in this area at this point in time

18 (indicating).

19          MR. CLOHERTY:   The record is not going to

20 reflect where you're pointing, so if you could describe it.

21 The record is not reflecting where you just pointed, sir.

22     A.   To the right-hand side in front of the desk by the

23 counter area.

Concise Stmt Ex. #2
Page 9 of 12

49

1    Q.    By **the customer counter area?**

2    **A.    Yes, ma'am.**

3    Q.    **And you asked** Mr. **Murphy what?**

4    **A.    Did she tell me, because** I **heard** it and I **wanted to**

5    **make sure to confirm that** I **heard the right thing that she**

6    **told me to shut** up.

7    Q.    **And what** did Mr. **Murphy say?**

8    **A.    He said he** heard **it too.**

9    Q.    **And what was the next thing that happened after**

10   **that?**

11   **A.    At that point** Mr. **Murphy left.** I **had left hoping**

12   **the situation would defuse itself.** I had gone to **the fire**

13   **station.** I **forget how long exactly I was** there.

14   Q.    **well, you went out through the meter room onto the**

15   **loading dock, is that right?**

16   **A.    Yes.**

17   Q.    **And the next thing you did was you went to the fire**

18   **station?**

19   **A.    Yes, I got in my truck and went to the fire station**

20   I **believe at that point.**

21   Q.    **And at that point your truck was parked right near**

22   **the loading dock?**

23   **A.    The loading** dock, yea.

```
 1      Q.   Did any employees at the onset water Department

 2   tell Mr. DiPasqua that they would sue him?

 3      A.   Not that I am aware of.

 4      Q.   what's your relationship with Mr. Harlow, how would

 5   you characterize that --

 6              MR. CLOHERTY:   Objection.

 7      Q.   -- friendly, unfriendly, neutral?

 8              MR. CLOHERTY:   Objection.   You can answer.

 9      A.   Neutral.

10      Q.   Pardon me?

11      A.   Neutral.

12      Q.   During the period from say January 1, 2000, to the

13   present, has the, any disciplinary action been taken

14   against any onset water Department employee other than Lori

15   Mo ran?

16      A.   what were the dates?

17      Q.   January 1, 2000, up until today.

18      A.   Yes.

19      Q.   And who else?

20      A.   The other four employees of the water Department.

21      Q.   And that would be who?

22      A.   Myself, Kathi, Chris and Jay.

23      Q.   And when did that happen?
```

1    A.   About two weeks ago.

2    Q.   And what were the reasons given for the

3  disciplinary action?

4              MR. CLOHERTY:   Objection.   You can answer.

5    A.   They had their own conception of how our contract

6  read and what it meant and we had another way of reading

7  it.

8    Q.   On what issue?

9    A.   Christmas holiday.

10    Q.   And specifically what was the dispute?

11              MR. CLOHERTY:   Objection.   You can answer.

12    A.   On the days that the Board of water commissioners

13  said that we had and the days that the contract actually

14  read.

15    Q.   so the Board of water commissioners said that you

16  had a particular day or days off at Christmas and you felt

17  it was not sufficient, is that right?

18    A.   It says we have certain days off and they were not

19  going to allow us to take those certain days.

20    Q.   And before you took the days off, did they tell you

21  that you shouldn't?

22              MR. CLOHERTY:   Objection, you can answer.

23    A.   Yup.

VOLUME:    I
PAGES:     1-85
EXHIBITS:  I-17


U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-10033NG



*   *   *   *   *   *   *   *   *   *   *   *   *   *

LORI ANN MORAN,
            Plaintiff,


vs.

ANDREW DIPASQUA, MICHAEL SANBORN,
WILLIAM F. GAY, III and the ONSET
FIRE DISTRICT,
            Defendants.

*   *   *   *   *   *   *   *   *   *   *   *   *   *


        DEPOSITION OF MICHAEL SANBORN, a witness

called on behalf of the Plaintif, pursuant to Federal

Rule of Civil Procedure, 30(a) before Carolyn McGill,

a Shorthand Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of

Margaret A. Ishihara, 86 Church Street, Mattapoisett,

Massachusetts, on Wednesday, February 15, 2006

commencing at 10:05 a.m.

## *Leavitt Reporting, Inc.*

1207 *Commercial Street, Rear*                    *Tel.* 781-335-6791
*Weymouth, MA* 02189                              *Fax:* 781-335-7911
                                                  *leavittreporting@att.net*
*Hearings # Conferences # Legal Proceedings*

1    alleged events of April 27, 2004 involving Lori

2    Moran?

3        A.    No.

4        Q.    Other than what you've already told us

5    about, have you spoken with anyone about Lori

6    Moran's job performance?

7        A.    No.

8        Q.    I'm going to show you a document which

9    states at the top Agreement. It says this

10   agreement entered into by and between the Onset

11   Fire District, etc. We'll mark this as Exhibit

12   Number Seventeen.

13                  (Exhibit No. 17, Agreement, so

14   marked).

15       Q.    Can you take a look at Exhibit Number

16   Seventeen.   And you can take your time and tell us

17   what that is.

18       A.    This is an agreement to the Onset Water

19   Department employees to the water commissioners.

20       Q.    Would that agreement have been in effect

21   in April of 2004?

22                  MR. CLOHERTY:    Objection.

23       Q.    And your answer is?

1      A.    Yes.

2      Q.    Would it have been in effect throughout

3   2004?

4                MR. CLOHERTY:   Objection.

5      A.    Yes.

6      Q.    If you can take a look at the second page

7   of that document, Article 2, Management Rights. Do

8   you have that? The first paragraph, the second

9   sentence, the employer shall retain the right to

10   issue procedures, rules and regulations governing

11   the internal conduct of the employees included in

12   the association and subject to all district

13   by-laws, local state and federal laws. Do you see

14   that?

15                MR. CLOHERTY:   Where are you reading?

16   The second sentence in that paragraph?

17                MS. ISHIHARA:   Right.   Article 2,

18   Management Rights, second sentence.

19      A.    Yes.

20      Q.    Do you have that?

21      A.    Yes.

22      Q.    Has the Onset Board of Water Commissioners

23   issued any procedures, rules or regulations

1    governing the internal conduct of the employees

2    included in the association at any time?

3                    MR. CLOHERTY:   Objection.

4        A.    What do you mean by rules and regulations?

5        Q.    Well, this particular agreement was signed

6    by you, is that right?

7        A.    Yes.

8                    MR. CLOHERTY:   Why don't you look at

9    the document.

10       A.    Yes.

11       Q.    You read it before you signed it?

12       A.    Yes.

13                   MR. CLOHERTY:   Counsel, will you

14   clarify Article 22 concerning the duration of the

15   agreement please based on your earlier question

16   about the effective period of this, or I can do it

17   on cross-examination.

18       Q.    Looking at Article 22 it says duration of

19   agreement.   It covers the fiscal year beginning

20   July 1, 2003 and ending June 30, 2004 or until it's

21   agreed upon to change such agreement. Do you see

22   that?

23                   MR. CLOHERTY:   Counsel, you're looking

at the next year's agreement, I think, the one

that's marked as Exhibit Seventeen.

        MS. ISHIHARA:  I marked as Exhibit

Number Seventeen the next year's agreement.

        MR. CLOHERTY:  Okay.  I have the wrong

one.

        MS. ISHIHARA:  I gave you two

actually.  I marked the second one. Do you see

that?

        MR. CLOHERTY:  Right.

   Q.   So it's your understanding that this

agreement ran through June 30, 2004?

   A.   Yes.

   Q.   Going back to Article 2 regarding

procedures, rules and regulations -- let me go back

a bit. That's your signature on the last page of

this document, is that correct?

   A.   Yes.

   Q.   You read the document before you signed

it?

   A.   Yes.

   Q.   And it contained the statement the

employer shall retain the right to issue

1    procedures, rules and regulations governing the

2    internal conduct of the employees included in the

3    association, didn't it?

4        A.    Yes, it does.

5        Q.    So let me ask you again, did the employer

6    being the Onset Water Department issue procedures,

7    rules and regulations under that provision?

8                MR. CLOHERTY:   Objection.

9        Q.    If you know?

10       A.    I don't know what you're talking about for

11   rules and regulations.   We issued -- they have

12   rules and regulations as an employee.

13       Q.    Are there written rules and regulations?

14       A.    They have this contract.

15       Q.    Do they have anything outside of this

16   contract?

17       A.    No.

18       Q.    So you were off the Board of Water

19   Commissioners as of May of 2005, is that right?

20       A.    Yes.

21       Q.    During the time period that you were a

22   water commissioner did the Board of Water

23   Commissioners ever consider doing drug testing for

1              MS. ISHIHARA:   Right, by the board.

2         A.   No.

3         Q.   Were you aware of any complaints about any

4    Onset Water Department employees other than the one

5    that you've told us about with regard to Lori

6    Moran?

7         A.   Complaint from who?

8         Q.   Complaints from anyone; customers, other

9    water department employees, other water

10   commissioners.

11             MR. CLOHERTY:   Objection.

12        A.   No.

13        Q.   Did you ever hear any complaints about any

14   of the Onset Water Department employees swearing at

15   another employee or a supervisor?

16        A.   No.

17        Q.   Were you aware of any insubordination by

18   any Onset Water Department employee towards a

19   supervisor other than what you said occurred with

20   regard to Lori Moran?

21        A.   No.

22        Q.   Do you recall an issue coming up in

23   Wareham regarding combining the Onset Water



ORIGINAL

AGREEMENT

This Agreement, entered into by and between the Onset Fire District, Water Department, hereinafter referred to as the "Employer", and the Onset Water Department Employee's Association, hereinafter referred to as the "Employee's Association", has as its purpose, the promotion of harmonious relations between the Employer and the Employee's Association, the establishment of an equitable and peaceful procedure for the resolution of differences, and the establishment of rates of pay, hours of work, and other conditions of employment.

ARTICLE 1 - RECOGNITION

A.) This agreement relates to and covers all permanent, full-time employees of the Water Department, including the following:

1) Equipment Operators
2) Skilled Laborers
3) Laborers
4) Clerical Employees
5) The Superintendent
b) The Business Manager
?) The-Foreman

B.) The Employer recognizes the Employee's Assoc. as the sole and exclusive representative for all of, its present and future permanent, full-time employees covered by this agreement, now engaged, governing hours of labor, wages, and rates of pay, and other conditions of employment.

C.) The Employer shall not enter into any agreement or contract with it's employees, individually or with any officer or representative of the Employeel s Assoc., Which in any way conflicts with the terms and provisions of this Agreement. Any such agreement or contract shall be considered null and void.

D.) Organizational Activities: Except where prohibited by is agreement, the employees shall have, and be protected in the exercise of, the right to act as Association representatives, to engage in Assoc. activities for the purpose of collective bargaining. In the exercise of such rights, the employees shall be free from any and all interference, restraint, or coercion and from any discrimination in regard to tenure, promotion, or other conditions of employment. The Association agrees that it shall represent the interest of all employees without discrimination and without regard as to whether an employee is a member of the Association.

ARTICLE 2 - MANAGEMENT RIGHTS

Except as modified by this Agreement, the rights of the Employer shall be respected at all times and the provisions of this Agreement shall be observed for the orderly settlement of all questions. The Employer shall retain tlLe right to issue procedures, rules and regulations governing the internal conduct of the employees included in the Assoc. and subject to all District By-Laws, Local, State and Federal Laws.

The Employer also retains the right to take whatever action is necessary to insure the protection, health, welfare, and safety of the District generally or citizens individually.

ARTICLE 3 - STEWARD

The duly elected or appointed Steward may use reasonable time during his normal working hours to investigate and present legitimate grievances in accordance with the provisions of this Agreement.

The Steward has no authority to take strike action or any other action interrupting the Onset Fire District Water Dept. operations.

. The Steward shall be placed on the seniority list as number one employee until such time as he is replaced for any reason, when he will be returned to his original position on the seniority list.

ARTICLE 4 - ASSOCIATION SECURITY

All present permanent, full-time employees covered by this Agreement as a condition of employment shall become and remain members of the. Employee's Association in good standing, on and after the thirty-first (31st) day following the signing of this Agreement. All future permanent, full-time employees covered by this Agreement shall be required to become Assoc. members or pay their commensurate costs of collective barc7aining on or after the thirty-first (31st) day following their date of employment. The failure of an employee to comply with this requirement will result in the employees' dismissal within thirty (30) days after receipt of written notice to the Employer and the Association.

ARTICLE 5 - SENIORITY & PROMOTIONS

The length of service in the Onset Fire District Water Department of the permanent full-time employees shall determine seniority. Length of service shall be the total accumulated uninterrupted service with the Water Dept. Seniority rights accrued to an employee under this article shall be lost in the event of a break in his continuous service caused by one of the following:

**CONT, ART. 5:**

1)    Voluntary resignation,
2)    Absence from work for three (3) consecutive days without notice to the Employer.
3)    Failure to return to work three (3) days after the expiration of any Leave of Absence.
4)    Failure to return to work within three (3) days after a registered or certified letter is mailed to the employee at his last known mailing address requesting the employee's return to work. Employees must notify the Employer of his intent to return to work upon receipt of said notice of recall.

The principle of seniority shall govern and control in most cases of promotion within the bargaining unit, transfer, decrease of the working force as well as preference of vacation periods.

A seniority list showing the status of each employee must be posted in a place accessible to the employees. The Assoc. may request, from time to time, a copy of such a list.

## ARTICLE 6 - JOB BIDDING AND POSTING

Any j ob opening- covered by this Agreement shall be filled by employees in order of their seniority, provided an employee has the ability and necessary qualifications to perform the work required. If in the Employer's opinion, there is no applicant employee with the necessary: qualifications to perform the required work, the Employer may fill the vacancy from outside the bargaining unit.

Job opening shall be posted for a period of five (5) days. All employees shall have an opportunity to apply for promotion. However, until said position is filled, in accordance with the above procedure, the Employer shall have the right to temporarily fill the position as he sees fit.

Any employee bidding for such job maybe allowed a thirty- (30) day period to see if he is qualified. After the thirty (30) day period, or if in the opinion of the Employer the employee has not performed satisfactorily, he shall be returned to his former position.

## ·ARTICLE 7 - HOURS OF WORK

A)    The regular workweek for permanent full-time employees shall be forty (40) hours for the labor force and forty (40) hours for the clerical staff, respectively. The regular workday for permanent full time employees working a regular workweek shall be eight (8) hours for the labor force and eight (8) for the clerical staff, respectively. The regular workweek shall consist of five (5) regular days.

B}    All hours worked in excess of forty (40) for the labor force and forty (40) for the clerical staff in any regular workweek shall be paid at the rate of time and one half (1 '/) the employee's regular straight time hourly rate of pay.

ARTICLE 7 CONT:

Employees shall work overtime, when requested, without advance notice should an-emergency arise. If an emergency does not exist, an employee shall work. overtime when required as long as reasonable notice is given when possible. The Superintendent or other officers of the District shall have the right, to determine an.emergency.

D.)  Rest Periods: Employees shall be allowed fifteen (15) minute rest periods during each on half shift, on the j ob site.

E.)  Lunch Periods: Employees shall be granted a meal period of one half (1/2) hour duration during the fourth and fifth hour of the work shift. If however, work conditions do not pemut a meal period, employees may be granted an additional fifteen (15) minute rest period during the remainder the workday. Employees who are requested to and work beyond their usual shift shall be granted a reasonable time off, not to exceed one half (1/2) hour, to eat with pay, when said work shift is extended at least two hours beyond their normal work day.

ARTICLE 8 - MILITARY CLAUSE

Employees entering into or enlisting in the Military or naval service of the United States, pursuant to the provisions of the Selective Service Act of 1948; shall be granted all rights and privileges provided by the Act.

ARTICLE 9 - LEAVE OF ABSENCE

Leave of absence, without pay, may be granted upon written request and at the discretion of the Water Department.

If a holiday falls within the leave of absence period, this holiday will not be considered a paid holiday.

ARTICLE 10 -GROUP INSURANCE PL-A-N

The Employer shall continue for the duration of this Agreement to provide a group insurance plan on substantially the same basis as present. The Employer shall not itself operate the plan but the insurance company or companies shall administer the benefits, which shall be subject to such conditions and limitations as are provided by the Law and in the applicable insurance policies or contracts. The premiums for such plan shall be paid, at least ninety-nine (99%) percent, by the Dept.. Any claim or disputes concerning eligibility for or payment of benefits under this Article shall be determined in accordance with the applicable insurance policies or contracts and shall not be subject to grievance or arbitration procedures herein.

ARTICLE 10 coot :

The Employer shall provide a Dental Plan to members of the Assoc., similar to that provided by the Dept. at present. This Plan shall be provided in the same manner as the Group Insurance Plan.

Pennanent full-time employees shall receive improved benefits or coverage, which may be adopted by the Water Dept. during the life of this Agreement.


ARTICLE 11 -Holidavs

A.) All permanent full-time employees covered by this Agreement who are regularly employed shall receive the following paid holidays:

New Years Day
Martin Luther King Day
President's Day
Patriot's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran Day
Thanksgiving Day
Christmas Day


B.   All permanent full-time employees covered by this Agreement who are regularly employed shall receive a paid half (1/2) holiday for the day before, Thanksgiving, Christmas and the day after. New Years shall be a (1!2) day before and New Years Day.

C.) Any employee covered by this Agreement who is required to work on a holiday shall receive in addition to the regular holiday pay, an amount equal to time and one half (1 1/2) the regular rate of pay for all hours worked, but in no case shall be less than an amount equal to one (1) hour working at the rate at the rate above. Any employee called to work on a holiday shall remain on call for the full one (1) hour without additional pay but need not remain on the job site during the entire period unless there is actual work to be performed.

D.) If a paid holiday falls during the work week, the overtime premium of time and one half (1 1/2) shall apply to all hours worked in excess of thirty-two (32) hours.

E.) If a paid holiday falls during a weekend, the day off shall be taken either on the Friday proceeding the Saturday holiday or the Monday following the Sunday holiday.


ARTICLE 12 - VACATIONS

The vacation policy for employees of the Water Dept. shall be as follows: Those with service of at least: Shall be granted vacation and pay at the flat rate and classification
*of:*

| | |
|---|---|
| *1 Year* | *? Weeks* |
| Years | 3 Weeks |
| 10 Years | 4 Weeks |

ARTICLE 12- CONT.:

A.) Employees vacation time shall be determined by their Anniversary date or years of service. -

B.) In calculating vacation benefits, an employee who starts work, (or terminates) on or before the 15th of the month, shall be considered to have started work, (or terminated) on the first of. the month. An employee who starts work, (or terminates) after the 15th of the month, shall be considered to have started work, (or terminated) on the first day of the following month.

C.) Granted vacation shall be accrued monthly for all employees covered by this Agreement,

D.) Employees shall be allowed to carry over only one year's accrued vacation time. All other vacation shall be used or forfeited.

E.) In recognition of their long service to the Water Dept. all employees shall be granted an additional day each year beginning with their fifteenth (15). Anniversary with a total accrued not exceeding thirty (30) working days.

F.) Terminating employees who have met the minimum vacation eligibility requirements shall be paid for all unused accrued vacation.

## ARTICLE 13 - PERSONAL DAYS

Each employee covered by this Agreement shall receive three (3) personal days to be used as they may per year.

## ARTICLE 14 – SICK LEAVE

Employees of the Water Dept. shall be provided the following sick leave plan:

Earned sick leave with pay shall accrue at the rate of one and one-quarter (1 '/<) days per month. Any sick leave time is earned only by the days worked. Consequently an employee can not accrue sick leave while he is on sick leave. Unused sick leave in excess of sixty (60) days cannot be accumulated from year to year. An employee's total accumulated sick time may exceed sixty (60) days at the end of that year. Employees shall be paid a bonus equal to one half (1/2) of the unused sick time so forfeited. This bonus shall be paid at the rate of pay as of June 30th. In order to qualify for the bonus, the employee must be employed with the Water Dept. on the last day of the fiscal year. An employee who retires shall, at the time of his retirement, be paid a bonus equal to all unused accumulated sick leave. Paid sick leave shall never be available except to cover actual absence from work due to illness. Sick leave must be authorized by the Dept. If an employee is absent by reason of injury sustained while on duty for which he is entitled to, receive Workmen's Compensation, such absence shall not be considered sick leave under this plan. However, if an employee injured while on duty and not entitled to Workmen's Compensation, he shall be paid his regular wages, if approved by the Board and such absence shall be considered sick leave.

ARTICLE 15 - LONGEVITY

Employees covered by this Agreement shall be granted longevity payments as follows:

After the completion of·

| | |
|---|---|
| 5   Years of service | $75.00 |
| 1 OYears of service | $ 100.00 |
| 15 Years of service | $200.00 |
| 20 Years of service | $ 300.00 |
| 25 Years of service | $400.00 |

The Anniversary date shall be used to determine eligibility for payments prior to
December 31 st, of each calendar year. Longevity payments shall be paid on the first payday in December. .

ARTICLE 16 - FUNERAL LEAVE

Emergency leave without loss of pay up to four (4) consecutive calendar days, but not to exceed beyond
the day of the funeral, provided the employee actually attends the funeral of said deceased, may be allowed
for a death in an employees family. The employee family shall include:

| | |
|---|---|
| Wife | Sister |
| Husband | Grandparent |
| Mother | Grandchildren |
| Father | Mother- in- law |
| Children | Father-in-law |
| Brother | |

 Any relative not included in above list shall be negotiable up to two- (2) day's leave including
the day of the funeral.

ARTICLE 11 - WEEKEND DUTY

A.) Weekend duty shall be govemed by the Water Commissioners Policy as outlined in Weekend Duty
and Standby Policy.
B.). Employees covered by this Agreement shall be paid at a rate of time and one half (1 1/2) for the
following:
 1-1/2 hours Stations duty -Saturday morning
 1-1/2 hours Stations duty - Sunday morning

All recall or Emergency overtime calls during the weekend.
C.) Management shall post a revolving schedule listing equitably the employees responsible for
weekend duty.
D.) Weekend standby shall be handled in the same manner as weeknight standby as outlined in
policy.

ARTICLE 18 -MISCELLANEOUS

A.) Examinations: All physical examinations, when required by the Employer and performed under his direction, shall be paid for by the Employer, not to exceed two (2) hours at the employees straight time hourly rate of pay. This applies only to physical examinations required to be performed during the employees off duty time.

B.) Injury on the Job: When an employee is injured on the job, he shall be quaranteed his day's'pay for day injured, provided he is instructed to cease work by the Employer or a physician, as a result of said injury. The employee who is injured on the job shall report his injury as soon as he is able to the Dept.

C.) Dangerous Conditions: Under no circumstances shall an employee be required or assigned to engage in any activity involving dangerous conditions of work or danger to persons of property as determined by the Dept or in violation of any applicable statute or court order, or governmental regulation relating to the safety of persons or equipment.

D.)' Accidents: Any employee involved in any accident shall immediately report said accident and any physical injury sustained to the Dept. The employee, before starting his next shift, shall make out an accident report in,writing, and shall turn in all available names and addresses, of witnesses to any accidents.

E.) Equipment Defects: Employees shall immediately report all defects of equipment. Such reports shall either be made to the Superintendent or in writing with a copy being retained by the employee. The Employer shall not ask or require any employee to take out equipment that has been reported as being and is in fact an unsafe operating condition as determined by the Dept until same has been placed in a safe condition to the satisfaction of The Dept.

F.) Announcements: Announcements shall be posted in a conspicuous place Parties to this Agreement, both of whom may use the bulletin board for notices of routine matters agree that it would be improper to post denunciatory or inflammatory written materials.

G.) Response to Fires: Employees who are members of the Onset Fire Department may respond to alarms or other emergencies and shall continue to receive their respective compensation even though they may not be performing their specific work for the Water Dept. This authorization may be specifically denied by the Dept. if the Dept. has an emergency of its own.

H.) Uniforms: The Department shall supply to its employees, uniforms and safety equipment. This shall include, but not limited to uniform shirts and pants, hard hats, gloves, rain gear and rubber boots. The employer reserves the right to provide other portions of the uniform or specific equipment.

ARTICLE 19 -RE-CALL

Any employee called back to work on the same day after having completed his assigned work and left his place of employment, and before his next regularly scheduled starting time, shall be paid at the rate of time and one half (11/2) for all hours worked on recall. He shall be guaranteed a minimum of one (1) hour pay at time and one half- (1 '/). Any employee so recalled shall remain on call for the full hour without additional pay but need not remain on the job site during the entire period unless there is actual work to be performed. This article excludes recall during weekend duty.

ARTICLE 20 - GRIEVENCE AND ARBITRATION PROCEDURES

A.) A Grievance is a dispute between the parties over the interpretation or application of the terms of this written Agreement and shall be handled in accordance with the following grievance procedure:

STEP 1: The Assoc. submits, in      ting, its grievance to the Water Dept. Superintendent within five (5) days after
the grievance arises. The Superintendent has five- (5) days, (exclusive of weekends and holidays), to act upon
same.

STEP 2:  Within Five (5) days (exclusive of weekends and holidays), of transmittal of an answer by the
Superintendent, either party may request that the grievance be presented to the Board of Water Commissioners
which has fifteen (15) days to act upon same.

STEP 3: If in the event of failure of the parties to settle the grievance under Steps 1 & 2, either party may request mediation by the State Board of Conciliation and Arbitration which may meet with the parties to attempt to settle
the grievance. Notice to the other party and to the Board of Conciliation and Arbitration to be within ten (10) days
of action taken Under Step 2.

STEP 4: If no settlement is reached within ten (10) days after the grievance is submitted to mediation; the matter
may go to arbitration in the following manner upon,assent of both parties in writing:
a.)   The Assoc. shall designate one person. b.) The Water Dept. shall designate one person.
c.) A third disinterested party shall be designated upon by the representative's of the Assoc.
and the Dept d.) In the event that the representatives from the Assoc. and the Dept cannot
afire: upon a third arbitrator within ten (10) days, then the parties agree to request the -Mass.
Board of Conciliation and Arbitration to select an arbitration from the panel maintained by
the Board the decision of these arbitrators shall be final and binding. e.) Costs of arbitration,
including fees of arbitrators, costs of records and incidental expenses shall be borne by the
pam7 found at fault. Each parry shall be responsible for all costs of preparation, presentation,
and appeal, if any, of its won case.

STEP 5: The Dept. has a grievance, either the Board of Water Commissioners or the
Superintendent shall notify the Assoc. Steward within five (5) days, who shall meet with the
person or Board requesting it, within ten (10) days, thereafter. If said matter is not resolved
within five- (5) days of said meeting, it may, at the discretion of the Dept., be processed
through the appropriate steps as set forth above.

STEP b: Any  grievance not processed by the Assoc. through Steps 1-4 above shall be waived.

ARTICLE 20 CONT:

B.) Grievance Procedure, Notification: The above steps that require notification will be by U.S. Certified mail. Notice to the Superintendent and the Assoc. Steward shall constitute notice to the parties respectfully.

C) No Strike Clause: It shall be a violation of this Agreement for any employee to engage in, induce, or encourage any strike, work stoppage, slowing down or withholding of service as provided by General-Laws: Chapter 15GB, section 9A.

D.) The Board of Water Commissioners reserve the right to act as their own agent at any time, and the words, "Board of Water Commissioners" shall be synonymous with any other representative specified by this Agreement. The Board also reserves the right to specify or allow someone other than the Superintendent to act as its representative where such title appears in this Agreement: The Dept recognizes its duty to notify the Assoc. of its representative, if different from the one noted in this Agreement.


ARTICLE 21 - WAGES

Employees covered by this Agreement shall receive the following:

An increase of pay for the fiscal year beginning July 1, and ending June 30, of an amount determined by the Board of Water Commissioners. .

The Board of Water Commissioners reserves the right to establish and reward outstanding employees with a merit increase or a onetime bonus. Said right will by no means be used to bribe or coerce any employee for any reason, but to extend our gratitude for an excellent performance above and beyond a normal call of duty.

The Board of Water Commissions reserves the right to reopen the wage articles only should the economic conditions of the District warrant doing so.


ARTICLE 22 - DURATION OF AGREEMENT

This Agreement covers the fiscal year beginning July 1, 2003 and ending June 30, 2004, or until it is agreed upon to change such agreement_ It is provided nevertheless that it may be opened upon mutual agreement.

Notwithstanding any provisions of this Agreement, it is hereby agreed as follows:

.4.) That the funds be duly appropriated at a District meeting or assured by the Water Department.

B.) That this Agreement be subject to all applicable rules, regulations and laws of the Federal Government of the United States and the Commonwealth of Massachusetts as well as the By-Laws of the Onset Fire District or the Water Department in existence at any time during the term of this Agreement.

C.) The Employees Agreement is only negotiable between the Onset Water Department employees and the Onset Water Department Board of Water Commissioners.

IN WITNESS THEREOF, the parties hereto have caused these presents to be signed
By their duly authorized representatives on the _____ day of JULU 2003.


FOR THE ASSOCIATION:


**STEWARD**
                    1


**ONSET** WATER DEPARTMENT EMPLOYEES ASSOCIATION
ONSET FIRE DISTRICT
15 SAND POND ROAD
ONSET, MA 02558



FOR THE EMPLOYER:

JOHN COOK-CHAIRMAN


MICH EL SANBOR,CLERK


'LAURENCE BLACKER

BOARD OF WATER COMMISSIONERS
ONSET FIRE DISTRICT
WATER DEPARTMENT
15 SAND POND ROAD
ONSET, MA 02558

COMMONWEALTH OF MASSACHUSETTS
U.S. DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * *
LORI ANN MORAN,               |
        Plaintiff,            |

     vs.                      | Docket No. 95-10033NG
ANDREW DIPASQUA, MICHAEL      |
SANBORN, WILLIAM F. GAY, III, )
and the ONSET FIRE DISTRICT   |

        Defendants.           |
* * * * * * * * * * * * * * * *
```

             The deposition of Andrew Dipasqua,
a witness called on behalf of the Plaintiff,
provisions of Rule 30 of the Massachusetts Rules of
Civil Procedure, before Carmen Branson, Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Margaret A. Ishihara, 86 Church Street, Mattapoisett,
MA  02739, on Thursday, February 16, 2006, commencing
at 10 a.m.

APPEARANCES:
MARGARET A. ISHIHARA, ESQ.
Law Office of Margaret A. Ishihara
86 Church Street
Mattapoisett, MA 02739
(For the Plaintiff)

JOHN J. CLOHERTY, III
Pierce, Davis & Perritano, LLP
Ten Winthrop Square
Boston, MA 02110
(For the Defendant)

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax. 781-335-7911
Leavittreporting@att.net

Hearings # Conferences  s  Legal Proceedings

1          (Agreement marked Exhibit No. 14 for

2     identification.)

3          Q.   Looking at Exhibit No. 14, can you tell us

4     have you seen that before today?

5          A.   Yes.

6          Q.   And can you tell us what it is?

7          A.   It is a Contract or Agreement signed by

8     three previous commissioners for working conditions

9     and working -- outlining the working conditions at

10    the Onset Water Department.

11         Q.   And when did you first see this document

12    that has been marked Exhibit No. 14?

13         A.   I can't remember exactly when.

14         Q.   Was it before the vote to terminate Lori

15    Moran from employment at the Onset Water Department?

16         A.   I can't remember.

17         Q.   I would like to refer you to the second page

18    of that document Article 2, Management Rights. It

19    states in the second sentence of that article, "The

20    employer shall retain the right to issue procedures,

21    rules, and regulations governing the internal conduct

22    of the employees included in the association and

23    subject to all district bylaws, local, state, and

*LEAVITT  REPORTING, INC.*

1     federal laws."   Do you see that?

2          A.   Yes.

3          Q.   And has the employer that is the Onset Water

4     Department issued any such procedures, rules, and

5     regulations governing the internal conduct of the

6     employees included in the association?

7                    MR. CLOHERTY:     Objection.   You can

8     answer.

9          A.   To my knowledge this is the only -- at that

10    time, is the only rules and regulations that I have

11    seen.

12         Q.   So just the document, the agreement itself?

13         A.   Correct.

14         Q.   At some later date were rules and

15    regulations governing the internal conduct of

16    employees issued by the Board of Water Commissioners?

17         A.   Yes.

18         Q.   And when was that?

19         A.   They have joined a union and we have just

20    signed a union contract that is similar to this.

21         Q.   Other than the union contract, have any

22    other procedures, rules, or regulations been issued

23    by the Board of Water Commissioners?

1    Q.    Do you remember generally what was said?

2    A.    I thought drug testing would be a good idea.

3    Q.    Anything else?

4    A.    I don't remember.

5    Q.    Do you remember bringing up William Gay, the

6    superintendent in that conversation with Mary McCoy

7    in that conversation?

8         MR. CLOHERTY:    Objection.

9    A.    I don't remember.

10    Q.    Other than Lori Moran, during the time that

11    you have been a member of the Board of Water

12    Commissioners, has any disciplinary action been taken

13    against any other Onset Water Department employees?

14    A.    Yes.

15    Q.    And when was that?

16    A.    Within the last month.

17    Q.    And which employees were those?

18    A.    The four present employees.

19    Q.    So that would be Kathy Semple, Chris

20    Poirier, Jay Semple, William Gay?

21    A.    Yes.

22    Q.    And what disciplinary action was taken

23    against them?

*LEAVITT REPORTING, INC.*

1      A.   At the present time it is an ongoing

2   situation and I would rather not discuss it until it

3   is resolved.

4      Q.   Let me just go back to the recommendation

5   that was made to William Gay relative to his not

6   operating certain pieces of equipment and letting the

7   other two guys do that. Is there any end date to

8   that recommendation?

9               MR.  CLOHERTY:    Objection.

10      A.   Any?

11      Q.   End date?

12      A.   Not that I recall.

13      Q.   Other than the ongoing situation, recent

14   situation that you just described, has there ever

15   been any other disciplinary action taken against

16   other water department employees other than Lori

17   Moran and the disciplinary action that occurred

18   recently?

19      A.   Other than my term, I couldn't tell what

20   went on before.

21      Q.   But during your term has there been anything

22   else?

23      A.   No.

*LEAVITT REPORTING, INC.*

# ORIGINAL

EXHIBIT

AGREEMENT

This Agreement, entered into by and between the Onset Fire District, Water Department, hereinafter referred to as the "Employer", and the Onset Water Department Employee's Association, hereinafter referred to as the "Employee's Association", has as its purpose, the promotion of harmonious relations between the Employer and the Employee's Association, the establishment of an equitable and peaceful procedure for the resolution of differences, and the establishment of rates of pay, hours of work, and other conditions of employment.

## ARTICLE 1 - RECOGNITION

A.) This agreement relates to and covers all permanent, full-time employees of the Water Department, including the following:

 1) Equipment Operators
 2) **Skilled** Laborers
 3) Laborers
 4) Clerical Employees
    The Superintendent
 6) The Business Manager
 7) The-Foreman

B.) The Employer recognizes the Employee's Assoc. as the sole and exclusive representative for all of, its present and future permanent, full-time employees covered by this agreement, now engaged, governing hours of labor, wages, and rates of pay, and other conditions of employment.

C.) The Employer shall not enter into any agreement or contract with it's employees, individually or with any officer or representative of the Employee l s Assoc., Which in any way conflicts with the terms and provisions of this Agreement. Any such agreement or contract shall be considered null and void.

D. i Organizational Activities: Except where prohibited by is agreement, the employees shall have, and be protected in the exercise of, the right to act as Association representatives, to engage in Assoc. activities for the purpose of collective bargaining. In the exercise of such rights, the employees shall be free from any and all interference, restraint, or coercion and from any discrimination in regard to tenure, promotion, or other conditions of employment. The Association agrees that it shall represent the interest of all employees without discrimination and without regard as to whether an employee is a member of the Association.

ARTICLE 2 - MANAGEMENT RIGHTS

Except as modified by this Agreement, the rights of the Employer shall be respected at all times and the provisions of this Agreement shall be observed for the orderly settlement of all questions: The Employer shall retain the right to issue procedures, rules and regulations governing the internal conduct of the employees included in the Assoc. and subject to all District By-Laws, Local, State and Federal Laws.

The Employer also retains the right to take whatever action is necessary to insure the protection, health, welfare, and safety of the District generally or citizens individually.

ARTICLE 3 - STEWARD

The duly elected or appointed Steward may use reasonable time during his normal working hours to investigate and present legitimate grievances in accordance with the provisions of this Agreement.

The Steward has no authority to take strike action or any other action interrupting the Onset Fire District Water Dept. operations.

The Steward shall be placed on the seniority list as number one employee until such time as he is replaced for any reason, when he will be returned to his original position on the seniority list.

ARTICLE 4 - ASSOCIATION SECURITY

All present permanent, full-time employees covered by this Agreement as a condition of employment shall become and remain members of the. Employee's Association in good standing, on and after the thirty-first (31 st) day following the signing of this Agreement. All future permanent, full-time employees covered by this Agreement shall be required to become Assoc. members or pay their commensurate costs of collective bargaining on or after the thirty-first (31st) day following their date of employment. The failure of an employee to comply with this requirement will result in the employees' dismissal within thirty (30) days after receipt of written notice to the Employer and the Association.

ARTICLE -5 - SENIORITY & PROMOTIONS

The length of service in the Onset Fire District Water Department of the permanent full-time employees shall determine seniority. Length of service shall be the total accumulated uninterrupted service with the Water Dept. Seniority rights accrued to an employee under this article shall be lost in the event of a break in his continuous service caused by one of the following:

<u>CONT. ART. 5:</u>

1)    Voluntary resignation,
2)    Absence from work for three (3) consecutive days without notice to the Employer.
3)    Failure to return to work three (3) days after the expiration of any Leave of Absence.
4)    Failure to return to work within three (3) days after a registered or certified letter is mailed to the employee at his last known mailing address requesting the employee's return to work. Employees must notify the Employer of his intent to return to work upon receipt of said notice of recall.

   The principle of seniority shall govern and control in most cases of promotion within the bargaining unit, transfer, decrease of the working force as well as preference of vacation periods.

   A seniority list showing the status of each employee must be posted in a place accessible to the employees. The Assoc. may request, from time to time, a copy of such a list.

## ARTICLE 6 - JOB BEDDING AND POSTING

   Any job opening covered by this Agreement shall be filled by employees in order of their seniority, provided an employee has the ability and necessary qualifications to perform the work required. If in the Employer's opinion, there is no applicant employee with the necessary qualifications to perform the required work, the Employer may fill the vacancy from outside the bargaining unit.

   Job opening shall be posted for a period of five (5) days. All employees shall have an opportunity to apply for promotion. However, until said position is filled, in accordance with the above procedure; the Employer shall have the right to temporarily fill the position as he sees fit.

   Any employee bidding for such job maybe allowed a thirty- (30) day period to see if he is qualified. After the thirty (30) day period, or if in the opinion of the Employer the employee has not performed satisfactorily, he shall be returned to his former position.

## ARTICLE 7 - HOURS OF WORK

A)    The regular workweek for permanent frill-time employees shall be forty (40) hours for the labor force and forty (40) hours for the clerical staff, respectively. The regular workday for permanent full time employees working a regular workweek shall be eight (8) hours for the labor force and eight (8) for the clerical staff, respectively. The regular worlt-week shall consist of five (5) regular days.

B}    All hours worked in excess of forty (40) for the labor force and  forty (40) for the clerical staff in any regular workweek shall be paid at the rate of time and one half (1 ', ~) the employee's regular straight time hourly rate of pay.

ARTICLE 7 CONT:

Employees shall work overtime, when requested, without advance notice should an-
emergency arise. If an emergency does not exist, an employee shall work. overt' me when
required as long as reasonable notice is given when possible. The Superintendent or other
officers of the District shall have the right to determine an.emergency.

D.)  Rest Periods: Employees shall be allowed fifteen (15) minute rest periods during each on
half shift, on the job site.

E.)  Lunch Periods: Employees shall be granted a meal period of one half (1/2) hour duration
during the fourth and fifth hour of the work shift. If however, work conditions do not permit a
meal period, employees may be granted an additional fifteen (15) minute rest period during
the remainder the workday. Employees who are requested to and work beyond their usual
shift shall be granted a reasonable time off, not to exceed one half (1/2) hour, to eat with pay,
when said work shift is extended at least two hours beyond their normal work day.

ARTICLE 8 - VIILITARY CLAUSE

Employees entering into or enlisting in the military or naval service of the United States,
pursuant to the provisions of the Selective Service Act of 1948, shall be granted all rights and privileges
provided by the Act.

ARTICLE 9 - LEAVE OF ABSENCE

Leave of absence, without pay, may be granted upon written request and at the discretion of the Water
Depamnent.
If a holiday falls within the leave of absence period, this holiday will not be considered a paid holiday.

ARTICLE 10 - GROUP INSURANCE PLAN

The Employer shall continue for the duration of this Agreement to provide a group insurance
plan on substantially the same basis as present. The Employer shall not itself operate the plan but
the insurance company or companies shall administer the benefits, which shall be subject to such
conditions and limitations as are provided by the Law and in the applicable insurance policies or
contracts. The premiums for such plan shall be paid, at least ninety-nine (99%) percent, by the
Dept.. Any claim or disputes concerning eligibility for or payment of benefits under this Article
shall be determined in accordance with the applicable insurance policies or contracts and shall not
be subject to grievance or arbitration procedures herein.

ARTICLE 10 cont.:

The Employer shall provide a Dental Plan to members of the Assoc., similar to that provided by the Dept. at present. This Plan shall be provided in the same manner as the Group Insurance Plan.

Permanent full-time employees shall receive improved benefits or coverage, which may be adopted by the Water Dept. during the life of this Agreement.

ARTICLE 11 -Holidavs

A.) All permanent full-time employees covered by this Agreement who are regularly employed shall receive the following paid holidays:

New Years Day
Martin Luther King Day
Presidents Day
Patriot's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran Day
Thanksgiving Day
Christmas Day

B.) All permanent full-time employees covered by this Agreement who are regularly employed shall receive a paid half (1/2) holiday for the day before, Thanksgiving, Christmas and the day after. New Years shall be a (1/2) day before and New Years Day.

C.) Any employee covered by this Agreement. who is required to work on a holiday shall receive in addition to the regular holiday pay, an amount equal to time and one half (1 ') the regular rate of pay for all hours worked, but in no case shall be less than an amount equal to one (1) hour working at the rate at the rate above. Any employee called to work on a holiday shall remain on call for the full one (1) hour without additional pay but need not remain on the job site during the entire period unless there is actual work to be performed.

D.) If a paid holiday falls during the work week, the overtime premium of time and one half (1 '/z) shall apply to all hours worked in excess of thirty-two (32) hours.

E.) If a paid holiday falls during a weekend, the day off shall be taken either on the Friday proceeding the Saturday holiday or the Monday following the Sunday holiday.

ARTICLE 12 - VACATIONS

The vacation policy for employees of the Water Dept. shall be as follows: Those with service of at least: Shall be granted vacation and pay at the flat rate and classification of.

| | |
|---|---|
| *1 Year* | *2 Weeks* |
| J Years | 3 Weeks |
| 10 Years | 4 Weeks |

ARTICLE 12- CONT.:

A.) Employees vacation time shall be determined by their Anniversary date or years of service. -

B.) In calculating vacation benefits, an employee who starts work, (or terminates) on or before the 15th of the month, shall be considered to have started work, (or terminated) on the first of the month. An employee who starts work, (or terminates) after the 15th of the month, shall be considered to have started work, (or terminated) on the first day of the following month.

C.) Granted vacation shall be accrued monthly for all employees covered by this Agreement,

D.) Employees shall be allowed to carry over only one year's accrued vacation time. All other vacation shall be used or forfeited.

E.) In recognition of their long service to the Water Dept. all employees shall be granted an additional day each year beginning with their fifteenth (15). Anniversary with a total accrued not exceeding thirty (30) working days.

F.) Terminating employees who have met the minimum vacation eligibility requirements shall be paid for all unused accrued vacation.

## ARTICLE 13 - PERSONAL DAYS

Each employee covered by this Agreement shall receive three (3) personal days to be used as they may per year.

## ARTICLE 14 - SICK LEAVE

Employees of the Water Dept. shall be provided the following sick leave plan:

Earned sick leave with pay shall accrue at the rate of one and one-quarter (1 ',%) days per month. Any sick leave time is earned only by the days worked. Consequently an employee can not accrue sick leave while he is on sick leave. Unused sick leave in excess of sixty (60) days cannot be accumulated from year to year. An employee's total accumulated sick time may exceed sixty (60) days at the end of that year. Employees shall be paid a bonus equal to one half (1/2) of the unused sick time so forfeited. This bonus shall be paid at the rate of pay as of June 30th. In order to qualify for the bonus, the employee must be employed with the Water Dept. on the last day of the fiscal year. An employee who retires shall, at the time of his retirement, be paid a bonus equal to all unused accumulated sick leave. Paid sick leave shall never be available except to cover actual absence from work due to illness. Sick leave must be authorized by the Dept. If an employee is absent by reason of injury sustained while on duty for which he is entitled to, receive Workmen's Compensation, such absence shall not be considered sick leave under this plan. However, if an employee injured while on duty and not entitled to Workmen's Compensation, he shall be paid his regular wages, if approved by the Board and such absence shall be considered sick leave.

ARTICLE 15 - LONGEVITY

Employees covered by this Agreement shall be granted longevity payments as follows:

After the completion of.

| | |
|---|---|
| 5  Years of service | $75.00 |
| 1OYears of service | $ 100.00 |
| 15 Years of service | $200.00 |
| 20 Years of service | $ 300.00 |
| 25 Years of service | $400.00 |

The Anniversary date shall be used to determine eligibility for payments prior to
December 31st, of each calendar year. Longevity payments shall be paid on the first payday in December-

-ARTICLE ARTICLE 16 - FUNERAL LEAVE

Emergency leave without loss of pay up to four (4) consecutive calendar days, but not to exceed beyond
the day of the funeral, provided the employee actually attends the funeral of said deceased, may be allowed
for a death in an employees family. The employee family shall include:

| | |
|---|---|
| Wife | Sister |
| Husband | Grandparent |
| Mother | Grandchildren |
| Father | Mother- in- law |
| Children | Father-in-law |
| Brother | |

 Any relative not included in above list shall be negotiable up to two- (?) day's leave including
the day of the funeral.

ARTICLE 1 1 - WEEKEND DUTY

A.) Weekend duty shall be governed by the Water Commissioners Policy as outlined in Weekend Duty
and Standby Policy.
B.). Employees covered by this Agreement shall be paid at a rate of time and one half (1 1/2) for the
following:
 1-l/2 hours Stations duty -Saturday morning
 1-1/2 hours Stations duty - Sunday morning

All recall or Emergency overtime calls during the weekend.
C.) Management shall post a revolving schedule listing equitably the employees responsible for
weekend duty.
D.) Weekend standby shall be handled in the same manner as weeknight standby as outlined in
policy.

ARTICLE 18 -MISCELLANEOUS

A.) Examinations: All physical examinations, when required by the Employer and performed under his direction, shall be paid for by the Employer, not to exceed two (2) hours at the employees straight time hourly rate of pay. This applies only to physical examinations required to be performed during the employees off duty time.

B.) Injury on the Job: When an employee is injured on the job, he shall be quaranteed his day's'pay for day injured, provided he is instructed to cease work by the Employer or a physician, as a result of said injury. The employee who is injured on the job shall report his injury as soon as he is able to the Dept.

C) Dangerous Conditions: Under no circumstances shall an employee be required or assigned to engage in any activity involving dangerous conditions of work or danger to persons or property as determined by the Dept or in violation of any applicable statute or court order, or governmental regulation relating to the safety of persons or equipment.

D.) Accidents: Any employee involved in any accident shall immediately report said accident and any physical injury sustained to the Dept. The employee, before starting his next shift, shall make out an accident report in writing, and shall turn in all available names and addresses_ of witnesses to any accidents.

E.) Equipment Defects: Employees shall immediately report all defects of equipment. Such reports shall either be made to the Superintendent or in writing with a copy being retained by the employee. The Employer shall not ask or require any employee to take out equipment that has been reported as being and is in fact in an unsafe operating condition as determined by the Dept until same has been placed in a safe condition to the satisfaction of The Dept.

F.) Announcements: Announcements shall be posted in a conspicuous place Parties to this Agreement, both of whom may use the bulletin board for notices of routine matters agree that it would be improper to post denunciatory or inflammatory written materials.

G.) Response to Fires: Employees who are members of the Onset Fire Department may respond to alarms or other emergencies and shall continue to receive their respective compensation even though they may not be performing their specific work for the Water Dept. This authorization may be specifically denied by the Dept. if the Dept. has an emergency of its own.

H.) Uniforms: The Department shall supply to its employees, uniforms and safety equipment. This shall include, but not limited to uniform shirts and pants, hard hats, gloves, rain gear and rubber boots. The employer reserves the right to provide other portions of the uniform or specific equipment.


ARTICLE 19 -RE-CALL

Any employee called back to work on the same day after having completed his assigned work and left his place of employment, and before his next regularly scheduled starting time, shall be paid at the rate of time and one half (11/2) for all hours worked on recall. He shall be guaranteed a minimum of one (1) hour pay at time and one half- (1 '/z). Any employee so recalled shall remain on call for the fall hour without additional pay but need not remain on the job site during the entire period unless there is actual work to be performed. This article excludes recall during weekend duty.

ARTICLE 20 - GRIEVENCE AND ARBITRATION PROCEDURES

A.) A Grievance is a dispute between the parties over the interpretation or application of the terms of this written Agreement and shall be handled in accordance with the following grievance procedure:

STEP 1: The Assoc. submits, in writing, its grievance to the Water Dept. Superintendent within five (5) days after
the grievance arises. The Superintendent has five- (5) days, (exclusive of weekends and holidays), to act upon
same.

STEP 2:  Within Five (5) days (exclusive of weekends and holidays), of transmittal of an answer by the
Superintendent, either party may request that the grievance be presented to the Board of Water Commissioners
which has **fifteen** (15) days to act upon same.

STEP 3 : If in the event of failure of the parties to settle the grievance under Steps 1 & 2, either party may request mediation by the State Board of Conciliation and Arbitration which may meet with the parties to attempt to settle
the grievance. Notice to the other party and to the Board of Conciliation and Arbitration to be within ten (10) days
of action taken Under Step 2.

STEP 4: If no settlement is reached within ten (10) days after the grievance is submitted to mediation; the matter
may go to arbitration in the following manner upon,assent of both parties in writing:
a.)   The Assoc. shall designate one person. b.) The Water Dept. shall designate one person. c.) A third disinterested party shall be designated upon by the representative's of the Assoc. and the Dept d.) In the event that the representatives from the Assoc. and the Dept cannot agree upon a third arbitrator within ten (10) days, then the parties agree to request the Mass. Board of Conciliation and Arbitration to select an arbitration from the panel maintained by the Board the decision of these arbitrators shall be final and binding. e.) Costs of arbitration, including fees of arbitrators, costs of records and incidental expenses shall be borne by the party found at fault. Each party shall be responsible for all costs of preparation, presentation, and appeal, if any, of its won case.

STEP 5: The Dept. has a grievance, either the Board of Water Commissioners or the Superintendent shall notify the Assoc. Steward within five (5) days, who shall meet with the person or Board requesting it, within ten (10) days, thereafter. If said matter is not resolved within five- (5) days of said meeting, it may, at the discretion of the Dept., be processed through the appropriate steps as set forth above.

STEP 6: Any  grievance not processed by the Assoc. through Steps 1-4 above shall be waived.

ARTICLE 20 CONT:

B.) **Grievance Procedure, Notification: The above steps that require notification will be by U.S. Certified mail. Notice to the Superintendent and the Assoc. Steward shall constitute notice to the parties respectfully.**

**C.) No Strike Clause: It shall be a violation of this Agreement for any employee to engage in, induce, or encourage any strike, work stoppage, slowing down or withholding of service as provided by General-Laws: Chapter 15GB, section** 9A.

D.) **The Board of Water Commissioners reserve the right to act as their own agent at any time, and the words, "Board of Water Commissioners" shall be synonymous with any other representative specified by this Agreement. The Board also reserves the right to specify or allow someone other than the Superintendent to act as its representative where such title appears in this Agreement: The Dept recognizes its duty to notify the Assoc. of its representative, if different from the one noted in this Agreement.**

ARTICLE 21 - WAGES

**Employees covered by this Agreement shall receive the following:**

    An **increase of pay for the fiscal year beginning July 1, and ending June 30, of an amount determined by the Board of Water Commissioners. .**

    **The Board of Water Commissioners reserves the right to establish and reward outstanding employees with a merit increase or a onetime bonus. Said right will by no means be used to bribe or coerce any employee for any reason, but to extend our gratitude for an excellent performance above and beyond a normal call of duty.**

    **The Board of Water Commissions reserves the right to reopen the wage articles only should the economic conditions of the District warrant doing so.**

**ARTICLE 22 - DURATION OF AGREEMENT**

    **This Agreement covers the fiscal year beginning July 1, 2003 and ending June 30, 2004, or until it is agreed upon to change such agreement. It is provided nevertheless that it may be opened upon mutual agreement.**

 **Notwithstanding any provisions of this Agreement, it is hereby agreed as follows:**

A.) **That the funds be duly appropriated at a District meeting or assured by the Water Department.**

**B.) That this Agreement be subject to all applicable rules, regulations and laws of the Federal Government of the United States and the Commonwealth of Massachusetts as well as the By-Laws of the Onset Fire District or the Water Department in existence at any time during the term of this Agreement.**

**C.) The Employees Agreement is only negotiable between the Onset Water Department employees and the Onset Water Department Board of Water Commissioners.**

IN WITNESS THEREOF, the parties hereto have caused these presents to be signed
By their duly authorized representatives on the ⸏ ☐☐ day of ⸏ ⸏, 2003.


FOR THE ASSOCIATION:


STEWARD _Kathi Semple_


ONSET WATER DEPARTMENT EMPLOYEES ASSOCIATION
ONSET FIRE DISTRICT
15 SAND POND ROAD
ONSET, MA 02558



FOR THE EMPLOYER:

JOHN COOK-CHAIRMAN

MICHAEL SANBORN-CLERK

LAURENCE BLACKER


BOARD OF WATER COMMISSIONERS
ONSET FIRE DISTRICT
WATER DEPARTMENT
15 SAND POND ROAD
ONSET, MA 02558

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


LORI-ANN MORAN,
                Plaintiff

                                     CIVIL ACTION
                VS                   NO. 05-10033NG


ANDREW DIPASQUA, MICHAEL
SANBORN, WILLIAM F. GAY,
III, AND THE ONSET FIRE
DISTRICT,
                Defendants

sYsYsrirsYsrsr3r~riririrsrsY~r4rs:   :: :: ::s;4;s:o;Xscsrstsrsr~'r



            DEPOSITION OF MARY E. MCCOY, taken on behalf
of the plaintiff pursuant to the Massachusetts Rules of Civil
Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand
Reporter and Notary Public in and for the Commonwealth of
Massachusetts at the offices of Margaret A. Ishihara, Esq.,
86 Church Street, Mattapoisett, Massachusetts, on Wednesday,
January 25, 2006, commencing at 9:57 a.m.


APPEARANCES:

MARGARET A. ISHIHARA, ESQ., 86 Church street, Mattapoisett,
MA 02739, For the plaintiff

JOHN J. CLOHERTY, III, ESQ., Pierce, Davis & Perritano, LLP,
Ten Winthrop Square, Boston, MA 02110-1257, For the defendant

ALSO PRESENT:

Lori-Ann Moran

## *Leavitt Rebortin , Inc.*

1207 *Commercial Street, Rear*            *Tel.* 781-335-6791
*Weymouth, MA* 02189                      *Fax:* 781-335-7911
                                          *leavittreporting@att.net*

*Hearings # Conferences # Legal Proceedings*

24

1    Q.   was it before the, so it was before the meeting at

2   which a vote was taken to terminate Lori Moran from

3   employment?

4    A.   Before that meeting.

5    Q.   And Kathi Semple was also present?

6    A.   At the particular meeting that I'm talking about,

7   yes.

8    Q.   so at the meeting in which there was some

9   discussion about Mr. Gay's performance, Kathi semple was

10   there?

11    A.   All the employees were there.

12    Q.   And Kathi Semple at the time was the office manager

13   for the water Department, is that right?

14    A.   I'm not sure if that was her title at the time.

15    Q.   But she was employed at the water Department?

16    A.   Yes.

17    Q.   Do you recall any statement made by Kathi Semple at

18   this meeting at which Mr. Gay's performance was being

19   discussed, statement or statements?

20    A.   I don't recall exactly what she -- could you ask

21   that question again please?

22    Q.   Do you recall Kathi semple making any statement or

23   statements at this meeting at which Mr. Gay's performance

25

1    was being discussed?

2         A.   There was -- I can't recall exactly what she said,

3    but I believe there was a comment made to Lori Moran that

4    if she needed help, exactly what the words were, if you

5    need help, don't call me. And what she made a comment to

6    Mr. Gay's performance I can't remember exactly, but I

7    believe there were some comments as far as what his

8    performance was, and that's why I spoke up and said this is

9    not a place to discuss openly Mr. Gay's performance.

10        Q.   So in addition to making the statement to Lori

11   Moran, if she needed help, don't call me, you recall that

12   Kathi Semple was also making some statements about

13   Mr. Gay's performance?

14        A.   Yes.

15        Q.   But you don't recall specifically what she was

16   saying --

17        A.   NO.

18        Q.   -- about Mr. Gay's performance?

19             At the meeting of the Board of water

20   Commissioners at which there was a vote taken to terminate

21   Lori Moran from employment, did you make any statements?

22        A.   I don't recall that.

23        Q.   Do you ever recall making a statement to the effect

Concise Stmt. Ex. #5